USDC SCAN INDEX SHEET

















JRL   7/19/05   15:23

3:04-CV-00676   MCBRIDE V. TITAN CORPORATION

*58*

*AMDCMP.*

# ORIGINAL

1 | LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | REED R. KATHREIN (139304)
JAMES W. OLIVER (215362)
3 | 100 Pine Street, Suite 2600
San Francisco, CA 94111
4 | Telephone: 415/288-4545
415/288-4534 (fax)
5 | – and –
BRIAN O. O'MARA (229737)
6 | 401 B Street, Suite 1600
San Diego, CA 92101
7 | Telephone: 619/231-1058
619/231-7423 (fax)
8 |
ROBBINS UMEDA & FINK, LLP
9 | BRIAN J. ROBBINS (190264)
JEFFREY P. FINK (199291)
10 | CAROLINE A. SCHNURER (206088)
STEVEN R. WEDEKING (235759)
11 | 610 West Ash Street, Suite 1800
San Diego, CA 92101
12 | Telephone: 619/525-3990
619/525-3991 (fax)
13 |
Co-Lead Counsel for the Securities Class
14 |



FILED

JUL 18 2005

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

15 | UNITED STATES DISTRICT COURT

16 | SOUTHERN DISTRICT OF CALIFORNIA

17 |
18 | ISRAEL SHURKIN and PAUL BERGER,
On Behalf of Themselves and All Others
19 | Similarly Situated,
20 | Plaintiffs,
vs.
21 | THE TITAN CORPORATION, GENE W.
RAY, MARK W. SOPP, ERIC M.
22 | DeMARCO, DEANNA LUND, MICHAEL B.
ALEXANDER, CHARLES R. ALLEN,
23 | EDWARD H. BERSOFF, JOSEPH F.
CALIGIURI, PETER A. COHEN, DANIEL J.
24 | FINK, SUSAN GOLDING, ROBERT M.
HANISEE, ROBERT E. LaBLANC,
25 | THOMAS G. POWNALL, GEORGE A.
ROBINSON, JAMES E. ROTH, JOSEPH R.
26 | WRIGHT, JR., PHILIP J. DeVERA,
27 | Defendants.
28 |

Master File No. 04-CV-0676-LAB(NLS)

(Consolidated with 04-CV-0701-K(NLS))

<u>CLASS ACTION</u>

FIRST AMENDED CONSOLIDATED
COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS AND FOR
BREACHES OF FIDUCIARY DUTY

<u>DEMAND FOR JURY TRIAL</u>



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In re TITAN, INC. SECURITIES LITIGATION

)
)
)

This Document Relates To:

)
)
)

ALL ACTIONS.

)
)
)

**TABLE OF CONTENTS**

Page

I.   SUMMARY OF THE FRAUD ..................................................................................1

    A.   Admissions by Titan as Part of the Department of Justice Plea Agreement ..........1

    B.   The Impact of Titan's Illegal Activity on Stock Purchasers....................................3

II.  JURISDICTION AND VENUE .............................................................................9

III. THE PARTIES...........................................................................................................10

IV.  BACKGROUND TO THE CLASS PERIOD ......................................................15

    A.   General.......................................................................................................................15

    B.   The FCPA and DOJ Guidance...............................................................................15

        1.   General Background .......................................................................................15

        2.   Antibribery Provisions of the FCPA..........................................................17

        3.   Sanctions for Violating the Antibribery Provisions of the FCPA..............19

    C.   Defendants' Knowledge of the FCPA and Statements to the Investment
        Community About Compliance ..............................................................................20

    D.   Defendants Knowingly Violated the FCPA, Titan's Code of Ethics, the
        Books and Records Provisions of the Securities Laws and the U.S. Internal
        Revenue Code ..........................................................................................................25

        1.   Titan Has Pled Guilty to Criminal Violations of the FCPA
            Provisions, Securities Laws Books and Records Provisions, and
            U.S. Internal Revenue Code Brought by the DOJ ....................................25

        2.   In February 2004, the Press Began to Report Possible Bribery by
            Titan ..............................................................................................................27

        3.   Titan's Plea Agreement, the SEC Complaint and Documentary
            Evidence Obtained by Counsel Have Established the Following
            Facts Regarding Titan's Illegal Activity in Benin ....................................30

            a.   Background of the Benin Project....................................................30

            b.   Defendants Considered Customs Exoneration for the BCT
                Contract a Requirement to Prevent Titan's Shares from
                "Plummeting" on the New York Stock Exchange............................32

            c.   Defendants' Bribery of Beninese Officials....................................33

                (1)   Defendants' Bribery of Karim Amadou .............................33

04-CV-0676-LAB(NLS)

**Page**

        (2)     "Social Payments" Made by Titan to Illegally Fund the Beninese Presidential Campaign...................................38

        (3)     Payments to Minister Severin Adjovi, Brother Edmund Adjovi, and Daughter Chantal Adjovi................42

            (i)    Payments to Severin's Brother, Edmund Adjovi .........................................................43

            (ii)   Payments to Severin's Daughter, Chantal Adjovi .........................................................46

        (4)     Bribes to the Corporate Council on Africa (Afrique Conseil)...........................................................47

4.     The Bribery Pays off with Customs Exoneration and Illusory Agreements to Inflate Reported Revenue ...................................47

5.     Titan Secure – Saudi Arabia and FAA Contract.........................52

6.     Admissions Made by Titan with Regard to Internal Accounting Controls...................................................................................52

    a.    Titan Secure's Operations and National I.D. Card Project in Saudi Arabia.................................................................57

        (1)     The Saudi Ministry of the Interior Was Gifted a $5 Million Supercomputer ...........................................57

        (2)     Titan Hired a Private Consulting Company Owned by the Saudi Minister of the Interior to Get Awarded the Project.............................................58

        (3)     Titan Improperly Recognized Revenue for Titan Secure in Saudi Arabia and Failed to Timely Write down the Value of the Associated Assets........................59

    b.    Titan Secure Inappropriately Recognized Revenue and Failed to Reserve for Uncollectible Accounts Receivable and Write down Impaired Assets of Its FAA Contract................60

7.     Datron World Communications Division – Far East/Asia .......................61

    a.    Improper and Illegal Payments .........................................62

    b.    Improper Recognition of Revenue...............................63

8.     Other Indications of Bribery in France, Japan, Nepal, Bangladesh and Sri Lanka ............................................................63

Page

E.    Alive Pre-Class Period Statements Made False and/or Misleading by Defendants' Conduct ........................................................................................64

V.    DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT ..............68

A.    Defendants Position Titan for Acquisition .......................................................68

B.    Defendants Issue False Financials and Guidance and Omit Violations of the FCPA and GAAP ........................................................................................70

C.    Defendants Negotiate a Merger with Lockheed ...............................................73

D.    Defendants Announce the Merger Agreement with Lockheed Without Disclosing the FCPA and GAAP Violations ....................................................80

E.    Titan Continues to Issue False Financials and Omits Impact of Violations of the FCPA and GAAP ...................................................................................81

F.    Titan Reveals Investigations into Possible Violations of the FCPA, but Denies the Veracity of the Allegations ..............................................................82

G.    Titan's 2003 Form 10-K Contained Numerous False and Misleading Statements ........................................................................................................86

H.    Titan Issues Further False or Misleading Financials for 1Q04 and Omits Impact of Violations of the FCPA and GAAP..................................................90

I.    The Merger Crumbles as Titan Fails to Resolve the Investigations .....................91

J.    Post-Securities Class Period Revelations About Titan .........................................95

K.    Basis that Statements Were False or Contained Material Omissions ...................99

L.    Defendants' Conduct Violated GAAP and SEC Rules and Regulations............100

    1.    Inadequate Disclosure in Titan's SEC Filings.........................................100

        a.    Inadequate Disclosure in Titan's Management's Discussion and Analysis Section of the Form 10-K.......................................100

        b.    Inadequate Footnote Disclosure...................................................101

    2.    Titan's Bribes and Resulting Revenue Were Material ...........................101

    3.    Titan Inappropriately Inflated Revenue and Accounts Receivables........102

    4.    Defendants Failed to Write off Impaired Assets......................................104

    5.    False Tax Return ...................................................................................104

VI.    SCIENTER ................................................................................................................106

|   |   |   | Page |
|---|---|---|------|
| A. | | Titan Has Admitted that It Had Actual Knowledge of the Falsity of Its Statements to the Public | 106 |
| B. | | Motive Caused by the Need for Cash if Titan Were to Continue to Grow by Acquisition | 106 |
| C. | | Facts Regarding Each of the Individual Securities Defendants Support a Strong Inference of Scienter | 108 |
| | 1. | Gene W. Ray | 108 |
| | 2. | Mark W. Sopp | 114 |
| | 3. | Deanna Hom Lund (Petersen) | 116 |
| | 4. | Eric M. DeMarco | 117 |
| D. | | Admission of Scienter by Titan Director | 121 |
| VII. | CLASS ACTION ALLEGATIONS | | 122 |
| VIII. | PRAYER FOR RELIEF | | 126 |
| IX. | JURY DEMAND | | 127 |

## I.   SUMMARY OF THE FRAUD

1.   This is a federal securities fraud class action arising out of defendants' scheme and wrongful course of business, which involved defendants' use of bribes and illegal payments to win contracts with foreign governments, and ultimately generated artificially inflated revenue and profits. This action is brought by the lead plaintiff on behalf of investors who purchased the common stock of The Titan Corporation ("Titan" or the "Company") at artificially inflated prices between July 24, 2003 and June 25, 2004, inclusive (the "Class Period") ("Securities Class" or "Securities Claimants"). Defendants are Titan and certain of the Company's key officers and directors. This class action also alleges breaches of fiduciary duty by certain officers and directors of Titan that is brought on behalf of all persons who held the common stock of Titan at any time from August 3, 1999 through and including July 23, 2003, and who continued to hold that stock on June 26, 2004 ("Holder Class" or "Holder Claimants").

2.   Titan is a technology provider for the Department of Defense (the "DOD"), the Department of Homeland Security, and intelligence and other key U.S. and foreign government agencies. The Company was founded in 1981 by its current Chairman and Chief Executive Officer ("CEO"), Gene W. Ray. The Company provides a range of services and products across the globe.

3.   By the beginning of the Class Period, Titan was achieving record earnings by engaging in illegal and/or impermissible practices by secretly paying kickbacks in the form of "consulting fees" to those foreign government officials in connection with Titan's sale of products to those foreign governments. As the defendants were announcing record revenue and earnings growth during the Class Period, portions of which were derived by sales obtained through these illegal means, defendants knew or were reckless in not knowing that their illegal practices would be discovered and that Titan would be penalized with fines and potential loss of business with the U.S. government.

### A.   Admissions by Titan as Part of the Department of Justice Plea Agreement

4.   The core allegations of this Complaint were admitted by Titan on March 1, 2005 in the U.S. Department of Justice ("DOJ") Plea Agreement entered into by Titan in *United States v.*

1   *Titan Corp.*, Case No. 05CR0314-BEN (S.D. Cal. Mar. 1, 2005) (the "DOJ Plea Agreement"). The

2   DOJ Plea Agreement settles the DOJ's criminal investigation and the Securities and Exchange

3   Commission's ("SEC") civil investigation by having Titan plead guilty to violations of the Foreign

4   Corrupt Practices Act of 1977 ("FCPA"), stemming from Titan's unlawful payments to Beninese

5   officials for the purpose of obtaining and retaining business. Titan has also pled guilty to falsifying

6   Titan's books and records in violation of federal securities laws, and to filing false or fraudulent tax

7   returns. As part of the DOJ Plea Agreement and subsequent settlement with the SEC, Titan was

8   required to pay a nearly $30 million fine, the largest FCPA fine in history, topping Lockheed Martin

9   Corporation's ("Lockheed") fine of $24.8 million in 1995. The instant Complaint expands upon

10   Titan's admissions in the criminal DOJ Plea Agreement by providing additional details of fraudulent

11   and illegal activities evidenced in documents obtained by plaintiffs, and by demonstrating how

12   purchasers of Titan's stock were harmed by Titan's actions.

13        5.     As is documented in the DOJ Plea Agreement, Titan has admitted to paying millions

14   of dollars to the business advisor to the president of the African country of Benin, primarily for the

15   purpose of obtaining and retaining business deals in Benin. DOJ Plea Agreement at 9-13. Some of

16   these payments were falsely recorded as "social payments." *Id.* at 9. As admitted by Titan, "[a]t

17   least a portion of the 'social payments' that TITAN made through the Benin Agent were funneled to

18   the re-election efforts of the Benin President." *Id.* at 11. Titan has admitted in the DOJ Plea

19   Agreement that there were numerous additional bribes made by Titan to other government officials

20   to secure work in Benin. Titan has also admitted to keeping improper books and records in violation

21   of the securities laws. *See, e.g., id.* at 7-8. Titan has admitted that they acted "corruptly,"

22   "willfully," and "knowingly" in violating these criminal provisions. *Id.* at 4-5.

23        6.     As part of the DOJ Plea Agreement, Titan has agreed to a best practices compliance

24   program designed to detect and deter future violations of the FCPA, a special assessment, factual and

25   legal admissions, a three-year probation, and a total of $13 million in fines. In addition, Titan was

26   forced to agree to an elaborate compliance program. Titan's settlement with the SEC also required

27   further fines of $15.5 million for a total of nearly $30 million in combined SEC and DOJ fines.

28

**B.    The Impact of Titan's Illegal Activity on Stock Purchasers**

7.    The Securities Class action Class Period begins with defendants' July 24, 2003 announcement that Titan's 2Q03 revenues had risen 27% compared to its 2Q02 revenues and Titan was increasing FY03 and FY04 expectations. This announcement caused the Company's stock price to surge 28% in a single trading session, later trading as high as $16 per share, from $11 per share. In the announcement, Titan omitted any reference to the liabilities associated with its FCPA violations, misrepresenting its financial condition and business prospects. As a result of defendants' false statements and undisclosed wrongful conduct, Titan's stock traded at artificially inflated prices throughout the Securities Class action Class Period.

8.    Seeking to be acquired, Titan entered into negotiations with defense contractor, Lockheed. Instead of being honest with the public and Lockheed, with the Company's common stock price inflated, and wanting to sell Titan to "cover their tracks in the sand," defendants attempted to hide the FCPA violations from Lockheed and the public. On September 15, 2003, defendants announced that Lockheed would acquire the outstanding shares of Titan, and would pay consideration valued at $22 per share, comprised of a mix of cash and Lockheed's stock. In connection with the negotiation of this merger, defendants caused Titan to agree to pay them millions of dollars in separation benefits, premature vesting of stock options, retention bonuses and extra bonuses for arranging the merger. The September 15, 2003 news of the proposed acquisition of Titan by Lockheed once again caused the Company's stock price to spike from $17 to $21 per share on extremely high volume. Lockheed was especially sensitive to any issues relating to foreign bribes as Lockheed had been forced to pay the then-record fine of $24.8 million for FCPA violations a few years earlier and could not afford to risk its U.S. government business.

9.    On February 13, 2004, defendants disclosed that Lockheed was delaying consummation of the acquisition until it could investigate possible payments made by Titan to foreign officials. Titan also revealed that the SEC and the DOJ had begun an inquiry into the illegality of the payments and Titan's nondisclosure of these payments. On this news, the price of Titan common stock declined sharply from a February 12, 2004 close of $21.80 to a February 13, 2004 close of $20.49 on heavy volume of over 8.5 million shares. Defendants moderated the impact

-3-                          04-CV-0676-LAB(NLS)

1  of the news by issuing a statement indicating that they had investigated the transactions and falsely

2  denied any wrongdoing, stating that "[n]either Lockheed nor us have found anything wrong." These

3  statements were part of an ongoing effort by defendants to keep Titan's stock price up so they could

4  complete the merger. The actual impact was that these further lies impaired Lockheed's willingness

5  to trust Titan, caused significant damage to the ability of Titan to carry out the merger, and

6  eventually caused significant damage to Titan's reputation with investors when the truth became

7  known.

8          10.    On March 5, 2004, it was disclosed that the DOJ had opened a formal criminal

9  investigation into whether illegal payments were made by Titan in violation of the FCPA, 15 U.S.C.

10  §78dd-1. Lockheed told *The Wall Street Journal* that the allegations of illegal payments, if true,

11  could constitute violations of the FCPA. Both companies indicated that delays occasioned by their

12  own internal investigations, including investigations into whether Titan properly accounted for the

13  payments in its financial statements, the SEC investigation, and the DOJ's formal criminal

14  investigation, would likely prevent the merger from closing prior to the March 31, 2004, the so-

15  called "walkaway" termination date at which point either party not then in breach could terminate

16  the merger.

17          11.    Then, on March 22, 2004, *The Wall Street Journal* published an investigative news

18  report, entitled "Titan Foreign Payments Scrutinized --- An Internal Look Uncovers Millions of

19  Dollars in Deals in Africa, Mideast and Asia." This report revealed that despite defendants' public

20  statements, Titan's internal investigations had confirmed widespread illegal payments of cash and

21  goods made by Titan through consultants to foreign officials in a number of countries around the

22  globe. The report also revealed that Titan was negotiating a Plea Agreement with the DOJ, stating in

23  relevant part that:

24          ***Internal investigators for Lockheed Martin Corp. and Titan Corp. have
        found Titan made potentially improper payments while competing for business in***
25      ***Africa, the Middle East and Asia,*** according to a person familiar with the
        investigation.
26
                The investigation -- which is unfolding amid Lockheed Martin's pending
27      $1.8 billion acquisition of Titan -- ***has uncovered millions of dollars of suspicious
        overseas payments, some as recently as 2003, according to this person. It has***
28

*already prompted the suspension of a midlevel employee and implicated a top marketing official for one of Titan's units, this person said.*

With lawyers for the two companies continuing to pursue allegations of improper payments on behalf of Titan to middlemen in countries ranging from Saudi Arabia to Bangladesh to the Philippines to parts of West Africa, *the probe could expand to focus on higher-level Titan executives*, this person said.

\* \* \*

*Talks with Justice Department prosecutors about a possible corporate plea agreement are slated for this week*, according to the person familiar with the internal investigation. The government's investigation of current and former Titan officials is slated to stretch out substantially longer. Titan also hopes to settle a separate civil investigation by the Securities and Exchange Commission.

\* \* \*

*Titan has maintained there isn't evidence of bribes or other illegal acts*. But the San Diego company recently set aside $3 million in reserves -- thereby lowering its earnings estimate for 2004 -- to cover potential government fines.

\* \* \*

Lockheed Martin, however, appears eager to avoid being tarred with Titan's missteps. *For the transaction to close, Lockheed Martin officials have privately suggested Titan must get out from under the threat of federal indictment*, according to people familiar with the situation.

12.    On these revelations, Titan's stock fell once again to close at $19.73 per share on heavy volume on March 22, 2004.

13.    The impact of defendants' wrongdoings continued. On April 7, 2004, Lockheed announced that it was reducing its offer to purchase Titan from $22 per share to $20 per share, thus costing Titan shareholders $200 million. Lockheed reduced its bid as a result of discovering wrongful transactions during its pre-merger review of Titan's books and records. Eventually, Lockheed called off the merger altogether. Had defendants come forward voluntarily to disclose the illegal transactions in a timely fashion (rather than wait for Lockheed to discover them), the consequences for Titan shareholders would have been far less substantial. In particular, defendants could have resolved the FCPA violations by honest and early disclosure to Lockheed, the DOJ and the SEC, so that Titan could have timely carried out the merger. Instead, as a direct result of defendants' actions, Titan shareholders were compelled to bear the cost of the defendants' defalcations through the aforementioned cancellation of the merger.

14.     While Titan's shareholders approved the revised terms of the merger on June 7, 2004, Titan was unable to resolve the investigation with the DOJ. Rather, on June 4, 2004, Titan received a "Wells Notice" from the SEC notifying Titan that the SEC staff intended to recommend action against Titan for violation of U.S. securities laws. Thus, on June 26, 2004, Lockheed notified Titan that it was terminating the merger agreement, sending Titan's stock plummeting to as low as $11.74 per share on July 2, 2004.

15.     Since then, Titan has belatedly written down or taken loss allowances relating to these African, Middle Eastern and Asian operations where the illegal acts took place. For the 2Q04, ending June 30, 2004:

(a)     Titan recorded an aggregate after-tax loss of $11.4 million pertaining to its long-discontinued Titan Wireless, Inc. ("Titan Wireless") activities in Benin, Africa, including a full allowance for the $14.351 million remaining on a receivable for the Benin contract, and $2.3 million (after-tax) relating to a contingent liability with a subcontractor on the project;

(b)     Titan took approximately $10 million in charges pertaining, in part, to impairment of two large computer systems in Saudi Arabia, and, in part, to termination of a program by an undisclosed "civilian government agency" (most likely the Federal Aviation Administration ("FAA"));

(c)     Titan recognized approximately $5 million in losses resulting from its contract in Saudi Arabia for a National Identification Card Project ("National I.D. Card Project"); and

(d)     Titan recorded an after-tax loss of $24.6 million related, in part, to discontinued operations of its Datron World Communications ("Datron") division in Asia, mostly to "goodwill" and "fixed asset values not expected to be recovered."

16.     Titan later admitted that it set aside a reserve of almost $30 million for resolution of the government's FCPA investigations – the largest FCPA penalty ever. Also, according to *The Wall Street Journal*, the DOJ was demanding that Titan plead guilty to multiple felony counts. Had defendants revealed the violations promptly and voluntarily, Titan would not likely have incurred this large of an FCPA penalty.

1     17.    On March 1, 2005, the public learned that Titan had in fact violated the FCPA in the

2    ways alleged by the DOJ and the SEC as Titan pled guilty to the DOJ's charges of criminal violation

3    of the FCPA and agreed to pay the DOJ and the SEC nearly $30 million in fines to settle the charges.

4    Many of the allegations described in this Complaint are taken directly from the DOJ Plea Agreement

5    in which Titan admits the legal and factual details of Titan's misdeeds.  Titan's guilty plea includes

6    violations of the FCPA (15 U.S.C. §78dd-1) provisions of the securities laws, falsifying books and

7    records (15 U.S.C. §§78m(b)(2)(A) and 78m(b)(5)), and aiding or assisting in filing false tax returns

8    (26 U.S.C. §7206(2)).  Titan also settled related charges with the SEC for these same violations as

9    well as §§21(d)(3) and 32(c) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C.

10   §§78u(d)(3) and 78ff(c)) and Rule 13b2-1 promulgated thereunder.

11     18.    Defendants' misconduct throughout the Class Period was designed to inflate Titan's

12   stock price and conceal its illegal activities so as to perpetuate the perception of Titan as a company

13   that was poised for continued growth and whose stock would soon be acquired by Lockheed at a

14   substantial premium to its pre-merger announcement trading price.  The statements made by

15   defendants during the Class Period were each false and misleading when made.  The true facts,

16   known only to defendants, were that by means of defendants' undisclosed, improper and illicit

17   practices set forth in §IV.D., Titan and defendants:

18          (a)    Inappropriately inflated revenue and accounts receivables, understated

19   liabilities and failed to timely write off assets, in violation of Generally Accepted Accounting

20   Principles ("GAAP") (*see* §V.L.);

21          (b)    Knowingly and corruptly violated the FCPA, in violation of 15 U.S.C. §78dd-

22   1, and Titan's own publicly stated Code of Ethics ostensibly designed to assure the investment

23   community that Titan would not violate these laws.  Titan has since admitted these violations in its

24   Plea Agreement with the DOJ;

25          (c)    Made Titan's financial results look better than they actually were prior to and

26   during the Class Period.  Titan has since written off tens of millions of dollars of assets and recorded

27   liabilities due to these activities;

28

1        (d)    Exposed Titan to huge civil and criminal penalties for its unlawful conduct,

2    the potential liabilities of which were not adequately reserved or disclosed in the Company's audited

3    financial statements.  Titan has since paid $30 million in fines to the DOJ and the SEC;

4        (e)    Negotiated a merger with Lockheed on favorable terms and kept Lockheed

5    bound to the merger contract through the end of the Class Period, despite knowing that the merger

6    would not occur because of FCPA violations;

7        (f)    Knowingly falsified their books and records as later admitted by Titan in its

8    Plea Agreement with the DOJ;

9        (g)    Willfully filed a false income tax return as later admitted by Titan in the DOJ

10   Plea Agreement;

11       (h)    Falsely denied any illegal or wrongful conduct.  Titan has since admitted to

12   this illegal and wrongful conduct; and

13       (i)    Knew Titan's revenue projections were false because they intentionally

14   omitted undisclosed liabilities associated with its FCPA violations.  When Titan's stock price

15   declined upon partial revelation of the true facts concealed by fraud, plaintiff Israel Shurkin and the

16   Securities Class members who purchased Titan's stock at fraudulently inflated prices suffered loss

17   and were damaged thereby.

18

19

20

21

22

23

24

25

26

27

28

04-CV-0676-LAB(NLS)

19.     The following chart graphically demonstrates the effect of Titan's statements on the market, and the impact of the hidden violations of the FCPA once their potential existence was disclosed:



**Titan Corp.**
Daily Share Pricing: June 6, 2003 to September 3, 2004

Plaintiffs and all plaintiff class members ("Securities Class Members" and "Holder Class Members") seek damages for the harm that they suffered through the diminution in the merger price and harm caused to stock holders as a result of defendants' failure to inform stock holders of the FCPA violations.

## II.     JURISDICTION AND VENUE

20.     Jurisdiction over the federal securities claims is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the fiduciary breach claims under the supplemental jurisdiction provisions of 28 U.S.C. §1367(a).  In particular, the fiduciary breach claims are related to the federal securities fraud claims, over which this Court has original jurisdiction, and these two claims form part of the same case or controversy under Article III of the United States Constitution.

-9-

1    21.    Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false

2    and misleading statements were made in, or issued from, this District.

3    22.    The Company's operational headquarters are in San Diego, California, where the day-

4    to-day operations of the Company are directed and managed.

5    **III.    THE PARTIES**

6    23.    Lead plaintiff Israel Shurkin ("Shurkin") purchased Titan common stock during the

7    Class Period and was damaged thereby, and therefore can properly represent the Securities Class.

8    This Court entered an Order designating Mr. Shurkin lead plaintiff on July 9, 2004.

9    24.    Holder Class plaintiff Paul Berger ("Berger") held the common stock of Titan during

10   the period from August 3, 1999 through and including July 23, 2003, and continued to hold that

11   stock on June 26, 2004.

12   25.    Defendant Titan is a technology developer and systems integrator for the DOD, the

13   Department of Homeland Security and intelligence and other key government agencies.  Titan is

14   headquartered in San Diego, California and has 81.5 million shares of common stock traded on the

15   New York Stock Exchange ("NYSE").  Titan's DOJ Plea Agreement admits the following additional

16   corporate facts:

17          Defendant TITAN CORPORATION maintained and continues to maintain its
            headquarters and principal place of business in San Diego, California.  TITAN
18          CORPORATION and its subsidiaries, including Titan Wireless, Inc., Titan Africa,
            Inc., and Titan Africa, S.A. (hereinafter collectively referred to as "TITAN"), were
19          engaged in, among other things, the business of developing and constructing wireless
            telephone systems for, among others, certain developing nations.
20
            TITAN CORPORATION was an "issuer" of securities within the meaning of
21          the Securities and Exchange Act of 1934, and, as such, was subject to the provisions
            of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§78dd-1 and 78m(b).
22
            Titan Wireless, Titan Africa, Inc., and Titan Africa, S.A., although separately
23          incorporated, (a) shared employees, officers, and personnel with TITAN
            CORPORATION; and (b) undertook the acts set forth herein and alleged in the
24          Information with the authorization and subject to the control of TITAN
            CORPORATION.
25
     DOJ Plea Agreement at 6. The major "shared employees, officers, and personnel" of Titan, Titan

26   Wireless, Titan Africa, Inc. ("Titan Africa"), and Titan Africa, S.A. at issue in this Complaint are as

27   follows:

28

| Titan Entity | Name | Title |
|---|---|---|
| Titan | Gene W. Ray | CEO |
| | Mark W. Sopp | Chief Financial Officer ("CFO") |
| | Shawn Lechien | Comptroller |
| | Eric M. DeMarco | CFO (Prior to April 2001) |
| | | Chief Operating Officer ("COO") (Post April 2001) |
| | Deanna Lund/Hom/Petersen | Corporate Controller |
| Titan Wireless | Eugene O'Rourke | President and CEO |
| | Chris Caulson | CFO |
| | Kevin Beaver | Director of Finance |
| | Herb Bradley | President and CEO |
| | Jean Louis Albert | Controller |
| Titan Africa | Steven L. Head | CEO |

26.     Defendant Gene W. Ray ("Ray") was a co-founder of Titan Systems, Inc., the parent of which merged into The Titan Corporation in 1985. He served as a Director, CEO and President of Titan Systems from its inception in 1981 until the merger in 1985. He has been Chairman of the Board of Directors (the "Titan Board") since May 1999 and CEO since the merger. Ray also served as President until May 2002 and was re-elected as President in February 2003. As a consequence of Ray's controlling position within Titan, Ray signed each of Titan's Annual Reports on Form 10-K filed with the SEC. Ray was Chairman of the Board of Titan Wireless and Titan Africa and signed the Registration Statement filed on Form S-4 with the SEC on July 9, 2003 on behalf of Titan, Titan Wireless and Titan Africa.

27.     Defendant Mark W. Sopp ("Sopp") has been Titan's Senior Vice President, CFO and Treasurer since April 2001. Prior to that, Sopp was a Vice President and CFO of Titan Systems Corporation, a subsidiary, since 1998. Sopp has signed each of Titan's annual and quarterly reports on Form 10-K and 10-Q filed with the SEC since he became CFO, including Titan's quarterly report for the period ending March 31, 2001 on Form 10-Q, filed on May 15, 2001. Sopp was Senior Vice President, CFO and Treasurer of Titan Wireless and Titan Africa and signed the Registration Statement filed on Form S-4 with the SEC on July 9, 2003 on behalf of Titan, Titan Wireless and Titan Africa.

28.     Defendant Eric M. DeMarco ("DeMarco") served in a variety of senior executive positions at Titan until February 20, 2003, when DeMarco resigned as an officer of Titan. DeMarco had been President and COO since May 16, 2002, and Executive Vice President and COO since April 2001.  Prior to that, DeMarco was Executive Vice President, CFO and Treasurer since September 1998, and Senior Vice President and CFO from January 1997 to August 1998.  As a consequence of DeMarco's controlling position at Titan, DeMarco signed the Annual Report on Form 10-K for the period ending December 31, 2001, filed with the SEC on April 1, 2002 and the Form 10-K/A filed with the SEC on June 12, and August 7, 2001.  DeMarco also signed each of Titan's filings with the SEC while he was Titan's CFO, including Titan's Form 10-Q filed on November 14, 2000, and Titan's Annual Report on Form 10-K405 for the period ending December 31, 2000 filed on April 2, 2001 and the Form 10-K405/A filed with the SEC on April 4, 2001.

29.     Defendant Deanna Lund ("Lund") was Titan's Corporate Controller until April 19, 2004, when Titan announced that Lund had left Titan for another position. Prior to working at Titan, Lund worked with defendant DeMarco at Arthur Andersen LLP's ("Arthur Andersen") San Diego office and then, in 1993, Lund joined Titan as corporate manager of operational analysis.  When DeMarco was hired by Titan in January 1997, Lund was promoted to Corporate Controller.  As a consequence of Lund's controlling position at Titan, Lund signed Titan's Form 10-Qs and Form 10-Ks from FY00 through year end 2003.  Lund now works as the Senior Vice President and CFO of Wireless Facilities Inc. ("Wireless Facilities") with defendant DeMarco.  Ms. Lund has variously referred to herself throughout her tenure at Titan as Deanna Hom, Deanna Lund, and Deanna Petersen.

30.     Defendant Michael B. Alexander ("Alexander") was a member of the Titan Board, having held that position from 2000 through present. Alexander served as the Chairman of the Titan Board's Government Investigation Committee and as a member of the Titan Board's Corporate Governance Committee.

31.     Defendant Charles R. Allen ("Allen") was a member of the Titan Board, having held that position from 1989 until he retired in 2002. Allen served as the Chairman of the Titan Board's Audit Committee.

32. Defendant Edward H. Bersoff ("Bersoff") was a member of the Titan Board, having held that position from 2000 through present. Bersoff served as a member of the Titan Board's Corporate Governance Committee.

33. Defendant Joseph F. Caligiuri ("Caligiuri") was a member of the Titan Board. Caligiuri served as a member of the Titan Board's Government Investigation Committee.

34. Defendant Peter A. Cohen ("Cohen") was a member of the Titan Board, having held that position from 2000 through present. Cohen served as a member of the Titan Board's Audit Committee.

35. Defendant Daniel J. Fink ("Fink") was a member of the Titan Board. Fink served as a member of the Titan Board's Audit Committee.

36. Defendant Susan Golding ("Golding") was a member of the Titan Board, having held that position from 2001 through present. Golding served as a member of the Titan Board's Audit Committee.

37. Defendant Robert M. Hanisee ("Hanisee") was a member of the Titan Board. Hanisee served as the Chairman of the Titan Board's Audit Committee.

38. Defendant Robert E. LaBlanc ("LaBlanc") was a member of the Titan Board.

39. Defendant Thomas G. Pownall ("Pownall") was a member of the Titan Board, having held that position since 1992 until he retired in 2002. Pownall served as a member of the Titan Board's Audit Committee.

40. Defendant George A. Robinson ("Robinson") was a member of the Titan Board, having held that position from 2000 until he retired in 2001.

41. Defendant James E. Roth ("Roth") was a member of the Titan Board. Roth served as a member of the Titan Board's Government Investigation and Corporate Governance Committees.

42. Defendant Joseph R. Wright, Jr. ("Wright") was a member of the Titan Board, having held that position from 2000 until he retired in January 2005. Wright served as the Chairman of the Titan Board's Corporate Governance Committee. On January 27, 2005, Wright resigned from the Titan Board.

43.     Defendant Philip J. DeVera ("DeVera") is Titan's Senior Vice President in charge of the Internal Audit department.  DeVera joined Titan in July 2002 to head the Company's internal audit function.  DeVera was instrumental in establishing Titan's internal audit department by, among other things, developing and implementing the Company's internal audit programs.

44.     Beginning with Titan's Amended Annual Report for the period ending December 31, 2001 filed on August 7, 2002, both defendants Ray and Sopp signed and filed with the SEC certifications pursuant to §906 of the Public Company Accounting Reform and Investor Protection Act of 2002 (18 U.S.C. §1350 as adopted) ("Sarbanes-Oxley Act"), representing that: (a) the quarterly and annual periodic filings from August 7, 2000 through the end of the Class Period fully complied with the requirements of §13(a) and §15(d) of the 1934 Act, as amended; and (b) the information contained therein fairly represented, in all material respects, the financial condition of the Company at the end of the period covered by the periodic report and results of operations of Titan for the same period.  Ray, Sopp and the other defendants never revealed during the Class Period that the certifications were, in fact, false due to the illegal activity alleged in this Complaint.

45.     The individuals named as defendants in ¶¶26-29 (Ray, Sopp, DeMarco and Lund) are referred to herein collectively as the "Individual Securities Defendants." Each Individual Securities Defendant is liable for participating in the making of false statements and/or failing to disclose adverse facts known to him or her about Titan.  The Individual Securities Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Titan's statements and presentations to securities analysts.  Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Securities Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and misleading.  The individuals named as defendants in ¶¶26-43 (Ray, Sopp, DeMarco, Lund, Alexander, Allen, Bersoff, Caligiuri, Cohen, Fink, Golding, Hanisee, LaBlanc, Pownall, Robinson, Roth, Wright, and DeVera) are referred to herein collectively as the "Individual Defendants."

1   **IV.    BACKGROUND TO THE CLASS PERIOD**

2        **A.    General**

3        46.    Titan provides products and services to governments and businesses around the

4   world.

5        47.    Titan was founded by defendant Ray in 1981.  When defense budgets began to

6   decline in the late 1980s, the Company diversified into commercial markets such as food irradiation

7   and telecommunications.  As those efforts faltered, Titan had net losses in eight of the past ten years.

8        **B.    The FCPA and DOJ Guidance**

9             **1.    General Background**

10       48.    One way Titan attempted to recover profitability was via sales to foreign

11  governments.  This move subjected Titan to the FCPA.  Pursuant to the 1988 Trade Act, the

12  Attorney General published guidance concerning the DOJ's enforcement policy with respect to

13  issues related to the FCPA.

14       49.    In general, the FCPA prohibits corrupt payments to foreign officials for the purpose

15  of obtaining or keeping business.  The DOJ is the chief enforcement agency with a coordinate role

16  played by the SEC.

17       50.    As a result of SEC investigations in the mid-1970s, over 400 U.S. companies

18  admitted making questionable or illegal payments in excess of $300 million to foreign government

19  officials, politicians, and political parties.  The abuses ran the gamut from bribery of high foreign

20  officials to secure some type of favorable action by a foreign government to so-called facilitating

21  payments that allegedly were made to ensure that government functionaries discharged certain

22  ministerial or clerical duties.  Congress enacted the FCPA to bring a halt to the bribery of foreign

23  officials and to restore public confidence in the integrity of the American business system.

24       51.    The FCPA was intended to have, and has had, an enormous impact on the way

25  American firms do business.  Several firms that paid bribes to foreign officials have been the subject

26  of criminal and civil enforcement actions, resulting in large fines, suspension and debarment from

27  federal procurement contracting, and their employees and officers have gone to jail.  For example,

28  Lockheed paid $24.8 million in fines and several executives went to jail in 1995.  To avoid such

1   consequences, many firms have implemented detailed compliance programs intended to prevent and

2   to detect any improper payments by employees and agents.

3       52.    The antibribery provisions of the FCPA make it unlawful for a U.S. person, and

4   certain foreign issuers of securities, to make a corrupt payment to a foreign official for the purpose

5   of obtaining or retaining business for, or with, or directing business to, any person. Since 1998, the

6   FCPA's provisions also apply to foreign firms and persons who take any act in furtherance of such a

7   corrupt payment while in the United States.

8       53.    The FCPA also requires companies whose securities are listed in the United States to

9   implement internal accounting provisions, designed to:

10      (A)    make and keep books, records, and accounts, which, in reasonable detail,
        accurately and fairly reflect the transactions and dispositions of the assets of the
11      issuer; and

12      (B)    devise and maintain a system of internal accounting controls sufficient to
        provide reasonable assurances that --

13
        (i)    transactions are executed in accordance with management's general or
14      specific authorization;

15      (ii)    transactions are recorded as necessary (I) to permit preparation of
        financial statements in conformity with generally accepted accounting principles or
16      any other criteria applicable to such statements, and (II) to maintain accountability
        for assets;

17
        (iii)    access to assets is permitted only in accordance with management's
18      general or specific authorization; and

19      (iv)    the recorded accountability for assets is compared with the existing
        assets at reasonable intervals and appropriate action is taken with respect to any
20      differences.

21   15 U.S.C. §78m(b)(2).

22      54.    These accounting provisions, which were designed to operate in tandem with the

23   antibribery provisions of the FCPA, require corporations covered by the provisions to make and keep

24   books and records that accurately and fairly reflect the transactions of the corporation and to devise

25   and maintain an adequate system of internal accounting controls.

26      55.    **Enforcement**. The DOJ is responsible for all criminal enforcement and for civil

27   enforcement of the antibribery provisions with respect to domestic concerns and foreign companies

28

- 16 -                                    04-CV-0676-LAB(NLS)

1 | and nationals. The SEC is responsible for civil enforcement of the antibribery provisions with
2 | respect to issuers.

3 | **2.    Antibribery Provisions of the FCPA**

4 | 56.    **Basic Prohibition**. The FCPA makes it unlawful to bribe foreign government
5 | officials to obtain or retain business. With respect to the basic prohibition, there are five elements
6 | which must be met to constitute a violation of the FCPA:

7 | (a)    The FCPA applies to any individual, firm, officer, director, employee, or
8 | agent of a firm and any stockholder acting on behalf of a firm. Individuals and firms may also be
9 | penalized if they order, authorize, or assist someone else in violating the antibribery provisions or if
10 | they conspire to violate those provisions. A foreign company or person is subject to the FCPA if it
11 | causes, directly or through agents, an act in furtherance of the corrupt payment to take place within
12 | the territory of the United States. There is, however, no requirement that such act make use of the
13 | U.S. mails or other means or instrumentalities of interstate commerce. U.S. parent corporations may
14 | be held liable for the acts of foreign subsidiaries where they authorized, directed, or controlled the
15 | activity in question, as can U.S. citizens or residents, themselves "domestic concerns," who were
16 | employed by or acting on behalf of such foreign-incorporated subsidiaries.

17 | (b)    The person making or authorizing the payment must have a corrupt intent, and
18 | the payment must be intended to induce the recipient to misuse his official position to direct business
19 | wrongfully to the payer or to any other person. The FCPA does not require that a corrupt act
20 | succeed in its purpose. The offer or promise of a corrupt payment can constitute a violation of the
21 | statute. The FCPA prohibits any corrupt payment intended to influence any act or decision of a
22 | foreign official in his or her official capacity, to induce the official to do or omit to do any act in
23 | violation of his or her lawful duty, to obtain any improper advantage, or to induce a foreign official
24 | to use his or her influence improperly to affect or influence any act or decision.

25 | (c)    The FCPA prohibits paying, offering, promising to pay (or authorizing to pay
26 | or offer) money or anything of value.

27 | (d)    The prohibition extends only to corrupt payments to a foreign official, a
28 | foreign political party or party official, or any candidate for foreign political office. A "foreign

1  official" means any officer or employee of a foreign government, a public international organization,

2  or any department or agency thereof, or any person acting in an official capacity. The FCPA applies

3  to payments to any public official, regardless of rank or position.

4       (e)    The FCPA prohibits payments made in order to assist the firm in obtaining or

5  retaining business for or with, or directing business to, any person. The DOJ interprets "obtaining or

6  retaining business" broadly, such that the term encompasses more than the mere award or renewal of

7  a contract. The business to be obtained or retained does not need to be with a foreign government or

8  foreign government instrumentality.

9      57.   **Third Party Payments**.  The FCPA prohibits corrupt payments through

10  intermediaries. It is unlawful to make a payment to a third party, while knowing that all or a portion

11  of the payment will go directly or indirectly to a foreign official. The term "knowing" includes

12  conscious disregard and deliberate ignorance. The elements of an offense are essentially the same as

13  described above, except that in this case the "recipient" is the intermediary who is making the

14  payment to the requisite "foreign official."

15      58.    Intermediaries may include joint venture partners or agents.  To avoid being held

16  liable for corrupt third party payments, U.S. companies must exercise due diligence and take all

17  necessary precautions to ensure that they have formed a business relationship with reputable and

18  qualified partners and representatives.  Such due diligence may include investigating potential

19  foreign representatives and joint venture partners to determine if they are in fact qualified for the

20  position, whether they have personal or professional ties to the government, the number and

21  reputation of their clientele, and their reputation with the U.S. Embassy or Consulate and with local

22  bankers, clients, and other business associates. In addition, in negotiating a business relationship, the

23  U.S. firm should be aware of so-called "red flags," *i.e.*, unusual payment patterns or financial

24  arrangements, *a history of corruption in the country*, a refusal by the foreign joint venture partner or

25  representative to provide a certification that it will not take any action in furtherance of an unlawful

26  offer, promise, or payment to a foreign public official and not take any action that would cause the

27  U.S. firm to be in violation of the FCPA, including: *unusually high commissions, lack of*

28  *transparency in expenses* and *accounting records*, apparent *lack of qualifications or resources on*

*the part of the joint venture partner* or representative to perform the services offered, and *whether the joint venture partner or representative has been recommended by an official of the potential governmental customer*.

### 3.   Sanctions for Violating the Antibribery Provisions of the FCPA

59.   **Criminal**.   Criminal penalties may be imposed for violations of the FCPA's antibribery provisions: corporations and other business entities are subject to a fine of up to $2 million; officers, directors, stockholders, employees, and agents are subject to a fine of up to $100,000 and imprisonment for up to five years.   Moreover, under the Alternative Fines Act, these fines may be actually quite higher – the actual fine may be up to twice the benefit that a defendant sought to obtain by making the corrupt payment.   Notably, Lockheed executives have been imprisoned under these provisions.

60.   **Civil**.   The Attorney General or the SEC may bring a civil action for a fine of up to $10,000 against any firm as well as any officer, director, employee, or agent of a firm, or stockholder acting on behalf of the firm, who violates the antibribery provisions.   In addition, in an SEC enforcement action, the court may impose an additional fine not to exceed the greater of (a) the gross amount of the pecuniary gain to a defendant as a result of the violation, or (b) a specified dollar limitation.   The specified dollar limitations are based on the egregiousness of the violation, ranging from $5,000 to $100,000 for a natural person and $50,000 to $500,000 for any other person. Notably, Lockheed settled its FCPA criminal and civil prosecution for $24.8 million in 1995.

61.   **Injunctions**.   The Attorney General or the SEC may also bring a civil action to enjoin any act or practice of a firm whenever it appears that the firm (or an officer, director, employee, agent, or stockholder acting on behalf of the firm) is (or about to be) in violation of the antibribery provisions.

62.   **Bars from Doing Business with the Government**.   Under guidelines issued by the Office of Management and Budget, a person or firm found in violation of the FCPA may be barred from doing business with the federal government.   Indictment alone can lead to suspension of the right to do business with the U.S. government.   The U.S. President has also directed that no

1   executive agency shall allow any party to participate in any procurement or nonprocurement activity

2   if any agency has debarred, suspended, or otherwise excluded that party from participation in a

3   procurement or nonprocurement activity.

4       63.   **Other Government Action**.   In addition to the above, there are other severe

5   consequences for violating the FCPA:

6           (a)   A person or firm found guilty of violating the FCPA may be ruled ineligible to

7   receive export licenses;

8           (b)   The SEC may suspend or bar persons from the securities business and impose

9   civil penalties on persons in the securities business for violations of the FCPA;

10          (c)   The Commodity Futures Trading Commission and the Overseas Private

11  Investment Corporation both provide for possible suspension or debarment from agency programs

12  for violation of the FCPA; and

13          (d)   A payment made to a foreign government official that is unlawful under the

14  FCPA cannot be deducted under the tax laws as a business expense.

15      64.   **Private Causes of Action**.   Conduct that violates the antibribery provisions of the

16  FCPA may also give rise to a private cause of action for treble damages under the Racketeer

17  Influenced and Corrupt Organizations Act ("RICO"), or to causes of action under other federal or

18  state laws.  For example, an action might be brought under RICO by a competitor who alleges that

19  the bribery caused a defendant to win a foreign contract.

20      **C.**   **Defendants' Knowledge of the FCPA and Statements to the**
21          **Investment Community About Compliance**

22      65.   Prior to the Class Period, defendants represented to the investment community that

23  Titan acted with the highest ethical standards and, hence, complied with the FCPA.  At an August

24  12, 2002 investor conference call, in which each of defendants Ray, Sopp and DeMarco participated

25  and spoke on behalf of Titan, Ray stated to analysts that:

26          Turning to a different but important topic, [o]ur new auditors, KPMG, have
    completed their accounting review and signed off on our first and second quarter of

27      '02 financial statements.  This morning we filed our June 30th 10-Q.  With that filing
    is a certification of the quarterly financial statements that Mark Sopp our CFO, and I

28      have signed.  At the risk of sounding like I am saying I did not beat my wife
    yesterday, I would like to say that corporate integrity or corporate governance has

always been a priority at Titan. Indicative of that is that of the 11 members of our board, only one is insider [sic], me. And in addition to our audit and composition committee, we have a nominating and corporate governance committee all composed of 100% outside directors. Mostly important, it is -- *it has been our policy within Titan to not only adhere to all the laws of the U.S. and the countries in which we operate, but also, to operate Titan with the highest ethical standards*. That policy is seldom if ever, discussed outwardly but often, through several mechanisms, propagated internally. I have always and still do believe that this mode of operation is in the long-term best interest of our shareholders.

66.     Titan also represented in its Proxy Statements filed before the Class Period and in the Form DEF 14A filed on April 15, 2003, that defendants had

[a]dopted a written Code of Ethics that *applies* to our Directors and *to all of our employees, including our Chief Executive Officer, Chief Financial Officer, Corporate Controller*, and all of our other principal executives. Our Code of Ethics was adopted approximately fifteen years ago, and each Director and executive officer is required to review our Code of Ethics and to certify compliance annually. There have not been any waivers of the Code of Ethics relating to any of our executive officers or Directors.

The Form DEF 14A directs investors to the website, http://www.titan.com/about/ governance/ethics/index.html?select=3.1, to review the Code of Ethics. This webpage contains an introduction by defendant Ray stating:

Titan is very proud of its reputation for excellence and commitment to upholding the highest ethical standards. . . .

*       *       *

We all must remember, however, that everything we do is dependent upon each individual's commitment to quality and the knowledge that *no true success is achieved at the expense of compromising behavior*. As part of our day-to-day work, we must be continuously aware of our moral responsibilities and obligations to our many customers, suppliers, subcontractors, fellow employees, and communities in which we do business. We can never take these things for granted.

Many of the qualities we have come to expect in the way of moral and responsible behavior as an employee and a company are simply principles of good common sense. Current laws and regulations that govern our actions express these principles of common sense into written and prescribed rules of conduct. On the other hand, what may appear to be acceptable conduct or behavior using common sense principles may sometimes be in direct violation of laws and regulations for complex reasons.

This booklet was prepared as an aid in promoting a clearer understanding of the scope and content of the many *rules and regulations with which we must comply*.

67.     The booklet contains the Code of Ethics and states that:

All employees and Titan will observe the following general codes of conduct:

- 21 -                                    04-CV-0676-LAB(NLS)

1               *     *     *

2       •   *Abide by all laws and regulations of countries* and communities in which we do business, to the maximum extent permissible by United States law.

3

4       •   Maintain a high sense of honor and honesty in dealings and commitments with our customers and suppliers. . . .

5

6       •   Comply with the Company's Standards of Conduct and follow their spirit and intent.

7     68.    The Code of Ethics also contains representations concerning defendants' conduct

8 relating to Titan's accounting and billing practices:

9     Titan managers and supervisors who are involved in, or who affect accounting and billing activities, need to ensure that their employees are properly

10 trained and follow established company policies and procedures. In addition, these managers and supervisors must, as appropriate to their area and level of

11 responsibility:

12       •   *Ensure that costs are properly classified* and allocated in compliance with pertinent government accounting regulations (when contracting

13          with the government), including:

14       •   Cost Accounting Standards.

15       •   Cost principles governing cost allowability.

16       •   Contract clauses and other provisions governing payments and billings.

17

18       •   Ensure that all billings to customers accurately reflect the actual amount due for the systems or services rendered and are properly screened for any unallowable or otherwise non- billable costs or fees.

19

20       •   *Ensure that an adequate system of internal control is in place* and properly maintained and complied with.

21       •   Ensure the integrity of Titan's accounting books, records and reports. Comply with all Titan accounting policies and procedures including

22          the company's established and disclosed cost accounting practices.

23     69.    The Code of Ethics also represents that defendants will maintain accurate corporate

24 records:

25     It is essential to the basic integrity of Titan to represent accurately, truthfully and completely records normally and customarily maintained by a business concern.

26 Employees have a responsibility to preserve and maintain the integrity of Titan records with due care and diligence. Statements and representations to authorized

27 representatives of the government, auditors or other authorized outside persons should be treated in the same manner as corporate records.

28

1    *All corporate records for which employees are responsible must accurately reflect and be a fair presentation of the activity they record and reflect the nature and purpose of the activity. No false or inaccurate entries shall be made in Titan's records for any reason.*

3    The term "records" as used here includes, without limitation, the following: time cards or other time-reporting documents, invoices and related billing documents, travel and business meeting expense reports, property or asset registers and accounting or other financial records.

6    *Employees who are authorized to make expenditures on behalf of the company must ensure that they maintain complete records and that all transactions are properly recorded.*

8    All employees are expected to prepare expense reports in a timely, accurate and truthful manner. Only expenses properly incurred and substantiated for Titan business purposes should be submitted for reimbursement.

10    70.    The Code of Ethics represents that Titan and its employees would and did comply

11   with the FCPA in matters of international business:

12    Social customs and laws vary widely among countries. Specific federal laws and regulations govern the conduct of international business. Occasionally, foreign customs and laws may conflict with those of the United States. Titan will follow all laws of the countries in which it does business, to the maximum extent permissible by United States law. We will not participate in any activity that supports international restrictive trade practices such as international boycotts, or agreements to refuse to deal with potential or actual customers or suppliers. Where common practice accepts a standard of conduct lower than ours, Titan will adhere to its own standards of conduct.

17    Employees involved in international business matters must be aware of applicable trade embargos and anti-boycott provisions. In addition, *employees must be fully familiar with and strictly adhere to such provisions as the Foreign Corrupt Practices Act that prohibit payments or gifts to foreign government officials for the purpose of influencing official government acts or assistance in obtaining business.*

20    Export of Titan's products, and disclosure of the technology involved in such products are subject to export regulations. It is essential that Titan comply with all export licensing requirements by obtaining permits and approvals from appropriate governmental agencies.

23    If in doubt, Corporate Legal Counsel should be consulted on any of the above matters.

24    71.    Finally, the Code of Ethics represents that defendants would report any violations to

25   the Code:

26    Any Titan employee who becomes aware of any matter that involves a potential violation of any provision of this Code and Standards of Conduct has an *affirmative responsibility to report* the matter immediately to his or her manager or

- 23 -                    04-CV-0676-LAB(NLS)

supervisor or a member of the Ethics Committee. The procedures for reporting are as follows:

- If circumstances permit, advise the person who is suspected of wrongdoing that he or she is violating Titan policy or procedures and that corrective action should be taken immediately.

- If the situation is not completely or satisfactorily corrected immediately, the matter should be reported to the employee's supervisor for correction; or

- If it is not practical under the circumstances to report it to the employee's supervisor, the situation should be addressed to any one of the following:

  - Your segment/division General Manager or a designated representative.

  - Any member of Titan's Ethics Compliance Committee.

- If any employee unintentionally violates Titan's codes or standards, the employee should immediately seek assistance as required from any of the above-mentioned sources for proper resolution.

Employees who report violations may do so verbally or in writing. All reports of violations:

1. Will be treated in confidence. Titan will protect the identity of the person suspected of wrongdoing to the extent possible unless the violation is proved and results in disciplinary or legal action.

2. Will be properly investigated and corrective action taken if the reported violation appears to be valid.

3. Will result in a response to the reporting employee as to whether the matter will be investigated or dismissed for reason.

It shall be a violation of this Code for any employee to retaliate in any way against any person for reporting in good faith any suspected violation.

It is Titan's policy to encourage reporting of misconduct where it exists. Titan will protect employees who report instances of misconduct against any retribution, discrimination or other adverse employer/employee-related consequences which the employee may be concerned about in fulfilling his or her reporting responsibility.

Written reports of violations should be addressed to a member of the Ethics Committee. Titan also maintains an Ethics Hotline for use in reporting matters involving these Standards of Conduct. Calls to the Ethics Hotline shall remain confidential.

72. Around 1998-1999, Titan began to engage in overseas ventures and Mike Fowler, Titan's Vice President of Corporate Contracts who reported directly to Ray, thoroughly briefed Ray

1   on the FCPA. These briefings included the prohibitions and restrictions on bribes to foreign

2   government officials.

3       **D.**    **Defendants Knowingly Violated the FCPA, Titan's Code of Ethics, the Books and Records Provisions of the Securities Laws and the U.S.**

4                 **Internal Revenue Code**

5       73.    Despite defendants' knowledge of the FCPA and representations that they would and

6   did comply with the FCPA, prior to and leading up to the Class Period, defendants either personally

7   violated the FCPA or were aware that Titan or its employees violated the FCPA.

8              **1.**    **Titan Has Pled Guilty to Criminal Violations of the FCPA Provisions, Securities Laws Books and Records Provisions, and**

9                    **U.S. Internal Revenue Code Brought by the DOJ**

10       74.    On March 1, 2005, Titan and the DOJ filed a Plea Agreement with the United States

11   District Court for the Southern District of California, in which Titan admitted to criminal violations

12   of the FCPA, books and records provisions of the federal securities laws, and U.S. Internal Revenue

13   Code reporting violations. Titan also agreed to settle the SEC's securities law Complaint in *SEC v.*

14   *Titan Corp.*, Case No. 05-cv-00411-PLF (D.D.C. Mar. 1, 2005) ("SEC Complaint"). The DOJ Plea

15   Agreement and the SEC settlement required Titan to pay nearly $30 million in fines, required Titan

16   to admit to the *legal* elements of the criminal violations, required Titan to admit to the *factual* bases

17   of the criminal violations, imposed a special additional fine, imposed a three-year probation which

18   required Titan to adhere to an elaborate compliance program, and required Titan's cooperation with

19   the DOJ Fraud Section and the U.S. Attorney's Office in their further investigations.

20       75.    The legal admissions by Titan include the following:

21           Count 1 [Bribery]:    Making use of interstate and foreign instrumentalities corruptly in furtherance of unlawful payments to a foreign official for the

22           purpose of influencing his acts and decisions to assist TITAN CORPORATION in obtaining and retaining business, in violation of Title 15,

23           United States Code, Section 78dd-1;

24           Count 2 [False Books and Records]: Falsifying the books and records of TITAN CORPORATION in violation of Title 15, United States Code,

25           Sections 78m(b)(2)(A) and 78m(b)(5); and

26           Count 3 [False Tax Return]:    Wilfully aiding and assisting in the preparation or presentation of a false or fraudulent tax return for TITAN

27           CORPORATION in violation of Title 26, United States Code, Section 7206(2).

28

                                         - 25 -               04-CV-0676-LAB(NLS)

1   DOJ Plea Agreement at 2.

2   76.   Defendants' plea also included admissions of each of the legal elements of each of the

3   above noted crimes as follows:

4   Defendant understands that the offenses to which defendant is pleading guilty have the following elements:

5

6   *Count 1: Foreign Corrupt Practices Act (15 U.S.C. §78dd-1)*

That the defendant acted **corruptly**;

7

8   That the defendant made use of the mails or any means or instrumentalities of interstate commerce in furtherance of an unlawful act under the Foreign Corrupt Practices Act;

9

10   That the defendant offered, paid, promised to pay, or authorized the payment of money or anything of value;

11   That the payment was to a person **knowing** that such money would be offered, given, or promised, directly or indirectly, to a foreign public official;

12

13   That the payment was to influence any act or decision of the foreign public official, to induce the foreign public official to do or omit to do any act in violation of his lawful duty, to induce the foreign public official to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality; or to obtain any improper advantage; and

14

15

16

17   That the payment was made to assist the defendant in obtaining or retaining business for or with, or directing business to, any person.

18   *Count 2: Falsifying Books & Records (15 U.S.C. §§78m(b)(2)(A) and 78m(b)(5)*

19   That the defendant was an "issuer" under the federal securities laws and therefore required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets;

20

21   That the defendant **knowingly** falsified its books, records, and accounts; and

22   That the defendant acted **willfully**.

23   *Count 3: Aid or Assist in Filing of False Return (26 U.S.C. §7206(2))*

24   That the defendant **willfully** aided, assisted, procured or advised in the preparation of an income tax return that was false; and

25

26   That the return was false as to any material matter – that is, a matter that was necessary to a determination of whether income tax was owed.

27

28

- 26 -                                      04-CV-0676-LAB(NLS)

1    *Id.* at 4-5. Notably, pursuant to these admissions, the Company has admitted that it acted "willfully,"

2    "knowingly" and "corruptly" in its illegal actions.

3        77.    Pursuant to the Plea Agreement, defendants are not permitted to deny "involvement in

4    the offense," give "conflicting statements about that involvement" or be "untruthful" with the

5    "Government" or "court." *Id.* at 24.

6        78.    The Plea Agreement was signed by Titan and ***did not prevent*** further criminal actions

7    against the Individual Securities Defendants:

8            This Plea Agreement applies to the defendant only and does not prevent the United
             States Department of Justice from investigating or prosecuting any other individuals
9            or entities.

10   *Id.* at 3.

11       79.    Titan's Plea Agreement admits that the illegal acts in question were undertaken by

12   Titan itself and through Titan's direct control over its subsidiaries, Titan Wireless, Titan Africa and

13   Titan Africa, S.A. divisions, and its employees. *Id.* at 6.  As described below, internal Titan

14   documents obtained by counsel demonstrate that the Individual Securities Defendants were involved,

15   directed and controlled these illegal actions.

16               **2.    In February 2004, the Press Began to Report Possible Bribery
                         by Titan**
17
18       80.    In 2003, an anonymous note was sent to the Federal Bureau of Investigation and the

19   U.S. Attorney's Office, describing bribes made by Titan to procure foreign contracts to boost Titan's

20   performance.  The note stated:

21           "The Titan Corporation made multiple violations of the foreign corrupt practices act
             during the period 1997 to 2001 by making payments directly to an agent of the
22           Government of Benin.  The payments were used to secure favorable terms for
             contract work carried out by the Titan Wireless Division during this period.  Revenue
23           from this activity fueled [Titan] performance to be the leading price gainer on the
             [New York Stock Exchange] in 1999[']

24           "To conceal these activities, the division was liquidated in 2001.  The remainder of
             [Titan] is to be acquired by Lockheed Martin."
25
     *San Diego Reader*, February 26, 2004.
26
         81.    On February 13, 2004, Titan and Lockheed announced that they had initiated
27
28   meetings with both the DOJ and the SEC to advise them of an internal review relating to payments

                                        - 27 -                    04-CV-0676-LAB(NLS)

1    made to international consultants.   While Titan spokesman Wil Williams denied that the

2    investigation had anything to do with Benin or Titan Wireless, as shown below, one month later,

3    Titan admitted that such payments were indeed under investigation.   Titan's continued denial of

4    these charges harmed the Class Members of the Securities Class by continuing to artificially inflate

5    the price of Titan's stock and harmed the Class Members of the Holder Class by destroying Titan's

6    credibility with the investing community, the SEC, and Lockheed, and threatening Titan's ability to

7    consummate a merger at a premium to market price.

8        82.    Titan made millions of dollars of potential illegal bribes or "suspect payments" as late

9    as 2003, failed to disclose, and improperly accounted for in Africa, the Middle East and Asia.  Andy

10   Pasztor and Jonathan Karp, staff reporters of *The Wall Street Journal*, reported in an article, entitled

11   "Titan Foreign Payments Scrutinized --- An Internal Look Uncovers Millions of Dollars in Deals In

12   Africa, Mideast and Asia," published on March 22, 2004, that based on personal interviews of

13   people familiar with certain internal investigations at Titan:

14       Internal investigators for Lockheed Martin Corp. and Titan Corp. *have found
     Titan made* potentially *improper payments while competing for business in Africa,*

15   *the Middle East and Asia*, according to a person familiar with the investigation.

16       The investigation . . . has uncovered *millions of dollars* of suspicious
     overseas payments, some as recently as 2003, according to this person.  It has already

17   prompted the *suspension* of a midlevel employee and implicated a top marketing
     official for one of Titan's units, this person said.

18

19       With lawyers for the two companies continuing to pursue allegations of
     *improper payments on behalf of Titan to middlemen in countries ranging from*

20   Saudi Arabia to Bangladesh to the Philippines to parts of West Africa, the probe
     could expand to focus on higher-level Titan executives, this person said.

21                 *            *            *

22       The investigation into the suspicious transactions *centers on Titan's use of
     middlemen and so-called facilitators*.  Sam Dailey, a marketing manager at Datron

23   World Communications Inc., the Titan unit that makes military-radio systems, has
     been interviewed about payments to such representatives as part of the internal

24   inquiry, *according to the person familiar with the details*.  One of Mr. Dailey's
     associates has been suspended without pay as a result of the investigation, according

25   to this person.

26       Mr. Dailey served as regional director for Africa and the Middle East at
     Datron before it was acquired by Titan in 2001.  Reached at his office in Vista,

27   Calif., on Friday, Mr. Dailey referred all questions to a Titan spokesman, who
     declined to comment.  The legal teams in charge of the fact-finding efforts for the

28

companies are also believed to be looking into suspect payments that go beyond Datron.

83.     Titan has since admitted that the investigations have involved at least three business units of Titan – Datron World Communications division, Titan Wireless, and Titan Secure Systems. As reported by Bruce V. Bigelow, staff writer for *The San Diego Tribune*, on April 1, 2004:

> San Diego's Titan Corp. disclosed yesterday that the federal probe into allegations of foreign bribes now includes two of its business units that were not previously identified as part of the inquiry.
>
> In a notice filed with federal regulators, Titan said the government is now focused on three of its business units. The San Diego defense contractor said previously that only its Datron World Communications division, which sells military radio equipment, was under scrutiny for possible illegal overseas payments. Datron operates mostly in the Far East.
>
> The company said yesterday *the inquiry also includes activities in Benin conducted by its discontinued Titan Wireless business* and its operations in Saudi Arabia carried out by Titan Secure Systems.

84.     This was confirmed in Lockheed's Proxy Statement and Prospectus Supplement, filed with the SEC on March 31, 2004, and Titan's Form 10-Q, filed on May 10, 2004:

> Titan and Lockheed Martin have met with the SEC and the DOJ to discuss the allegations of improper payments and on March 25, 2004, met with the SEC and DOJ to discuss the preliminary findings of the reviews. The discussion with the government focused primarily on three of Titan's business units: the Datron World Communications division, which operates primarily in the Far East; Titan's activities in *Benin*, conducted as part of Titan Wireless, a business unit that has been reported as part of Titan's discontinued operations since 2002; and Titan's operations in Saudi Arabia, conducted through the Titan Secure Systems division.

85.     On August 4, 2004, Titan reported in a Form 8-K filed with the SEC that it was increasing its reserves to settle the investigation to almost $30 million:

> As previously disclosed, Titan had reserved $3 million as of December 31, 2003 for resolution of the government Foreign Corrupt Practices Act (FCPA) investigations. Titan recorded an additional provision in the second quarter of 2004 of $25.5 million for anticipated settlement costs, and $8.8 million in merger and government investigation-related expenses, mostly legal costs, incurred during the quarter. The company did not accrue for future legal costs expected to be incurred to reach resolution of the FCPA matter; those costs will be expensed as incurred in future periods.

86.     According to a second article written by Don Bauder and published in the *San Diego Reader* on July 8, 2004, the *San Diego Reader* received another letter in the same typeface and writing style as the first anonymous letter, reporting on Titan's bribes in Benin. That letter, received

- 29 -                                      04-CV-0676-LAB(NLS)

1  in June 2004, reiterated the charge of illegal overseas payments and said that from 1998 to 2002,

2  Titan "established minority positions in startup companies and then transferred obsolete inventory to

3  avoid costly write off charges." As with the first letter, Titan spokesperson Wil Williams denied this

4  allegation as "untrue."

5        87.    As described herein, counsel's investigation into these matters has uncovered further

6  details concerning these or related bribes and other attempts to inflate Titan's revenues and earnings.

7            **3.**    **Titan's Plea Agreement, the SEC Complaint and Documentary Evidence Obtained by Counsel Have Established the Following**

8                      **Facts Regarding Titan's Illegal Activity in Benin**

9        88.    Defendants' illegal and improper business activities in Benin, Africa included: (a) $2-

10  $8 million in illegal payments to Karim Amadou (and his company "Karicom") who illegally acted

11  as a "facilitator" to assist Titan Wireless in obtaining Beninese customs "exoneration"; (b) illegal

12  payments to Severin Adjovi and his relatives; (c) illegal payments to Afrique Conseil (Corporate

13  Council); (d) an improper $1.6 million disbursement for "T-shirts to support" the Beninese

14  President's election; and (e) improper recognition of revenue and the inflation of accounts

15  receivables of more than $25-$30 million on a contract with the Benin national telephone company,

16  the Postal and Telecommunications Office of the Republic of Benin ("OPT").

17        89.    Pursuant to the terms of the SEC Complaint, Titan has admitted to a long list of facts

18  pertaining to Titan's illegal activities in Benin.  SEC Complaint at 6-17.  These admissions are

19  supplemented throughout this section by additional details obtained from the SEC's investigation

20  and internal Titan accounting documents obtained by counsel.

21            **a.**    **Background of the Benin Project**

22        90.    The originations of Titan's involvement are based in "a Partnership Agreement dated

23  February 1, 1996, between the Postal and Telecommunications Office of the Republic of Benin

24  ("OPT"), a state-owned enterprise organized and operating under the Benin Ministry of

25  Telecommunications, and Afronetwork, Ltd. (later Afronetwork, Inc.) ("Afronetwork") . . . to

26  develop a telecommunications network in Benin.  At that time, the founder and principal of

27  Afronetwork was a relative of the Benin Minister of Telecommunications." *Id.* ¶13.

28

91.   "In Article 11 of the Partnership Agreement, OPT agreed to 'facilitate relations between AFN [Afronetwork] and the Benin Governmental Agencies in order to obtain the authorizations, exemptions and other facilities that will allow rapid implementation of the [project].'" *Id.* ¶14.

92.   "On or about August 3, 1998, Afronetwork and OPT entered into a Build, Cooperate and Transfer contract under which Afronetwork agreed to 'acquire and install a rural telephone network' and assign the operation of the network to OPT. Afronetwork was to be reimbursed for its costs using the project's revenues. The contract also required that Afronetwork obtain the consent of OPT to assign its rights under the contract." *Id.* ¶15.

93.   "By a Memorandum of Agreement dated October 9, 1998, Afronetwork and Titan agreed to establish a joint venture company called Afronetwork, Benin. On October 20, 1998, Titan issued a press release announcing that it had acquired a 50% ownership interest in Afronetwork, Benin. The same press release further stated that Afronetwork, Benin will build 'a satellite-based telephone system in Benin' and claimed that '[t]elephone service revenue generated once the system is operational is expected to be many times' the $10 million to be spent for the project's equipment. On November 30, 1998, Afronetwork and Titan executed a joint venture agreement memorializing their respective rights and obligations regarding Afronetwork, Benin." *Id.* ¶16.

94.   According to the DOJ Plea Agreement, Titan has admitted to the following facts about its early involvement in Benin:

> In 1998, TITAN embarked on a project to develop a telephone system in the African nation of the Republic of Benin and to generate revenue from operating the system for a number of years. ***TITAN generally understood that this project, and related contracts and legal agreements, were subject to governmental approval in Benin, including approval by the Council of Ministers, which included the President of Benin.***
>
> *        *        *
>
> On August 17, 1999, TITAN entered an agreement with the OPT, known as the "BCT Contract," under which TITAN would build a wireless telephone network that would be transferred to the Benin government after TITAN was paid in full for equipment and services provided by TITAN. Under the BCT contract, the OPT had to obtain sites for telecommunications facilities, to secure authorization for use of specific frequencies, and to assist in the exoneration of all customs, duties and taxes on equipment and products which TITAN imported into Benin for the BCT project.

1    DOJ Plea Agreement at 6-9.

2              b.      **Defendants Considered Customs Exoneration for the**
                       **BCT Contract a Requirement to Prevent Titan's Shares**
3                      **from "Plummeting" on the New York Stock Exchange**

4        95.    On October 11, 2000, defendant Ray composed a letter to the Beninese President

5    Kerekou, threatening to stop the BCT project because Titan was not receiving exoneration from

6    customs duties.  In the letter that was carbon copied to the Minister of Telecommunications and

7    Culture, Republic of Benin, U.S. Ambassador to Benin and the French Ambassador to Benin,

8    defendant Ray stated:

9              It has been a privilege and a pleasure to have the opportunity of meeting you
         several times, both in Washington and Benin. . . . Therefore, it is with some personal
10       sadness that I must inform you that the Board of Directors of the Titan Corporation
         and our American bank group have advised me to terminate all further shipments of
11       telecommunications equipment to Benin and to prepare to stop all further work in
         Benin.
12
               The reason is, of course, that we have not had the Exoneration from customs
13       and taxes that has been a part of our business plan from the beginning of this project
         in November 1998.  The Exoneration was promised and expected.  It was a major
14       part of my recommendation to the Titan Board to make our investment decision in
         Benin.  With the Exoneration, the business plan had a barely acceptable return on
15       investment that was offset for Titan by our ability to expand our VSAT sales.
         Without the Exoneration, the return on the business plan is unacceptable.  Even more
16       important to our Board and bank group we would have to deduct the additional 60M
         FRF needed to pay for customs clearance and VAT from our Global Financing loan.
17       This would prevent us from purchasing important parts of the equipment investment
         that we have promised to the OPT.
18
         Our bank group has told us that *we will be in default on our total line of credit if we*
19       *do not get the Exoneration, and our shares will plummet on the New York stock*
         *exchange*.  Therefore, I must request that we stop the project.
20
         96.    On October 16, 2000, in a similar letter, defendant Ray also pled with the Minister
21
     Gaston Zossou, Minister of Culture and Telecommunications, for full exoneration from customs and
22
     taxes, and again reiterated that "[o]ur bank group has told us that *we will be in default on our total*
23
     *line of credit if we do not get the Exoneration, and our shares will plummet on the New York stock*
24
     *exchange*.  Therefore, I must request that we stop the project unless the Exoneration can be obtained
25
     by 31 October 2000 at the very latest."
26
         97.    Shortly thereafter on October 26, 2000, Steven L. Head ("Head") composed a letter to
27
     the Minister Gaston Zossou, making sure the Minister had a copy of the letter, and stated that "[a]s a
28

                                    - 32 -                      04-CV-0676-LAB(NLS)

1   courtesy to you, I would welcome an opportunity to visit you any time you find it convenient to

2   discuss the background that led my CEO to write this letter."

3        98.     On or before January 15, 2001, Titan was granted a partial customs exoneration. In a

4   letter to Emmanuel Chaize, Regional Manager Africa & Middle-East, ALCATEL Network Services

5   Division, carbon copied to defendant DeMarco, Head laid out the exonerations:

6             As we discussed at the Program Review in San Diego in early January, this
    letter is to confirm that Titan has been informed by the Government of Benin that the
7   long awaited tax exoneration has been granted by the Council of Ministers for the
    Benin BCT. In particular, we have been informed that we will pay 3.5% as customs
8   duties on the equipment for the VSAT, digital switching, fiber optic cable and
    transmission and WLL. The GSM unique equipment will receive customs duties at a
9   higher rate to be negotiated with the Government in the coming weeks. However,
    these duties will not be due immediately. They will be payable after a delay of 1-2
10  years to permit the GSM network to be fully supporting and generate enough
    revenues to be able to pay the customs charges.

11

12       99.     This Complaint, the DOJ Plea Agreement, and the SEC Complaint tell the story of

13  how Titan established an elaborate maze of bribery to both ensure that Titan obtained, retained, and

14  expanded on its business dealing with the Beninese government and to ensure that they obtained the

15  above noted customs exoneration so as to prevent Titan's stock from "plummeting on the New York

16  stock exchange." Titan achieved huge revenues from this bribery. In filings with the SEC for 1999-

17  2001, Titan booked revenues of approximately $98.2 million from the Benin project, comprising

18  approximately $27.4 million in 2001, $50.1 million in 2000, and approximately $20.7 million in

19  1999. SEC Complaint at 7. These revenues could not have occurred absent to rampant bribery

20  instituted by Titan.

          **c.**     **Defendants' Bribery of Beninese Officials**

21

22            **(1)**     **Defendants' Bribery of Karim Amadou**

23       100.    The DOJ Plea Agreement with Titan contains the following facts which defendant

24  Titan has admitted as a condition of its plea:

25            In November 1998, certain TITAN personnel, including a TITAN
    CORPORATION officer, went to Benin and discussed their proposal with the Benin
26  Minister of Telecommunications and the Director General of the Postal and
    Telecommunications Office of the Republic of Benin ("OPT"), an office under the
27  Benin Ministry of Telecommunications. During this visit, the TITAN personnel and
    a consultant were introduced to a Beninese national ("The Benin Agent") and told
28  that he had access to the President of Benin.

- 33 -        04-CV-0676-LAB(NLS)

1    DOJ Plea Agreement at 7. As described and documented herein, the Benin Agent described in the

2    Plea Agreement is Karim Amadou. Titan paid bribes to Karim Amadou either personally or through

3    his company "Karicom." As noted in a February 16, 1999 article, entitled "Titan Corporation

4    Satellite Communications Project Moving Forward in Benin, Africa," the Titan officer that visited

5    Benin was defendant Ray. The Benin Minister of Telecommunications was Severin Adjovi and the

6    Director General of the OPT was Barthelemy Agnan ("Agnan").

7        101.    Bribery drove the entire Benin deal with Karim Amadou and others. Head made

8    direct disbursements from a Benin ECOBANK bank account, which had no discernible business

9    purpose. These were large, glaring payments that could not be explained, and no supporting

10    documentation or receipts could be found. Many of these payments were to Karim Amadou or

11    Karicom. Karim Amadou was purportedly "buddy-buddy" with Beninese President Kerekou.

12    Karim Amadou's ostensible role was as consultant and as "inter-commerce facilitator" to assist with

13    importing equipment and clearing customs. However, Karim Amadou's real job was to ensure that

14    Titan/Titan Wireless received "exoneration" from customs duties and levies when bringing

15    equipment into Benin. Titan's disbursements to Karim Amadou included multiple payments of 100

16    million Beninese French francs (approximately \$185,000 at current rates) for a total of

17    approximately \$5 to \$6 million. These disbursements were reflected on Titan's bank statements

18    received from ECOBANK in Benin. Sometimes, these disbursements were in *cash*.

19        102.    Karicom's role was as Titan/Titan Wireless' agent to fulfill a combination of

20    functions, which included obtaining customs exoneration for the importation of equipment by

21    Titan/Titan Wireless into Benin. Titan hoped that these payments to Karicom would ensure total

22    exoneration from the Beninese customs duties. While not able to deliver "total exoneration,"

23    Karicom did, in fact, deliver "partial exoneration" of Titan's customs duties. All the members of the

24    Titan Wireless/Titan Africa Board – which consisted of Head, Ray, Eugene O'Rourke ("O'Rourke"),

25    Herb Bradley ("Bradley"), and DeMarco – were completely aware of the "status of exoneration," or

26    lack thereof, on the Beninese project. These individuals were also completely aware of the role that

27    Karicom fulfilled in Benin for Titan/Titan Wireless.

28

         04-CV-0676-LAB(NLS)

103.    A percentage of revenues earned by the joint venture between Titan and the OPT was paid to Karicom under the purported purpose of returning this money to the Beninese government. The dubious nature of this purported purpose is demonstrated by DeMarco's attempt to hide the nature of these transactions.  In particular, in carrying out these payments to Karicom, DeMarco told Head to direct Karicom to send invoices to Titan Africa for work-related activity that Karicom did not actually perform, such as for "site surveying" and other "technical work."  Under DeMarco's plan, Titan received invoices for the fictitious work and paid Karicom based on these fictitious bills. The purpose of DeMarco's plan was to hide the bribery and to inflate Titan's revenues.

104.    Most of these facts have been admitted to by Titan in the DOJ Plea Agreement.  In particular, the DOJ Plea Agreement states:

> On or about July 28, 1999, with the consent of the OPT, TITAN acquired from an African company named Afronetwork, Ltd. all of Afronetwork's rights and obligations under various prior agreements with the OPT to develop and operate a wireless telephone system in Benin.

> On or about July 28, 1999, the same date as Afronetwork's assignment of its rights to TITAN, TITAN entered into a Consulting Agreement with the Benin Agent [Karim Amadou] making him TITAN's agent in Benin.  Under the Consulting Agreement, the Benin Agent [Karim Amadou] purportedly was to assist TITAN in marketing, to identify potential business, and to advise TITAN on financing requirements in Benin.  TITAN did not conduct any formal due diligence regarding the Benin Agent's [Karim Amadou's] background, qualifications, other employment, or relationships with foreign government officials before or after engaging him.

> Prior to engaging the Benin Agent [Karim Amadou] – and no later than April 1999 – TITAN employees were aware that the Benin Agent [Karim Amadou] was the "Head of State's business advisor."  In fact, at all relevant times, the Benin Agent [Karim Amadou] was an advisor to the President of Benin.  While working with the Benin Agent [Karim Amadou], at least one officer of a TITAN subsidiary believed that the Benin Agent [Karim Amadou] traveled on a diplomatic Benin passport.

DOJ Plea Agreement at 7-8.

105.    As described in the SEC Complaint, "[a]s the relationships developed, at least one former officer of a Titan subsidiary believed that the Titan Benin Agent [Karim Amadou] . . . was able to arrange for meetings with the President of Benin and other senior government officials.  The former officer also understood that, at least on one occasion, the President of Benin sent the Titan Benin Agent [Karim Amadou] to another African nation as the President's personal ambassador." SEC Complaint ¶18.

- 35 -                          04-CV-0676-LAB(NLS)

106. The DOJ Plea Agreement with Titan contains the following additional facts, which defendant Titan has admitted as a condition of its plea:

> The Consulting Agreement stated that the Benin Agent [Karim Amadou] would be paid a percentage of the price of equipment installed. On August 3, 1999, before virtually any equipment was installed, and only six days after signing the consulting agreement, the Benin Agent [Karim Amadou] submitted an invoice to TITAN for $399,919, which invoice detailed extensive services purportedly performed by the Benin Agent [Karim Amadou] and various sub-agents and consultants.

> One week later, on August 10, 1999, with written approval from a then-senior TITAN CORPORATION officer, TITAN CORPORATION paid the Benin Agent's [Karim Amadou's] invoice by sending a wire transfer in the amount of $400,000 from a TITAN bank account in San Diego, California, to a bank account in Contonou, Benin held in the name of a relative of the Benin Agent [Karim Amadou]. TITAN made the payment without any evidence that the purported services actually were performed or expenses actually incurred by the Benin Agent [Karim Amadou].

DOJ Plea Agreement at 8.

107. Internal Titan accounting documents obtained by counsel demonstrate conclusively that the "Benin Agent" referred to above was Karim Amadou and that the relative of Karim Amadou is Mansouratou Amadou. In particular, these internal Titan Africa documents show $1.3 million in payments going to Karim Amadou and Mansouratou Amadou, which continued until February 2002. Many of the payments were made in payments of $16,626,888 and $20,321,788, and occurred in October, November, and December 2001.

108. DeMarco was responsible for transferring the funds to Benin so that Head could use them for these disbursements to Karim Amadou. Head objected to DeMarco's instructions to handle the disbursements to Karicom in this manner, but was overruled by DeMarco in a March 2001 telephone conversation that included Head, DeMarco, O'Rourke, current Titan CFO (and one-time Titan Wireless CFO) Chris Caulson ("Caulson"), and Shawn Lechien ("Lechien"). In conversations between DeMarco and Head, DeMarco assured Head that he would tell Ray about the payments to Karicom.

109. These disbursements were listed on the Beninese P&L managed by Head, which was circulated to DeMarco and Ray. The payments worked and Titan was successful in reducing customs duties. Through Karim Amadou's dealings, Agnan, the Beninese Minister of OPT, as well

1    as President Kerekou made a lot of money from Titan and, in exchange, Titan got a phony contract

2    to report $90 million in revenue.

3         110.   On or around December 7, 2001, O'Rourke sent a letter to Karim Amadou cutting off

4    the flow of payments to Karim Amadou.  The letter admitted that the nature of the relationship was

5    that of Karim Amadou acting as Titan's agent as O'Rourke noted that "your contract as an Agent for

6    Titan Corporation with regard to the above referenced Project was terminated effective with your

7    completion of the assigned duties under that contract."  In this letter, O'Rourke also admitted why

8    they were terminating Karim Amadou:

9           In particular, you were charged with preparing the documentation and
     obtaining a complete tax exoneration from Beninese customs and VAT for the
10   equipment provided in ref 3.  This was to have been accomplished by April 2000 as
     agreed at our BCT Board Meeting of February 2000.  The Council of Ministers of
11   Benin granted only a partial exoneration of customs duties, with no exoneration at all
     for the GSM part and no exoneration for VAT.  That was granted in December 2000
12   and documentation not provided until well into 2001.  Nevertheless, Titan
     reimbursed you for the full amount of your invoiced Agent fees.  Therefore, you have
13   been more than fairly compensated for all agreed amounts with respect to the duties
     that you have accomplished.

14
15   (Translated from French.)  This letter was sent to Ray and DeMarco.  Notably, the electronic file title

16   for this document was "CanXAgent."

17        · 111.   On May 13, 2002, Karim Amadou sent a letter to Owens Alexander ("Alexander"),

     President and CEO of Titan Africa, regarding Alexander's letter sent to him on behalf of Ray.  The
18
     letter stated:
19
            I acknowledge receipt of your letter of May 3, 2002 that you were kind
20   enough to send me on behalf of Dr. Gene Ray, President of Titan Inc.  The contents
     of this letter has retained all my attention.
21
                              *          *          *
22
     I am taking the liberty to point out to you that refusal to an international investor to
23   open the local subsidiary capital to national interests is contrary to essential rights
     and liberties granted by the Constitution of the Republic of Benin, as well as
24   promotion principals of the national shareholders, granted by local legislation.

25   (Translated from French.)  According to internal Titan audit minutes obtained by counsel, Karim

26   Amadou ended the letter by saying "[y]ou know, as I do, Mr. President, the harm which would result

27   from the possible failure of Titan Africa for the mother company, Titan Inc."  In this letter, Karim

28   Amadou also requested an extraordinary meeting to be held in Cotonou (Benin).  Unwilling to

                                   - 37 -                          04-CV-0676-LAB(NLS)

1   further continue with Karim Amadou, on July 11, 2002, Titan Wireless succumbed to Karim

2   Amadou's threats and simply discontinued its operations in Benin.

3       112.    Pursuant to the DOJ Plea Agreement, Titan has admitted that it acted "corruptly" in

4   making these payments to Karim Amadou and made these payments knowing that such money

5   would be offered, given, or promised to a foreign public official as a bribe. DOJ Plea Agreement at

6   4, 6-13.

7                   (2)     "Social Payments" Made by Titan to Illegally
                            Fund the Beninese Presidential Campaign
8
9       113.    The DOJ Plea Agreement with Titan contains the following facts that defendant Titan

    has admitted: ,
10
11              Afronetwork's 1996 agreement to build a telecommunications network in
        Benin obligated Afronetwork (and TITAN upon assignment of the contract) to pay
12      "part of its profits as subsidies for development" of certain "sectors" in Benin, such
        as health, education, and agriculture. TITAN was to determine the practical methods
        of carrying out these subsidies in consultation with the Benin cabinet departments
13      responsible for those sectors. A then-officer of TITAN CORPORATION and certain
        TITAN employees were aware that these subsidies, which they referred to as "social
14      payments," were required under the agreement assigned to TITAN.

15              On or around December 19-20, 2000, at a BCT Steering Committee meeting
        in Paris, France, the Benin Agent and the Director General of the OPT demanded that
16      TITAN accelerate the "social payments" and insisted that they be paid before the
        next election in March 2001. Under the terms of the 1996 agreement, the social
17      payments were not yet due, nor had there been any coordination or consultation with
        Benin cabinet departments, as required under the 1996 agreement.
18
    Id. at 9-10. According to internal Titan audit minutes obtained by counsel, the December 2000 BCT
19
    Steering Committee meeting was attended by Agnan, Karim Amadou, Ray, DeMarco, and Head.
20
    The internal minutes of the meeting indicate that these topics were discussed:
21
                The tax exoneration dossier for the Benin BCT is still being pursued and
22      should be accepted by the Council of Ministers soon. All understand that this is
        critical to continuation of the project.
23
                                *       *       *
24
                Dr. Gene Ray, currently CEO of Titan Africa, Inc., observed . . . .
25
    (Translated from French.)
26
        114.    The DOJ Plea Agreement with Titan describes what happened at that December 2000
27
    BCT meeting, which Ray and DeMarco attended:
28

                                    - 38 -                    04-CV-0676-LAB(NLS)

1         In or about December 2000, the BCT Steering Committee, including a then-senior officer and employees of TITAN, *agreed to pay to the Benin Agent [Karim Amadou] some $2 million in expedited "social payments." This payment was to be made in exchange for, and contingent upon, the agreement of the OPT that TITAN's management fee under the BCT Contract be increased from 5% to 20% of the value of the equipment that TITAN provided under the contract.*

        In or about December 2000, TITAN had reason to believe that the accelerated "social payments" demanded by the Benin Agent [Karim Amadou] and the Director General of OPT would not be used for the purposes identified in the BCT Contract. Nevertheless, a then-senior officer of TITAN caused the requested payments to be made to the Benin Agent [Karim Amadou], caused the payments to be made incrementally (rather than in one lump sum), and caused the payments to be supported by false invoices from the Benin Agent [Karim Amadou].

        In late January 2001, the Benin Agent [Karim Amadou] submitted two invoices totaling $2,381,551. Neither invoice mentioned "social payments" or "subsidies" but instead falsely identified the purpose of the payments as customs exoneration and other services. Neither invoice reflected the true purpose of the requested payments - to provide funds for the benefit of the Benin President's re-election campaign.

        Between January 2001 and May 2001, TITAN made seven payments to the Benin Agent totaling approximately $2.1 million, during which period TITAN knew that the "social payments" in fact would be used to support the Benin President's re-election effort.

DOJ Plea Agreement at 10. As described above, the "then-senior officer" of Titan was DeMarco.

      115.   The DOJ Plea Agreement with Titan contains the following facts which defendant Titan has admitted as a condition of its plea:

        At the direction of a then-senior TITAN CORPORATION officer [DeMarco], on or around March 6, 2001 and April 10, 2001, TITAN wired two payments of $500,000 each to the Benin Agent's [Karim Amadou's] offshore account in the Principality of Monaco from a TITAN bank account in San Diego, California.

        TITAN made the remaining five payments, totaling approximately $1.1 million, to the Benin Agent in cash in Benin. This was accomplished by the issuance of checks, drawn on a bank account of Titan Africa, S.A., made payable to employees of either Titan Africa, Inc., or Titan Africa S.A. TITAN issued these checks knowing that most of the cash proceeds from these checks would be given to the Benin Agent to support the re-election of the President of Benin, in the following approximate amounts (in U.S. dollars) and on the following dates:

      A.     $400,000 on or around January 24, 2001;

      B.     $500,000 on or around February 2, 2001;

      C.     $107,500 on or around March 6, 2001;

      D.     $107,500 on or around March 7, 2001; and

E.    $70,000 on or around May 29, 2001 (which funds were drawn from petty cash rather than by check).

*Id.* at 11.

116.   Internal Titan accounting documents obtained by counsel detail these payments to Karim Amadou.  These internal documents include the following chart:

| Date | Montant | |
|---|---|---|
| 24-Jan-01 | 280,000,000 | Solde du total de $ 400K commission BCT |
| 02-Fev-01 | 350,000,000 | $500K T-shirts & tissue |
| 06-Mars-01 | 375,000,000 | $500K Virement (T-shirt& tissue) |
| 06-Mars-01 | 75,000,000 | $215K (partiel) T-shirts & tissue |
| 07-Mars-01 | 75,000,000 | $215K (partiel) T-shirts & tissue |
| 10-Avril-01 | 375,000,000 | $500K Virement (T-shirt& tissue) |
| 29-Mai-01 | 50,000,000 | $70K T-shirts & tissue |
| Fev-Mars -01 | 45,000,000 | 600 postes GSM |
| Total 2001 | 1,625,000,000 | |
| | | |
| Jan-00 | 118,000,000 | $180K |
| Mars-00 | 198,000,000 | $ 300K |
| Avril-00 | 106,000,000 | $ 160K |
| Total 2000 | 422,000,000 | |
| | | |
| Total 2000 & 2001 = | 2,047,000,000 | CFA |

117.   As admitted by Titan in the Plea Agreement:

At least a portion of the "social payments" that TITAN made through the Benin Agent were funneled to the re-election efforts of the Benin President.  For example, these funds were used to purchase T-shirts bearing a picture of the President of Benin and instructing Beninese citizens to vote for him.  Those T-Shirts with voting instructions were distributed to the electorate just prior to the Benin presidential election.

DOJ Plea Agreement at 11.  Further, as noted in the SEC Complaint:

A former senior officer of Titan and a former officer of a Titan subsidiary understood that at least a portion of the "social payments" would be used to purchase T-shirts to help the President's re-election.

SEC Complaint at 10.  These facts are echoed in the DOJ Plea Agreement:

The use of most of the purported "social payments" to support the re-election of the Benin President was known by then-employees of TITAN prior to the completion of the payments.  Additionally, in November 2001, an officer of Titan Africa, Inc., stated in an "aide memoire" that the approximately $2 million in "social payments" had been made to purchase T-shirts and related items.

1  DOJ Plea Agreement at 12.

2      118.   Titan has admitted that after having made these payments as a condition of obtaining

3  increased revenues:

4          In or about March 2001, TITAN demanded that the OPT approve an increase
       of TITAN's management fee under the BCT Contract as a condition to its continuing
5      to make "social payments."

6  *Id.*

7      119.   After Titan's payments were made, on March 25, 2001, the incumbent President of

8  Benin was announced as the winner of the Benin presidential election. *Id.*

9      120.   Titan has admitted that thereafter:

10         On or around March 29, 2001, a then-senior officer of TITAN
       CORPORATION and employees of TITAN CORPORATION and its subsidiaries
11     met with the Benin Agent and representatives of the OPT in Paris, France at a BCT
       Steering Committee meeting. During the meeting, the Director General of the OPT
12     reaffirmed that TITAN's management fee for operating the wireless telephone
       system in Benin would be increased from 5% to 20%.
13
           On or around March 29, 2001, the Director General of OPT signed a letter to
14     a then-senior TITAN CORPORATION officer increasing TITAN's project
       management fees from 5% to 20%. Thereafter, as detailed above, TITAN made two
15     additional "social payments" to the Benin Agent totaling $570,000.

16  *Id.* Internal documents obtained by counsel demonstrate that the "then-senior Titan Corporation

17  officer" negotiating this deal was DeMarco. In particular, the actual March 29, 2001 letter from the

18  Director General of OPT, Agnan, to DeMarco stated:

19         In the Equipment Supply Contract between Titan and ALCATEL for the
       BCT, Titan has obtained a Management Fee of slightly over 5%.
20
           This is considerably below the industry standard for integration contracts, and
21     inconsistent with the risks in the African environment.

22         The OPT hereby agrees that Titan should have a 20% management fee, paid
       out of the Global Financing. This fee should be retroactive to the beginning of the
23     BCT and should be carried forward on any new equipment or services provided by
       Titan under the BCT.
24
25      121.   Titan has also admitted as a condition of its Plea Agreement that:

26         On or around June 25, 2001, TITAN and the OPT signed an agreement that,
       among other things, falsely stated that TITAN had made "substantial contributions to
27     social programs in Benin" when in fact most of such payments had been to assist in
       the re-election campaign of Benin's President. The agreement also confirmed the
28     retroactive increase in TITAN's management fee from 5% to 20%.

On January 23, 2003, TITAN submitted a Request for Arbitration under the BCT Contract and claimed that the entire 20% management fee was worth "not less than $9,100,000." Based on this claim, the increase in TITAN's management fee from 5% to 20% was worth approximately $6,825,000.

Beginning in 2001, TITAN CORPORATION falsely characterized the payments to the Benin Agent [Karim Amadou] as "social payments" under the BCT Contract and, despite knowing that most of the payments to the Benin Agent would be and were used to support the re-election of the President of Benin, maintained those false books through at least January 1, 2004.

DOJ Plea Agreement at 12-13.

122.    Finally, in a September 17, 2001 email entitled "Benin Project" from DeMarco to Ray, Sopp, Head, O'Rourke and others, DeMarco wrote:

TTN [Titan] has funded certain "social program" expenses ahead of the required payment of such expenses, as outlined in the BCT agreement. This is approximately $1,500,000. We need to have the OPT recognize this obligation to TTN [Titan] in the form of a Note Payable that will stand up in a Benin court, and that we can gain insurance on. We need to ultimately get the OPT to pay TTN [Titan] back for these "Advanced" amounts.

As noted above, the term "social program" appeared in quotation marks as did the term "Advanced." Hence, the Individual Securities Defendants knew of the illegal payments prior to 2002. Notably, DeMarco's email demonstrates Titan's intent to have the Beninese pay for Titan's bribes to the Beninese.

123.    Indeed, Titan attempted to recover the costs of its bribes by attempting to get repaid these amounts out of the project revenues. However, this maneuver was rejected, noted by a May 22, 2002 document, entitled "PAST DUE TITAN OPEX," which stated that the:

Government and OPT very sensitive to abnormal payments made by previous Titan management, making them unwilling to use project revenues to cover these[.]

### (3)    Payments to Minister Severin Adjovi, Brother Edmund Adjovi, and Daughter Chantal Adjovi

124.    On July 8, 1999, Ray wrote Minister Severin Adjovi, the Benin Minister of Telecommunications, congratulating him on his new ministerial position and acknowledged that Adjovi's daughter was working for Titan at Afronetwork. In the letter, defendant Ray stated:

My warmest congratulations on your new responsibilities as the Minister of Culture and Tourism for the Republic of Benin. I am sure that you will bring all the enthusiasm, energy and talent to this challenging job that you showed when we worked together on telecommunications project.

Titan is continuing to push forward with all the telecommunications and computer manufacture efforts that we discussed together last November in Cotonou. We valued and appreciated your support in your previous job and hope to continue to have your support in your new position.

It was a pleasure to see your daughter, Chantal, again when she attended the VSAT training course held at Vallejo and San Diego in February and March. I know she worked very hard. I also read the superb graduation speech that she prepared and presented at the end of the Vallejo classes. *We are fortunate to have Chantal as an employee of AFRONET Benin.*

Over the next two years, Titan would make numerous payments to Severin Adjovi's brother and his daughter, Chantal, to gain Severin Adjovi's influence with the Beninese government.

(i)     **Payments to Severin's Brother, Edmund Adjovi**

125.    The February 2000 and August 2000 BCT Steering Committee meetings were attended by key Titan management including defendants Ray and DeMarco, Karim Amadou, and Edmund Adjovi, the brother of the Benin Minister of Telecommunications, Severin Adjovi.

126.    Prior to the February 2000 BCT Steering Committee meeting, Head composed a list of topics to be discussed in a memo to Bradley and defendants Ray and DeMarco. The memo had topics that were to be discussed in the presence of Edmund Adjovi and items of discussion where Adjovi would be excluded. Different revisions of the memo were circulated, evidenced by this version obtained by counsel which contained the following comments:

*Here are the revisions to reflect your comments and those of Agnan and Karim.*

You will see that Agnan and Karim put a couple of topics back into the category of "OK to discuss with Edmund," but not many. I wanted to give them a chance to react to the agenda with almost everything private from Edmund to see what they said.

Items to be discussed with Edmund Adjovi included:

Managing the Political Scene in Cotonou.

How is Edmund doing, how are his former AFRONET partners?

Items excluded from discussion with Edmund Adjovi included:

Global Financing status

Customs Exoneration status

*     *     *

- 43 -                    04-CV-0676-LAB(NLS)

1    Dealing with Edmund Adjovi

2    Dealing with former minister Adjovi

3    127.    The February 2000 BCT Steering Committee meeting was attended by "Dr. Gene

4    Ray, Mr. Eric DeMarco, Mr. Herb Bradley, Mr. Steven Head, Mr. Agnan (DG OPT), Mr. Karim

5    Amadou and Dr. Edmund Adjovi," as reflected in an internal document obtained by counsel titled

6    "Minutes, Decisions, and Key Action Items Of the 1st BCT Steering Committee Meeting, Paris, 26-

7    27 February 2000." In the general section of the minutes, where key decisions were agreed to by all

8    present, the minutes stated that:

9        Edmund Adjovi duties:  Edmund will help with Rascom and other regional
         telecom activities.  He will also continue to have the title of General Manager of
10       Titan Africa, supporting Steve Head as the President and CEO. *Dr Adjovi will have
         a staff, Titan Africa company vehicle, and office space fitting for one who is to be
11       perceived as the founder of the project in Benin.*

12    In the Executive Session of the minutes, Titan discussed specifically how to deal with Edmund

13    Adjovi:

14       Dealing with Edmund Adjovi:  All understand that Adjovi can maintain
         contact with his former partners at AFRONETWORK and potentially invoke
15       lawsuits against Titan for conspiring with OPT to transfer the rights and
         responsibilities of the BCT to Titan. Therefore, all agree to go slowly with Adjovi.
16       He will have the title of Vice Chairman of Titan Africa, and will retain use of the
         Toyota 4x4, AFRONET office space and AFRONET support staff.
17
18    128.    Titan San Diego knew of these payments to Edmund Adjovi as demonstrated by an

19    August 1, 2001 email, entitled "Benin BCT" from DeMarco to Head, Sopp, Kevin Beaver, Caulson

20    and Lechien.  The email contained questions and answers which were circulated among the group.

21    In response to a question, "How many employees do you have - #[?]  What is the monthly payroll of

22    these employees[?]," the email stated:

23       We also pay for Dr Adjovi ($96K per year paid out of San Diego directly) and the
         staff of five that he maintains in Benin.  Adjovi receives $1240 per month for his
24       support people and about $500 per month for incidental expenses. . . .

25       In summary: Total salaries for the Beninese that actually work for me now is
         $6,720, proposed to increase to $14,650 with a total staff of 22. The cost for the
26       ROM team and Mark Raimbault are $40K per month.  Adjovi and his staff add $9K
         per month. Therefore the grand total for all Titan Africa Employees plus Adjovi has
27       been $56K per month and is proposed to go down to $54K, including the raises for
         the local people but the decrease in the ROM costs.

28                              *      *      *

The direct cost paid in Benin out of operating funds sent from San Diego has been $748K for the first six months and is expected to decrease slightly to $746K for the next six months. . . .

129.   On February 21, 2002, at 1:49 a.m., Lechien, Comptroller of Titan, sent an email to Head copying DeMarco with the subject line "Edmond Adjovi," asking if Head could "confirm the arrangement that was made with Edmond Adjovi and the exact obligations (in writing) which have been made to him by Titan." The email further stated that "Adjovi is still receiving monthly checks from Titan and I do not understand why." In response on the same day at 3:38 a.m., Head replied to Lechien (copying *DeMarco*), stating that "Eric will remember completely why we are still paying Adjovi." The email further stated:

This payment is what we agreed to provide Afronetwork when we acquired all their rights and obligations to the BCT in August 1999.

At the time, Nick Costanza cautioned that the payment was a good start on making a credible buy out of a key director and officer of Afronetwork, but that it might not be seen by the courts as a sufficient payment to Afronetwork as a corporation.

***We had not terminated this payment for several reasons***:

           \*      \*      \*

***our partners at the time, Agnan and Karim, cautioned that it was still not the right time in Benin politics to cut Adjovi off***.

The fact that none of us (Herb Bradley, Gene O'Rourke, Eric, Gene, Frank Fair or myself) could ever find anything useful for Adjovi to do except stay out of our way has nothing to do with the salary payments as employee. Those payments were to purchase the rights and obligations of Afronetwork.

Now as a separate matter, Adjovi needed office space and some staff support (driver, secretary).  To keep him out of our way, I had suggested a physical separation of offices.  Therefore, we paid to rent a cheap office villa that Adjovi himself had picked out for us (but which I would not have used) and provided him with a monthly expense budget. The expense budget was in two parts:  1)  enough money to pay any employees that he as Afronetwork Benin (but clearly not anything to do with Titan Africa, and under NO contractual relation to Titan Africa) wanted to hire as driver, secretary, guardian, and three technical staff to help him with computers and appearances!  2) reimbursement for previously approved ACTUAL expenses such as car insurance, utilities, repairs.

130.   Alexander then replied by email at 8:54 a.m. to Lechien and O'Rourke and stated: "what a f . . . ing mess . . . do you believe this is a correct history . . . Gene [O'Rourke] let's discuss . . . ."

- 45 -                    04-CV-0676-LAB(NLS)

131.    Lechien, then replied by email at 9:31 a.m. and stated, "Based on Steve's e-mail, we kept Adjovi on because we thought he could hurt us politically.  If this is no longer necessary, I say we terminate immediately, with Nick's approval." O'Rourke replied, "This guy may be useless in a positive sense, but he probably could hurt us."

(ii)    <b>Payments to Severin's Daughter, Chantal Adjovi</b>

132.    Titan also paid off Severin Adjovi's daughter Chantal.  As noted above, on July 8, 1999, Ray wrote Minister Severin Adjovi, the Benin Minister of Telecommunications, congratulating him on his new ministerial position, and acknowledged knowing that his daughter was working for Titan at Afronetwork:

> We valued and appreciated your support in your previous job and hope to continue to have your support in your new position.
>
> It was a pleasure to see your daughter, Chantal, again when she attended the VSAT training course held at Vallejo and San Diego in February and March.  I know she worked very hard.  I also read the superb graduation speech that she prepared and presented at the end of the Vallejo classes.  *We are fortunate to have Chantal as an employee of AFRONET Benin.*

133.    Besides going to San Diego for "training," Chantal Adjovi also traveled to Paris for the February 2000 BCT Steering Committee meeting attended by Ray, DeMarco and others.  In the minutes for this meeting, discussed above, an item listed for discussion was: "VSAT Marketing project (Microbank type approach with VITA, Chantal to lead)."  Similarly, according to a PowerPoint presentation obtained by counsel named "TAorgch6.ppt," Chantal Adjovi reported only to Head and was put in charge of the "Phone Shop Project."

134.    As reflected in Titan Africa's Banque of Africa account obtained by counsel, Titan began making payments to Chantal Adjovi and Minister Severin Adjovi as early as July 2000 with the payments totaling 108,273,169.00 Beninese francs (approximately $200,000).  In addition to these payments, Chantal Adjovi was also paid cash payments "versement especes" totaling over $62,000 U.S. dollars and was provided a car, which she kept for some time after leaving the employment of Titan.

(4)     **Bribes to the Corporate Council on Africa**
        **(Afrique Conseil)**

135.    On or about March 13, 1999, defendant Ray wrote to Beninese Ambassador Tonoukouin on Titan letterhead, stating:

> I understand that you encouraged Titan to become more closely associated with the Corporate Council on Africa. We had only recently heard about the Corporate Council, since the contract for telecommunications in Benin is our first major venture in Africa. We will be delighted to pursue your suggestion as soon as possible.

136.    The phrase "close association with the Corporate Council" was a euphemism for payment of a bribe to this organization.

137.    Titan had no obligation to pay the Africa Council as evidenced by drafts of the BCT Contract Global Amendments:

> Titan has paid over $1.6M for the start up costs of Libercom that were to have been paid by OPT Benin. Examples of these costs include the lease of the Libercom Headquarters building, all of the Beninese marketing staff during the start up period (Afrique Conseil), advertising expenses, etc. Titan has agreed to continue to make similar payments since there are no net OPT revenues from Libercom above the principal and interest payments needed for the Global Financing. Titan and OPT Benin have agreed that OPT Benin will reimburse Titan from the OPT portion of the revenues obtained from Libercom, after repayment of the principal and interest due under the Global Financing. OPT has agreed to pay Titan's costs prior to receiving any net revenue share.

138.    Red flags were raised by Titan's auditor/accountant, Vincent Charles ("Charles"), in his audit report of December 18, 2001 about these payments to Afrique Conseil:

> We do not find all invoices related to these services, I estimate roughly payments to 200 k EUR. . . .

> Without being sure of the exhaustiveness of this listing, and even if we don't find the AC invoice for August, both the quantity of salesmen and the price invoiced seem quite suspicious.

Charles also noted that J Houessou of Afrique Conseil also performed cash withdrawals from the Titan account. One discharge was "signed by J HOESSOU to Eliane (Titan Africa) mentioning the withdraw from our petty cash of 4,5 K Eur for 'current expense to Justify.'"

4.      **The Bribery Pays off with Customs Exoneration and Illusory**
        **Agreements to Inflate Reported Revenue**

139.    On or before January 15, 2001, Titan was granted a partial customs exoneration due to the bribes described above. On March 29, 2001, Agnan sent a letter obtained by counsel, entitled

"Titan Management Fee on Build Co[-]Operate and Transfer Contract (BCT) with the OPT of Benin" to defendant DeMarco.  In the letter, Agnan claimed to give Titan an increase in its management fee:

> In the Equipment Supply Contract between Titan and ALCATEL for the BCT, Titan has obtained a Management Fee of slightly over 5%.
>
> This is considerably below the industry standard for integration contracts, and inconsistent with the risks in the African environment.
>
> The OPT hereby agrees that Titan should have a 20% management fee, paid out of the Global Financing.  This fee should be retroactive to the beginning of the BCT and should be carried forward on any new equipment or services provided by Titan under the BCT.
>
> A portion of this fee may be negotiated between Titan and ALCATEL as a supplier discount as is the case for the current Management Fee.  Any portion that ALCATEL does not provide to Titan as a supplier discount will be payable to Titan from the Global Financing in any event.

140.    On July 19, 2001, Agnan composed a letter to DeMarco stating the parties had signed the "Summary Amendment to the Build Cooperate and Transfer (BCT) contract" on June 25, 2001:

> the amount due to Titan on account of the "management fee" as revised by paragraph 5.2.5 of our June 25, 2001 agreement, is 45.000.000 FF for the period from August 3, 1998 through June 30, 2001;
>
> OPTB owes to Titan Africa Inc. an amount of  29.186.000 FF representing the reimbursement of the Titan Equipment under its undertakings of the OPTB in the Facility Agreement.

(Translated from French.)

141.    The original contract for the satellite network developed and deployed by Titan for Benin provided for $19 million in revenue with an additional 5% management fee drawn from the revenues earned by the network once it was operational (a total of approximately $30 million).  However, the addendum increased the satellite portion of the contract and increased the management fee from 5% to 20%, skyrocketing the value of the contract from $30 million to $60 million.

142.    Booking revenue on the basis of this contract addendum was inappropriate.  There was no legitimate reason for the contract increase.  Titan had not yet been paid anything by the customer despite realizing huge outflows of cash to support activities in Benin, including the unverifiable disbursements.  Further, Titan had no basis for expecting to be paid $60 million as it was known that the Beninese had no ability to pay this amount.  Titan knew that these receivables

were fictitious. Indeed, Titan had not required secured letters of credit from the Beninese, but had rather obtained only unsecured letters of credit – something that is simply not done in Africa.

143. Evidence that revenue on this contract could not be recognized is demonstrated by a September 17, 2001 email from DeMarco to Ray, Sopp, Head, O'Rourke and others, entitled "Benin Project" (mentioned above). In the email, DeMarco stated:

> The previous OPT Director General (Mr. Agnan) did execute an agreement early in '2001 increasing TTN's management fee on all Alcatel equipment, retroactively, up to 20%. We need to go through with the "new" OPT Director General, once in place, this Fee Increase, why is called for, reasonable and just. This is "critical to TTN", as, TTN made certain business decisions based on Agnan's signature on the documents authorizing this fee increase. Once we have this approval, we need to get together with the OPT and the AMB and walk them through it.

Thus, contrary to Titan recognizing revenue in accordance with SEC Staff Accounting Bulletin ("SAB") No. 101, DeMarco effectively admitted that SAB No. 101 was not met because Titan had no persuasive evidence that an arrangement existed and that Titan's collectibility was not reasonably certain. Thereby, Titan was required to restate its financials to account for this missing revenue. The subsequent history of this contract demonstrates this lack of collectibility. An internal PowerPoint draft presentation dated April 29, 2002 states that Titan Wireless management believed that the only realistic source of revenue to pay Benin's debt was revenue from the project and not funds from the Beninese government. Indeed, according to a May 2, 2002 briefing document written by Titan Wireless President O'Rourke, Titan Africa had come to a "gentleman's agreement" for repayment of the debt out of project revenue "if discounted by 25%."

144. Indeed, the collectibility of the debt was further compromised by the dubious nature of the debt. By mid May 2002, Titan, the OPT, and the Benin Minister of Telecommunications were in clear disagreement over the justification for the $30 million revenue increase purported obtained by Titan. A letter recapping the meeting held on May 15, 2002 attended by O'Rourke, President and CEO of Titan Wireless, stated:

> The VSAT valuation issue was discussed as this is one of the few areas in which the Minister of Telecom (Gaston Zossou) and the OPT are focusing. In brief they believe that there is no justification for the $30m price tag and are trying to get a consultant to go in and establish what they consider a fair market value. This could be potentially very damaging and we need to act and produce some decent documentation to help substantiate our claim.

- 49 -                                        04-CV-0676-LAB(NLS)

145.    The letter discloses that O'Rourke knew that there was no enforceable agreement in place to permit booking the additional increased revenue:

It appears that the only documentation we have to support the increase in the VSAT portion of the project from the original $11m to $30m is;

1.    An amendment to the scope of the BCT, which is a retrospective document signed by Agnan, the old DG OPT, but not approved by the OPT board.

2.    A letter from Agnan to Steve Head approving Titan's increase in value for the VSAT equipment, supported by a single table of figures.

As Agnan was effectively disgraced and dismissed we will be hard pressed to rely on this fairly flimsy documentation.

146.    The dubiousness of this account receivable and the omnipresence of bribery are also made clear by events that occurred after Head left Titan Wireless. Efforts were made to salvage the Benin contract after Head's departure in 2002, as Titan recognized that it had totally lost control of the project. The Libercom entity was "stealing $1.5 million of revenues a month" that rightly should have been paid to Titan. The contract had "very clearly delineated cash flows" in terms of what the customer was expected to pay to Titan, but these payments had not been made. As such, the project had "a very large cash deficit" because the customer had not been paying Titan. Titan had already recognized revenue on the project. As such, after Head's departure, efforts were made to renegotiate the contract so as to come to terms with the Beninese to obtain payment.

147.    Towards this goal, Titan personnel approached the U.S. Ambassador to Benin, Pamela Bridgewater, and requested her assistance in collecting the monies owed by the Beninese to Titan. Together, Bridgewater and Head's replacement met with various Beninese government officials, including Benin President Kerekou. In one meeting with Bridgewater and President Kerekou, Kerekou brought a "macro-economic advisor" and directed this individual to do everything necessary to assist Titan in receiving payment. This advisor told Titan that he could fix the situation for Titan, but that *he would require payment for doing so*.

148.    Before summer of 2002, the Beninese owed Titan/Titan Wireless approximately $50 million but had not paid anything. By summertime 2002, it was obvious that Titan/Titan Wireless was not going to get the full $50 million. No significant payments were made. There were

negotiations to reduce the amount owed by half, to only $25 million. By November 2002, the relationship between Titan and the Beninese had deteriorated to the point that the differences between the parties were being contested legally and no one associated with Titan "dared" to go to Benin.

149.   Titan executives were no strangers to Benin but rather were intimately involved in these transactions and aware of these problems. Indeed, all the members of the Titan Wireless/Titan Africa Board – which included Ray and DeMarco – were completely aware of the "status of exoneration" or lack thereof on the Beninese project and were completely aware of the role that Karicom fulfilled in Benin for Titan/Titan Wireless. Ray and DeMarco were informed of this by Head, who submitted information to the Titan Africa Board in the form of PowerPoint presentations. These PowerPoint presentations detailed the monthly performance of operations in Benin for a given quarter, including actual revenues compared to projected revenues for the period, in addition to revenues projected for future periods.

150.   Defendant DeMarco would have been aware of the inappropriate disbursements and inappropriately reported revenues occurring in Benin because Titan Wireless' activities in Benin were not resulting in incoming cash for Titan and it had been necessary for DeMarco to routinely "transfer funds" to support operations in Benin. Since these funds would have included the unaccountable $7.5-$8 million given to Karim Amadou, for among other purposes, to spend for Kerekou's presidential campaign, DeMarco would have known what Head was using the money for. Defendant Ray also was directly involved in the negotiations with the OPT and developed the deal for Titan in Benin. Ray visited Benin and met directly with Beninese President Kerekou, met with the OPT, and later returned to Benin to "turn on" the GSM network. Ray also entertained Agnan of the Beninese OPT at his home in Rancho Santa Fe, California. Similarly, DeMarco was involved in Benin as he traveled to Africa frequently to meet with Alcatel officials – the equipment manufacturers for the Benin contract – and to meet with Head. As such, top executives of Titan knew of the existence of bribes and the uncollectibility of the Benin receivables.

151.   DeMarco clearly understood the illegality of his actions. An hour before Head was scheduled to have a conference call with Lockheed's attorneys regarding these transactions,

1  DeMarco called Head and told Head to tell the lawyers "as little as possible." DeMarco told Head

2  that if Head answered all the questions from the lawyers, "they'll go down a path we don't want to

3  go."

4       152.   Eventually, after the Class Period, Titan recorded an aggregate after-tax write-off of

5  $11.9 million pertaining to its discontinued Titan Wireless activities in Benin, Africa. This loss

6  included a full allowance for the remaining amount of the past-due $14.4 million receivable on the

7  underlying Benin contract, a $2.3 million after-tax provision related to a contingent liability

8  associated with a subcontractor on this project, and administrative and legal costs related to this

9  operation.

10        **5.    Titan Secure – Saudi Arabia and FAA Contract**

11       153.   Defendants' illegal and improper business activities in Titan Secure Solutions and

12  Titan Secure Systems (collectively, "Titan Secure") included: (a) Titan's gift of two Hewlett-

13  Packard Supercomputers to Saudi Arabia's Ministry of the Interior and Titan's failure to properly

14  expense the $5 million gifts; (b) hiring a third-party, "El Alm" – a "private subsidiary" of the

15  Minister of the Interior – in order to win Saudi Arabia's National I.D. Card Project contract; (c) the

16  improper recognition of revenue based on the National I.D. Card Project; and (d) the improper

17  recognition of revenue on an unformalized agreement with the FAA to the tune of $3-$4 million.

18       154.   Titan Secure Solutions comprises divisions of Titan that provide secure solutions for

19  governments and business. During 2003 and 2004, Titan Secure worked in Saudi Arabia for the

20  Ministry of the Interior and in the United States for the FAA, a civilian government agency.

21        **6.    Admissions Made by Titan with Regard to Internal**
22               **Accounting Controls**

23       155.   In the DOJ Plea Agreement, Titan has pled guilty to:

     Falsifying the books and records of TITAN CORPORATION in violation of Title
24       15, United States Code, Sections 78m(b)(2)(A) and 78m(b)(5) . . . .

25  DOJ Plea Agreement at 2.

26       156.   The Plea Agreement contains the following facts which defendant Titan has admitted

27  as a condition of its plea:

28

TITAN had knowledge of a serious lack of internal controls in certain of its African subsidiaries. Such notice came from, among other things:

A.   A Management Letter from TITAN's external auditor for fiscal year 2000 stated that there was a "need to establish standard policies and procedures to be followed by the entities reporting to Titan Wireless;"

B.   Written allegations sent to certain TITAN officers in 2001 and 2002 claiming that a Titan Wireless employee in Benin had forged invoices and bills and paid bribes in Benin; and

C.   Written notification in 2002 from the external auditor of Titan Africa, S.A., that it was unable to issue an opinion on the financial statements for either of fiscal years 2000 and 2001 because it was unable to substantiate payments made by Titan Africa, S.A., citing $1.8 million in "missing cash" and highlighting the lack of internal controls within Titan Africa, S.A.

D.   A draft "process review" report on "Titan Africa" issued by TITAN CORPORATION's external auditor on or about August 29, 2001, which stated that "there is no accounting system set up in the company," that the system used to compute accounting data "is not reliable," and that there were risks at "Titan Africa" such as "intentional mistake: loss of cash," "fraud," and "loss of data."

TITAN failed to properly investigate these warnings, take corrective action, or report these issues to TITAN CORPORATION's audit committee.

*Id.* at 14-15.

157.   Counsel has obtained a version of the draft process review 2001 report noted in the Plea Agreement. The document is an Arthur Andersen-created PowerPoint presentation, named "rapport TitanProcess.ppt." The audit report states that "[t]he objective of our assignment was to understand the processes and evaluate the internal controls related to revenue recognition and cash." The work was based on information acquired from: "[d]iscussions with employees of both Titan Africa, Libercom, and Sofrecom," "[v]arious accounting documents" and "[b]ank account document." The report made the following comments:

Accounting and Compliance with local GAAP

There is no accounting system set up in the company as it is required by the SYSCOA (local GAAP).

Intangibility of data

The system (EXCEL), used to compute accounting data is not reliable:

Excel worksheet cells are not protected .

There are many versions of the reports.

1    Lack of delegation

2          [M]ajority of control is performed by one person

3    Lack of control carried out at various points throughout the processes.

4          No enough segregation of duties in cash collection.

5          No enough control to ensure that all revenues are billed.

6          Billing system is not well locked.

7          158.    For accounts receivables, the audit report stated that "[n]o analy[sis] of company bad

8    debt exposure by customers segments is available" and that "[r]eceivable aging is not followed."

9    Arthur Andersen also warned under the "Risks" heading that "[r]eserves are inadequate."

10         159.    Under the heading "Titan books," the audit report identified that "[t]here is no

11   accounting system," noting that they used "Excel worksheet[s] to record transaction[s]" and that

12   there was "[n]o compliance with local GAAP[s]."

13         160.    Under the heading "Bank reconciliation," the audit report identified that "[b]ank

14   reconciliations on the pledged account are not performed since the beginning of the year" and that a

15   "[g]ap between cash in accounting system and bank statement is not explained."

16         161.    On December 10, 2001, at 2:30 p.m., defendant DeMarco sent an email to O'Rourke,

17   President and CEO of Titan Wireless, copying defendant Sopp, CFO of Titan, Caulson, CFO of

18   Titan Wireless, and Lechien, Comptroller of Titan.  In the email, defendant DeMarco stated, "[a]s

19   we know, we have heard some things from certain people indicating that there may be some 'funny

20   business' going on."

21         162.    On December 11, 2001, at 2:07 p.m., CFO Caulson replied back to defendants

22   DeMarco and Sopp, and O'Rourke, stating:

23         We had a[n] audit performed by Arthur Andersen.  They certainly did not
           uncover the "funny business" that is occurring, but it was performed and things were
24         identified. . . .

25         As far as other assessments and control reviews, Vincent Charles, my
           accountant out of France, is down there at this moment cleaning things up.
26
           We will follow this up with a full time employee.
27

28

163.   On December 11, 2001, at 2:36 p.m., defendant DeMarco replied to Caulson and O'Rourke, copying defendant Sopp and Lechien, giving Caulson instructions to "[i]nstruct new management to do its own study and investigation for any funny stuff."

164.   Later that night on December 11, 2001, at 7:35 p.m., defendant DeMarco replied to the same email again to Caulson and O'Rourke, copying defendant Sopp and Lechien, stating that he "want[s] a written report [from Charles] by January 15, 2002 documenting exactly what he did and what are his findings."

165.   Charles' draft report dated December 18, 2001 was recently obtained by counsel. The report contains details on a myriad of illegal and suspicious activities occurring in Benin involving suspicious bank accounts, cash transactions, transactions with no economic substance, transactions carried out with bank secrecy countries, and transactions involving dubious value.  Plaintiffs have attached a copy of this draft report to this Complaint and incorporates its contents by reference into this Complaint.

166.   The Charles' draft report contains a section describing transactions with "no legal support found & no obvious economic substance."  Some of the transactions identified under this heading include: (a) large transactions with Libercom and Afronetwork; and (b) "sleeping" bank accounts with cash withdrawals by Chantal Adjovi, Afrique Conseil, Celestin Zinsou, Agnan and several unknown persons.  The Charles draft report concludes that "[b]oth the quantity and the nature of persons entitle to withdraw directly the cash is curious and require further investigations."

167.   The Charles' draft report also discusses two Titan accounts at Continental Bank, Benin and three other accounts at Ecobank for which no bank statements were available.  One of these accounts was a joint account held with one of its suppliers, General d'Afrique.  The report noted that the "utility of a joined account" was "not obvious" and was used for only one transaction of 2.5 million Euros for which Charles was unable to provide any economic rationale.  Similar suspicious transactions occurred in a joint account with Afripa-Libercom.

168.   The Charles' draft report also points to suspicious transactions with bank secrecy haven countries specifically pointing to a transaction with Enitel. The Charles' draft report noted that this was a "suspicious transaction" because:

- We have no evidence of the reality of this transaction (no delivery bill, no transitaire bill). This document should however exist as handwritten mention of the existence.

- We don't see the economic benefit for Titan Africa to pay the customs fees.

- ENITO SA doesn't exist (not listed in database of the Lux Co and in the directory, false phone number on the invoice).

- We do not clearly identify the financial flows. It may be possible that we do not collect from Enitel all payment required. Final conclusion will however be given in the SOFRACOM consultant report.

- The letter & invoices were archived in a carton inside the former CEO bedroom/office (S Head), instead of being in the accounting department.

- The mention of the certificate of incorporation is compulsory in Luxembourg. Luxembourg is a French speaking country, and there is no rational for having a 'certificate of incorporation' written in English in the legal stamp duty of the company.

The Charles' draft report admitted that "Titan Wireless San Diego is aware of similar deals with Enitel concerning the purchase of Scratch card."

169.   The Charles' draft report also contains a section discussing "unusual" withdrawals from a Paris bank account found "in a carton stored on S. Head balcony," which consisted of two withdrawals by the administrative manager of Titan Africa, S.A., Macaire Zinsou. Similarly, the report contains a list of a related party transaction with Karim Amadou totaling 180,000 Euros, noting that "[i]t's a known fact that the transaction negotiated with Transit Benin was very unbalanced for Titan."

170.   The Charles' draft report also contains a section regarding the purchases of "immaterial services" and includes suspicious payments of 1.5 million Euros for payments to Afrique Conseil. After conducting an investigation into this payment, the report stated that "both the quantity of salesmen and the price invoiced seem quite suspicious." The report mentions several other suspicious purchases and payments to "Multi Media," Anita Aguenoukoun, Finance Consultant Associés, Atelier d'Impression IB.

04-CV-0676-LAB(NLS)

### a.   Titan Secure's Operations and National I.D. Card Project in Saudi Arabia

171.    Titan's largest project in Saudi Arabia involved the creation of Saudi Arabia's National I.D. Card Project. Titan had been trying to get a deal with the Saudis for the National I.D. Card Project for over two years and was eventually awarded the contract on September 11, 2002.

172.    In order to do business in Saudi Arabia, a foreign company must have a Saudi partner or obtain a business license from the Saudi government. Titan had attempted to form a partnership with a "rice and beans" commodity business, owned by Prince Al Sudari, but the Saudis had "expressed displeasure" that Titan had not partnered with a more technically relevant partner company.

173.    Titan thereafter began to seek a Saudi business license. A foreign company seeking a business license must show "long-term commitment" to Saudi Arabia. The Ministry of the Interior would help Titan obtain a business license from a different government office provided that Titan could show the commitment that was required.

### (1)   The Saudi Ministry of the Interior Was Gifted a $5 Million Supercomputer

174.    In order to show its commitment to Saudi Arabia, Titan offered, and the Saudis "accepted Titan's offer to make available use of equipment." Specifically, Titan offered two Hewlett-Packard Superdome computers and granted "free utilization" of the systems. Although Titan retained ownership of the computers formally, in reality, Titan had effectively given a $5 million computer to the Saudi Ministry of the Interior.

175.    The systems arrived in Saudi Arabia around November/December 2002 and were located in the Ministry Data Center in a room that had previously housed a mainframe computer for the Ministry. Hewlett-Packard Superdome computers are used for simulating nuclear explosions and can be substituted in place of full-fledged nuclear tests. The gift of the Superdome computers paid off as Titan was awarded the National I.D. Card Project on September 11, 2002 and Titan's business license was issued in December 2002.

176.    Despite the fact that the computers were not intended for use on the National I.D. Card Project, and had been given away, they were maintained as assets of the Company. Titan

finally admitted the failure to properly expense this asset, declared the asset was impaired and discussed writing off its value on the July 8, 2004 "Business Outlook" conference call:

> Item 4, a non-cash asset impairment charge of 20-25 million, approximately half of which is attributable again to our Titan Secure Solutions Division. These impairments pertain to two large computer systems purchased in 2000 and 2002. With one system supporting a program for US civilian government agencies. And the other for our business activities in Saudi Arabia.
>
> On the other system in Saudi Arabia, given that we have decided to curtail our activities in a [sic] that marketplace, we expect to not be able to recover our investment in the computer systems.

On August 9, 2004, when Titan filed its June 30, 2004 Form 10-Q, defendants stated that Titan had recorded asset impairment charges for assets in Saudi Arabia:

> Approximately $10 million of these charges pertain to impairment of fixed assets directly related to the termination of a program by a U.S. civilian government agency in the second quarter, and impairment of assets associated with a reduction in scope of planned business activities in Saudi Arabia.

Furthermore, defendants disclosed that Titan had "$5.1 million in losses resulting from our National I.D. card system contract in Saudi Arabia."

### (2) Titan Hired a Private Consulting Company Owned by the Saudi Minister of the Interior to Get Awarded the Project

177.    Another condition of the National I.D. Card Project with Saudi Arabia was that Titan had to hire employees from a consulting company owned by the Saudi Minister of the Interior, or his family members. In putting together the National I.D. Card Project, Titan had been dealing with the Saudi Minister of the Interior. One consulting company Titan was obligated to hire, was "El Alm," a company made up of "employees" of the Saudi Ministry of the Interior who "wear a lot of hats" and would take an "absence" from the Ministry to work on El Alm projects.

178.    During the original contract negotiations of the National I.D. Card Project, there had been a purported agreement between the Saudis and Titan that some of the research and development on the project would be handled by the Saudis. However, El Alm did not actually have personnel available to do the work.

(3)   **Titan Improperly Recognized Revenue for Titan Secure in Saudi Arabia and Failed to Timely Write down the Value of the Associated Assets**

179.   Titan improperly recognized revenue in Saudi Arabia.  Mike Walker, General Manager of Titan Secure Solutions, had "over-promised" Titan Secure's performance prospects. The actual performance of the division failed to meet Walker's expectations and Walker began reporting "future revenues" prior to those revenues being properly earned.

180.   One particular Saudi procurement involved the shipment of printers and cameras to Saudi Arabia for the National I.D. Card Project where revenue was booked, but unlikely to be collected.  Earlier, Titan had shipped a large quantity of printers and cameras, enough to equip 85 field offices where Saudi identification cards are issued, "knowing they would not work for the intended purpose because the specifications necessary for the printers had not yet been developed." The printers and cameras sat around Titan's offices in Riyadh during 2003 and were later relocated to a warehouse somewhere in Saudi Arabia.  By December 2003, the cameras and printers still had not been put to use for their intended purpose.

181.   By June 2003, Titan's secure National I.D. Card Project in Saudi Arabia was in severe condition due to delays in completion.  The system for the National I.D. Card Project had not gone live or been deployed, and Titan had only presented demonstrations.

182.   The Saudis had bound Titan to complete work on the project by getting a surety bond from Titan for alleged $500,000.  In the event Titan did not complete the required work, the Saudis would be able to claim the $500,000 surety bond at Titan's expense.  Titan also did not want to abandon the project because Titan had previously booked revenue for work performed on the project.  Thus, if they did not fulfill their obligations, they risked not getting paid at all by the Saudis.

183.   The National I.D. Card Project finally went "into production" – around April/May 2004.  However, by then the Saudis were suing Titan for "consequential damages" for failing to perform the contract properly according to the contract terms.

1    184.    On August 4, 2004, Titan reported a loss of $5 million on the National I.D. Card

2  Project, and an asset impairment charge of between $6 and $12 million relating to business activities

3  in Saudi Arabia.

       **b.    Titan Secure Inappropriately Recognized Revenue and**
4              **Failed to Reserve for Uncollectible Accounts Receivable**
5              **and Write down Impaired Assets of Its FAA Contract**

6    185.    On July 22, 2003, Titan announced that it was awarded a $200 million ID/IQ FAA

7  Engineering Support Services Contract.  The press release stated that the FAA awarded Titan "an

8  indefinite delivery, indefinite quantity (ID/IQ) contract having a potential value of $200 million over

9  the next ten years."

10   186.    Titan/Titan Secure was to perform approximately a dozen different subcontracts with

11 the FAA, but each sub-project required its own formal contract and authorization from the FAA.  On

12 one such sub-project, Titan did not formalize the agreement with the FAA, but began performing

13 work and improperly booking revenue associated with the project on the basis of a verbal agreement

14 with an FAA representative, Rick Ford.

15   187.    In early 2004, the FAA conducted an internal reorganization and put a new individual

16 into the Chief Information Officer ("CIO") position that was previously held by Ford.  The person

17 who replaced Ford began "looking closely" at various contracts and projects in which the FAA was

18 involved, and detected that Titan had been billing the FAA for work on the project even though no

19 formal contract existed.  The FAA informed Titan/Titan Secure in March 2004 that they were

20 "disallowing a whole bunch of work" that had been performed by Titan and that the FAA would not

21 be paying Titan for the amounts that had been billed.  Furthermore, the FAA had decided not to use

22 any of the work that had been performed by Titan/Titan Secure on the entire vehicle contract.

23   188.    Altogether Titan/Titan Secure reported $3-$4 million in inappropriate revenues and

24 receivables associated with the FAA work over a period of time.  Regardless of which quarter the

25 $3-$4 million in revenue was recognized, Titan Secure's *accounts receivables and assets were*

26 *impaired*.

27   189.    Because Titan was notified by the FAA in March 2004 that they were "disallowing a

28 whole bunch of work" and that they had decided not to use any of the work that had been performed

                                    - 60 -                    04-CV-0676-LAB(NLS)

by Titan/Titan Secure on the entire vehicle contract, Titan should have recognized *this asset impairment* in the quarter in which it was realized (first quarter ending March 31, 2004).  Instead, Titan did not recognize this asset impairment until it was finally discussed on Titan's July 8, 2004 "Business Outlook" conference call where they warned of a non-cash asset impairment charge of $20-$25 million:

> In the second quarter we were *informed by the civilian agency* that they were moving the program back to within the agency.  And that the utilization of the computer system we had purchased would no longer be needed.

190.   In Titan's June 30, 2004 Form 10-Q, Titan recorded the asset impairment charge of $22.7 million of which approximately $10 million related to the FAA termination and other problems.

### 7.   Datron World Communications Division – Far East/Asia

191.   Some of Titan's FCPA violations involved its Datron subsidiary.

192.   The DOJ Plea Agreement with Titan contains the following facts about Datron, which defendant Titan has admitted as a condition of its plea:

> In 2001, TITAN CORPORATION acquired Datron Systems Inc. ("Datron") and thereafter operated it as a subsidiary.  TITAN CORPORATION did not perform any FCPA due diligence on Datron's foreign agents prior to or subsequent to the acquisition.
>
> Prior to its acquisition by TITAN CORPORATION, Datron did have a written FCPA policy, which required that all payments to its foreign agents be made in the name of the recipient and generally should be made in-country.  The Datron FCPA policy also required Datron to compile and keep a diligence file on each of its foreign agents.  Datron and its employees, both before and after its acquisition by TITAN CORPORATION, ignored this policy.

DOJ Plea Agreement at 15.  Based upon these facts, Titan pled guilty to the criminal offense of "[f]alsifying the books and records of TITAN CORPORATION in violation of Title 15, United States Code, Sections 78m(b)(2)(A) and 78m(b)(5)."  *Id.* at 2.  Titan also admitted the underlying legal predicates:

> That the defendant was an "issuer" under the federal securities laws and therefore required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of its assets;
>
> That the defendant knowingly falsified its books, records, and accounts; and
>
> That the defendant acted willfully.

1 | *Id.* at 5.

2 |     193.    Defendants' illegal and improper business activities in its Datron division also

3 | include: (a) bribes associated with Datron representatives in Sri Lanka and Bangladesh; (b) a huge

4 | $9 million bribe designed to obtain a $20 million contract with the Sri Lankan army; and (c) the

5 | improper recognition of revenue on shipments to Indonesia. The following additional facts about

6 | Datron have been compiled by counsel in its further investigation of this case.

7 |           **a.    Improper and Illegal Payments**

8 |     194.    Datron's customers were typically military organizations for countries like Sri Lanka

9 | and Indonesia. Datron's business involved the use of approximately 100 sales representatives

10 | throughout the world. These representatives served as a local presence for Datron and brought

11 | business to Datron based on the representative's command of the language and local connections.

12 | Datron representatives received a commission for their roles in facilitating deals. The commission

13 | was a percentage of the overall value of the contract. Datron did not verify how that representative

14 | utilized the commissions given to the representative, and therefore, a sales representative could

15 | receive a particularly large commission, the purpose of which was to use those funds to pay a

16 | government official in exchange for some favor being extended by the official to Datron.

17 |     195.    Lockheed, in the course of its due diligence investigation of Titan, detected bribes at

18 | Datron which they reported to the DOJ as possible FCPA violations. Two Datron representatives

19 | that have been associated with the bribes are: Ranjan Gomez (for Sri Lanka) and Shajad Ali (for

20 | Bangladesh). These individuals were supervised by Datron Internal Sales Representative Jeff Good,

21 | who was responsible for the entire Pacific Rim region, which included Indonesia and Sri Lanka.

22 |     196.    One of the suspicious transactions carried out by Datron involved a huge $20 million

23 | contract with the Sri Lankan army in 2001. The amount of the "commission" paid demonstrates that

24 | this deal clearly involved bribery. The deal, negotiated by Datron's President Art Barter, totaled $20

25 | million of which the Datron representative on the deal, P.T. Merial Esa, received *$9 million in*

26 | *commissions and "fees."* Based on the size of the transaction, it would have been reviewed by

27 | Titan's management.

28 |

### b.   Improper Recognition of Revenue

197.   One unusual element of the Indonesian army deal was that the Indonesians had requested that the radios purchased from Datron be shipped completely disassembled, down to the individual diode level.  Shipping the systems disassembled proved to be very problematic because the Indonesians did not have the expertise to reassemble the systems.  As such, it became necessary for Datron to send engineering personnel to Indonesia to reassemble the systems.

198.   United States Customs ("U.S. Customs") authorities "seized" the radios being shipped to Indonesia and refused to allow the systems to ship.  The U.S. Customs authorities apparently detected a discrepancy in Datron's bill of lading, and thereafter, shipments by Datron became "blacklisted" by U.S. Customs to ensure that Datron was not exporting prohibited military technology out of the country.  As a result, Datron had 16 shipments to various customers seized or delayed by U.S. Customs.

199.   Because of the delays in getting the products released from U.S. Customs, the Indonesians concluded that Datron was late in meeting the delivery date for the systems, resulting in difficulties for Datron getting paid on the contract.  Despite this known risk of not getting paid and the U.S. Customs problems, Datron booked revenue on the shipments to Indonesia as soon as the systems were delivered to a freight forwarder in Los Angeles.

200.   On July 8, 2004, Titan announced that it had offered its Datron business and its Titan Scan Technologies service business for sale.  The Company recorded an aggregate after-tax loss of $24.6 million in discontinued operations related to these two businesses in 2Q04.  The loss is primarily comprised of the impairment of intangible assets, mostly goodwill, and fixed asset values not expected to be recovered.

### 8.   Other Indications of Bribery in France, Japan, Nepal, Bangladesh and Sri Lanka

201.   On March 2, 2005, *The New York Times* reported Titan's DOJ settlement.  In the story, *The New York Times* interviewed Paul R. Berger, an associate director at the SEC enforcement division.  According to *The New York Times*, he stated that "Titan's misconduct was global: though Titan does business in more than 60 countries, the company has had no policy on overseas bribery

and has failed to oversee its 120 international agents." According to this news source, the SEC stated that "Titan had falsified documents filed with the United States government, underreporting commission payments in its business dealings in France, Japan, Nepal, Bangladesh and Sri Lanka." As a result, the SEC noted that the case showed "'the virtually complete lack of internal controls' at Titan, along with the company's inability to operate with policies and procedures that would help them detect and deter such problems." Such additional indications of bribery in France, Japan, Nepal, Bangladesh and Sri Lanka further support plaintiff's allegations of the falsity and materiality of Titan's FCPA violations and provide additional evidence of defendants' scienter.

### E.  Alive Pre-Class Period Statements Made False and/or Misleading by Defendants' Conduct

202.   Prior to the Class Period, defendants made statements to the investment community, in addition to their adherence to Titan's Code of Conduct and the FCPA, that were alive in the market at the beginning of the Class Period, and false or misleading as a result of defendants' conduct set forth above. These statements included false revenues, earnings, accounts receivables and other asset violations set forth in their financial filings with the SEC from at least FY00, which inflated Titan's stock price at least during the Class Period. Other statements made by defendants relating to their businesses where this conduct occurred were equally false and/or misleading and contained the material omission of this conduct. For example:

(a)   On June 2, 1999, Titan announced the execution of an agreement to create a telecom infrastructure for Benin with a value exceeding $60 million. The press release stated:

> The Titan Corporation announced today that its Afronetwork, Inc. (AFNI) partner in Benin West Africa has executed a definitive agreement with ALCATEL of France for the supply of advanced state-of-the-art telecommunications infrastructure to the "Office des Postes and Telecommunications (OPT), Benin" under a set of "Build Cooperate and Transfer" (BCT) agreements between AFNI and the OPT.

> The total value of the project was expected to exceed $60 million.

Commenting on the contract, defendant Ray stated:

> "We are very pleased to have fully participated in making this multi-national cooperation happen." ... "We believe the project in Benin will serve as a prototype for regional cooperation in telecommunications infrastructure improvements in Africa and elsewhere, and fully satisfies our new vision for our global telecommunications subsidiary, Titan Wireless," he added.

1          (b)     On April 1, 2002, Titan filed its Annual Report on Form 10-K for FY01.

2  Defendants reported revenues of $331.9 million for 4Q01, a 21% increase over revenues of $274.9

3  million for the same period a year ago. The defendants also reported ***accounts receivables of $430.8***

4  ***million***. The report was signed by defendants Ray, Sopp, DeMarco, and Hom (Lund). Additionally,

5  the defendants represented the following:

6         While Titan Wireless has historically generated most of its revenues by
7  supplying communications systems and products and providing related integration
    services in developing countries, ***Titan Wireless is increasingly generating revenues***
8  ***from providing communications services over this network***. . . .

                 *   *   *
9

10     Revenues of approximately $27.4 million, or approximately 29.5%, of Titan
    Wireless's revenues were generated from the Benin project during 2001. In October
11  2000, we collected an $18.0 million receivable from an African group related to a
    sale of a portion of our economic interest, net of all fixed equipment payments, in the
12  revenue sharing of this project.

13                 *   *   *

14     For the year ended December 31, 2001, Titan Wireless had revenues of
    approximately $92.7 million, which represented 8.2% of our consolidated revenues.

15                *   *   *

16     Titan Wireless has historically generated most of its revenues by supplying
    communications systems and products and providing related integration services in
17  developing countries. ***Titan Wireless is increasingly generating revenues from***
    ***providing communications services over its global communications network. While***
18  ***the majority of service revenues are currently being generated from long distance***
    ***carriers that use our network to carry their long distance communications traffic to***
19  ***and from developing countries, service revenues are starting to be generated from***
    ***retail customers in developing countries***.
20

                 *   *   *
21

22    Titan Wireless' revenues increased from $27.3 million in 1999 to $81.4 million in
    2000 and from $81.4 million in 2000 to $92.7 million in 2001. Increased service
23  revenues in 2001 of $17.5 million generated by Titan's consolidated joint venture,
    Sakon, in Latin America, Africa, and the Middle East, and increased revenues of
24  $17.2 million in new international business, primarily in certain countries in Africa,
    were offset by reduced revenues of approximately $23.4 million on Titan Wireless'
25  project in Benin to build a telecommunications system for its customer, The Office of
    Post and Telecommunication of Benin ("OPT"), as Titan Wireless completed the
26  system during 2001. The revenues in 2001 recorded on this project are a result of the
    expansion of the original project to include: increased GSM lines, expansion of the
27  capacity and capability of the VSAT sites and an overall increase of lines in the
    country of Benin. The increase in 2000 revenues was due primarily to Titan
28  Wireless's contract with the OPT, and, to a lesser extent, the increased services

revenues generated by Titan's consolidated joint venture, Sakon LLC, in Latin America, Africa, and the Middle East.

\*   \*   \*

***Allowance for doubtful accounts.*** We provide a reserve against our receivables for estimated losses that may result from our customers' inability to pay. These reserves are based on potential uncollectible accounts, aged receivables, historical losses, our customers' credit-worthiness, changes in government funding on certain of our contracts and adjustments that may arise from audits by the Defense Contract Audit Agency ("DCAA") of certain of our government contracts. Should a customer's account become past due, we generally will place a hold on the account and discontinue further shipments and/or services provided to that customer, minimizing further risk of loss. The likelihood of a material loss to Titan on an uncollectible account in our commercial business would be principally dependent on a deterioration in economic and/or political conditions in a particular country, such as Benin, Africa, in which our receivables due from the government controlled phone company of Benin may be impacted.

\*   \*   \*

Titan's results of operations have historically fluctuated and may continue to fluctuate significantly in the future, which could adversely affect the market price of its common stock.

Titan's revenues are affected by factors such as the unpredictability of sales and contracts awards due to the long procurement process for most of its products and services, defense and intelligence budgets, the time it takes for the new markets Titan targets to develop and for Titan to develop and provide products and services for those markets, competition and general economic conditions. Titan's product mix and unit volume, its ability to keep expenses within budgets, its distribution channels and its pricing affect its gross margins. These factors and other risk factors described herein may adversely affect Titan's results of operations within a period and cause Titan's financial results to fluctuate significantly on a quarterly or annual basis. Consequently, Titan does not believe that comparison of its results of operations from period to period is necessarily meaningful or predictive of its likely future results of operations. It is possible that in some future quarter or quarters Titan's operating results will be below the expectations of public market analysts or investors. If so, the market price of Titan's common stock may decline significantly.

(c)   On March 31, 2003, Titan filed its 2002 Report on Form 10-K with the SEC. In this filing, defendants reported $1.392 billion in revenues and a loss of $271 million, with net accounts receivables of $314.3 million. In this filing, defendants made the following false statements with regards to the particular accounts receivables associated with the Titan Wireless project in Benin:

Titan Wireless's wholly-owned subsidiary, Titan Africa, inc., completed work on a satellite-based communications system for Benin's national telephone company during 2001.... The terms of Titan Wireless's agreement with the OPT to pay for this receivable and further amounts include, among other things, a revenue sharing of total net receipts on this project for up to a maximum period of 9 years, depending upon when the equipment has been paid for. The remaining carrying

1   value of the net receivable as of December 31, 2002 is approximately $34.6 million.
    Approximately $2.4 million of collections were received in 2002, and approximately
2   $3.7 million has been collected through March 25, 2003.

3   Titan's 2002 Form 10-K at 24. The Form 10-K also discussed FY01 and FY00 charges and made no

4   mention of any charge or reserve relating to Benin's accounts receivables. *Id.* at 31-32. The Form

5   10-K stated that with relation to the Benin receivable "[a]s of December 31, 2002, the carrying

6   value, net of non-recourse debt, due on this contract was approximately $34.6 million." *Id.* at 37.

7   The document was signed by defendants Ray, Sopp, and Lund.

8         (d)    Titan's 2002 Form 10-K also contained the following misleading statement

9   with regard to Titan's compliance with U.S. laws:

10        We must comply with and are affected by various government regulations.
          These regulations affect how we and our customers can do business. . . . Any failure
11        to comply with applicable laws could result in material fines and penalties or affect
          how we conduct our business in the future.
12
    *Id.* at 16-17.
13
14        (e)    Titan's 2002 Form 10-K also contained the following misleading statement

15  with regards to the methods which Titan used to value long-lived assets:

16        Valuation of goodwill, intangible and other long-lived assets.   We use
          assumptions in establishing the carrying value, fair value and estimated lives of our
17        long-lived assets and goodwill. . . . Factors that would influence the likelihood of a
          material change in our reported results include significant changes in the asset's
18        ability to generate positive cash flow, loss of legal ownership or title to the asset, a
          significant decline in the economic and competitive environment on which the asset
19        depends, significant changes in our strategic business objectives, utilization of the
          asset, and a significant change in the economic and/or political conditions,
20        particularly in which we have investments.

    *Id.* at 40.
21
22        203.    The 2002 Form 10-K did not restate any of the false and misleading statements made

23  in the 2001 Form 10-K, and reasserted much of the 2001 Form 10-K's financial statements as well as

24  statements and omissions regarding Benin and other foreign transactions. As the primary financial

25  information available to investors, these 10-K's were considered correct by the market and

26  incorporated into, and inflated the market price of Titan's stock and kept Titan's stock price inflated

27  until the end of the Class Period when it was conclusively determined that Titan and the Individual

28  Securities Defendants had been lying all along about their illegal activities.

- 67 -                              04-CV-0676-LAB(NLS)

1     204.    The above 2001 and 2002 Form 10-K statements and omissions were knowingly false

2  and misleading, and caused Titan's stock to trade at artificially inflated prices during the Class

3  Period.  In particular, Titan has admitted that its 1999-2001 actions in Benin violated the criminal

4  bribery elements of FCPA (15 U.S.C. §78dd-1).  DOJ Plea Agreement at 2.  Titan has admitted that

5  Titan acted "corruptly" by paying "money or anything of value" to "a person knowing that such

6  money would be offered, given, or promised, directly or indirectly" or "a foreign public official" to

7  "influence any act or decision" of a foreign public official." *Id.* at 4-5.  All of the underlying factual

8  bases for this violation are admitted to by Titan and occurred between 1999 and 2001.  *Id.* at 6-13.

9  Therefore, Titan has admitted to knowingly having committed these unlawful payments well before

10  either the 2001 or 2002 Form 10-K was filed.  This fact makes the above Form 10-K statements and

11  omissions regarding liabilities and revenues, and regarding compliance with the law, intentionally

12  false and misleading when made.  When the true facts came out, as pled below, Titan's stock price

13  declined, causing plaintiff Shurkin to suffer a loss and causing damage thereby.

14  **V.     DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT**

15     205.    With the above activities remaining undisclosed to the market, the above statements

16  still alive, and assets being carried on Titan's books, defendants (minus DeMarco who left under

17  pressure from the Board) set out to make Titan appear attractive as a take-over target so that they

18  could reap the benefits of Titan's apparently spectacular performance.

19     **A.    Defendants Position Titan for Acquisition**

20     206.    In the fall of 2002, Thomas G. Pownall, a former director of Titan and retired

21  Chairman and CEO of Martin Marietta Corporation, a company that combined with Lockheed in

22  March 1995 to form Lockheed Martin, contacted defendant Ray to introduce Frank H. Menaker,

23  Senior Vice President and General Counsel of Lockheed.  In connection with that introduction, Mr.

24  Menaker suggested that it could be mutually beneficial for Lockheed and Titan if Ray met with

25  Robert J. Stevens, Lockheed's President and COO.  Subsequently, Mr. Stevens sent Ray a letter

26  suggesting they meet at a mutually convenient time.

27     207.    Ray responded to Mr. Stevens in early October 2002, and the officers discussed

28  generally the businesses of their respective companies.  In December 2002, Mr. Stevens contacted

1    Ray to discuss possible strategic initiatives involving their respective companies.  Mr. Stevens told

2    Ray that the invitation to meet together with Dr. Vance D. Coffman, Chairman and CEO of

3    Lockheed, remained open.

4          208.   During 2002, Ray shifted the Company's focus back to government work, shutting

5    down Titan's commercial work.  The costs to exit commercial businesses led to Titan's largest loss

6    of $271.5 million, causing Titan's shares to tumble by 50% from their trading level of $20 per share

7    in early January 2002 down to $10 per share by the end of FY02.  By April 14, 2003, the Company's

8    stock price had declined to $6.80 per share.

9          209.   After the announcement of the acquisition of Veridian Corporation by General

10   Dynamics in June 2003, defendant Ray sought and obtained information from Relational Advisors

11   LLC regarding Titan's implied value at the valuation multiples paid by General Dynamics for

12   Veridian.  This information implied that Titan might be able to command a significant premium to

13   its then-current trading price through a similar transaction.

14         210.   On July 23, 2003, the Titan Board authorized Ray and Titan executive management to

15   meet with Lockheed to explore the terms of a sale of Titan to Lockheed.  Defendants knew that an

16   acquisition by Lockheed was substantially dependent upon Titan's reporting favorable financial

17   results and Titan's ability to represent to the public and Lockheed that it had not engaged in illegal

18   practices.  Titan's ability to report increasing revenues and earnings throughout the Class Period was

19   vital to the Company's success and to assuring Lockheed would acquire Titan.  Foreign payments

20   are a particularly sensitive area for Lockheed, who in 1995 paid one of the biggest penalties ever –

21   $24.8 million – for violating the FCPA after an executive was found to have bribed an Egyptian

22   politician to win a contract.  Indeed, the legislative origins of the FCPA arose from another

23   Lockheed bribery scandal in the 1970s.  Defendants also discussed and negotiated continuously

24   throughout the Class Period the Company's business, the merger, and the level of disclosure Titan

25   would make concerning its foreign business practices, especially the illegal "consulting" payments

26   which could derail the merger.  If defendants had accurately disclosed the FCPA violations, the stock

27   price and merger acquisition price of Titan would have been substantially lower.  However, Titan's

28

1  dishonesty – when found out – eliminated any prospect of the merger happening and devastated the

2  stock price even further than simple disclosure of the truth.

3      **B.    Defendants Issue False Financials and Guidance and Omit Violations
            of the FCPA and GAAP**

4

5      211.    On July 24, 2003, Titan announced to the investment community that it was

6  increasing its reserve and earnings for FY03 and FY04, causing its stock price to spike from $11 to

   nearly $16 per share in a single trading session on very high trading volume.  On that date, the

7  Company issued a press release, entitled "Titan Reports Record Quarterly Revenues of $438 Million,

8  up 27%," which reflected strong growth in revenue, operating margins, and earnings per share and

9  increased 2003 and 2004 earnings guidance, and stated in relevant part:

10

11          Titan reported record quarterly revenues for the second quarter of 2003 of
       $438 million, an increase of 27% from $346 million in the second quarter of 2002.
       The increase was a result of 29% organic revenue growth generated by Titan's core

12     national security solutions business.

13          Net income for the second quarter of 2003 was **$5.9 million**, or $0.07 per
       share, compared with a net loss of $11.8 million or ($0.16) per share for the second

14     quarter of 2002.

15     212.    Commenting on these results, defendant Ray stated:

16          "Titan is on track for a record year of growth and profits." . . . "We are
       particularly proud of the 29% year-over-year revenue increase in our core national

17     security business, which now accounts for over 99% of our revenues.  We were also
       able to ramp up quickly on new contracts, which accelerated program execution and

18     revenue growth.["]

19     213.    Defendants' press release also increased guidance for 2003:

20          The Company is increasing its guidance for fiscal 2003 by announcing that it
       expects revenue to be between $1.725 billion and $1.775 billion.  Earlier guidance

21     had been for revenues in the range of $1.59 billion to $1.61 billion.

22          The Company is also increasing its guidance by announcing that it expects
       fiscal 2003 pro forma earnings per share from continuing operations to be $0.70 to

23     $0.72.  Previous guidance had been $0.63.  GAAP earnings per share, including the
       charge for debt extinguishment costs of $12.4 million, are expected to be in the range

24     of $0.52 to $0.54.  Previous guidance for GAAP earnings per share was $0.46.

25     214.    Defendants also increased guidance for 2004:

26          The Company's guidance for fiscal 2004 revenue is $2.0 billion to $2.1
       billion, representing a year-over-year growth rate of 16% to 18%.  Earnings per share

27     on a GAAP basis is expected to be in the range of $0.84 to $0.88.

28

"The improved outlook for the remainder of 2003 and for 2004 reflects our record backlog, large program execution expertise, our bid and proposal pipeline and our proven ability to execute our business development initiatives," Ray said. "In today's environment of continuing geopolitical threats, we believe there will be increasing demand for Titan's proven capabilities in providing National Security Solutions."

Guidance Summary

| | (in millions except for earnings per share) | |
| | 2003 | 2004 |
| --- | --- | --- |
| Revenues | $1,725 to $1,775 | $2,000 to $2,100 |
| Revenue growth rate | 24% to 27.5% | 16% to 18% |
| Pro forma EPS | $0.70 to $0.72 | $0.87 to $0.91 |
| GAAP EPS | $0.52 to $0.54 | $0.84 to $0.88 |
| EBITDA | $142 to $148 | $170 to $178 |
| Free cash flow from continuing operations | $54 to $64 | $75 to $85 |

215.    Immediately after this announcement, which omitted any revelation of the revenue generated as a result of FCPA violations or with any of the financial or legal liabilities associated with these violations, Titan's stock price jumped from $11.26 per share on July 23, 2003 to as high as $16.16 per share on July 28, 2003.

216.    These results were repeated when Titan filed its quarterly Report on its June 30, 2003 Form 10-Q on August 11, 2003.  This report was signed by defendants Ray and Sopp, and represented the following:

The accompanying financial information includes substantially all subsidiaries on a consolidated basis and all normal recurring adjustments which are considered necessary by the Company's management for a fair presentation of the financial position, results of operations and cash flows for the periods presented.

217.    The June 30, 2003 Form 10-Q also contained false and misleading representations regarding Titan's liabilities as it omitted the complete financial and legal liabilities associated with its FCPA violations.  For example, the Form 10-Q stated that:

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. . . .

Despite this requirement, Titan failed to include any estimate of the contingent liabilities associated with FCPA violations, including the potential costs associated with Titan losing its ability to contract

- 71 -                                   04-CV-0676-LAB(NLS)

1    with the U.S. government, asset write-downs probationary costs, fines, legal costs, and the inability

2    of Titan to carry out mergers.

3       218.    Hence, the June 30, 2003 Form 10-Q contained representations regarding the total

4    current liabilities associated with Titan Wireless. The Form 10-Q claimed that the current liabilities

5    were $32.4 million and the non-current liabilities were $36.2 million. Titan explained that:

> 6     The current liabilities of $32.4 million of Titan Wireless include approximately $7.4
> million of remaining exit costs and approximately $22.0 million of accounts payable
> 7     and lease obligations of GlobalNet. Titan is endeavoring to divest these businesses
> through stock and asset sales and is currently in negotiations with a number of
> 8     potential buyers of GlobalNet. In the event that Titan is unsuccessful in its
> endeavors to sell GlobalNet, Titan may incur a net cash outlay of approximately $8.5
> 9     million, the net liability balance of GlobalNet, as well as potential unforeseen
> liabilities to shut down the business.

10

11       219.    Titan failed to include any estimate of the contingent liabilities associated with FCPA

12    violations, including the potential costs associated with Titan losing its ability to contract with the

13    U.S. government, asset write-downs probationary costs, fines, legal costs, and the inability of Titan

14    to carry out mergers.

15       220.    The above false and misleading statements and omissions regarding revenues and

16    liabilities were knowingly false and misleading when made. In particular, Titan has admitted that its

17    actions in Benin between 1998 and 2002 violated the criminal bribery elements of the FCPA,

18    15 U.S.C. §78dd-1. Titan has admitted that Titan acted "corruptly" by paying money or anything of

19    value to a person, knowing that such money would be offered, given, or promised, directly or

20    indirectly, to a foreign public official to influence any act or decision of the foreign public official.

21    DOJ Plea Agreement at 4. All of the underlying factual bases for this violation occurred between

22    1999 and 2001. *Id.* at 6-13. Therefore, as a result of the admissions made in the DOJ Plea

23    Agreement, Titan has effectively admitted to knowingly having committed these unlawful payments

24    well before July 2003, making the July and August 2003 statements regarding liabilities and

25    revenues intentionally false and misleading when made.

26       221.    The purpose of this denial, and its effect, was to artificially increase the price of

27    Titan's stock over and above what it would have been in the absence of these statements and

28    omissions. In the absence of these statements and omissions, in particular, were Titan to have

1   admitted the true facts that Titan "was aware" of unlawful payments by Titan, the price of Titan's

2   stock would have declined to take this information into account, to take into account the possibility

3   that Titan would lose its business with the U.S. government, and to take into account the fact that

4   any prospective merger would have to be revalued and potentially threatened when it emerged that

5   Titan was in fact guilty of these violations and that the Lockheed merger would not take place as a

6   result.  Indeed, when the truth was revealed slowly as the result of several disclosures and events in

7   2004, Titan's stock price declined from trading around $22 per share to as low as $11.74 per share

8   by July 2, 2004.

9       **C.    Defendants Negotiate a Merger with Lockheed**

10      222.    Thereafter, at a meeting held on August 6, 2003, in Washington, D.C., defendants

11  Ray and Sopp met with Jeffrey D. MacLauchlan, Lockheed's Vice President, Financial Strategies,

12  and with Frank H. Menaker, Lockheed's Senior Vice President and General Counsel, to discuss

13  Lockheed's interest in acquiring Titan.  During the August 6, 2003 meeting, members of Lockheed's

14  management indicated that their review of Titan to date had been limited to publicly available

15  information, but that they would like to conduct detailed "due diligence" of Titan.  Of particular

16  importance to Lockheed was Titan's compliance with all U.S. export regulations, as Lockheed had

17  paid one of the biggest penalties ever – $24.8 million – for violating the FCPA in 1995.  On August

18  6, 2003, Titan and Lockheed entered into a Confidentiality Agreement and Titan prepared to provide

19  Lockheed with certain of Titan's non-public information which would be controlled by Ray and

20  Sopp.

21      223.    On August 12 and August 13, 2003, Lockheed and Titan management met in San

22  Diego, California.  Titan management briefed Lockheed on certain due diligence matters.  Lockheed

23  made a number of follow-up due diligence requests, and the parties discussed the process for due

24  diligence going forward.  Again, Lockheed expressed particular interest in Titan's compliance with

25  all U.S. laws and export regulations.

26      224.    On August 15, 2003, based on its preliminary due diligence review, Lockheed wrote a

27  letter to Ray suggesting that Lockheed acquire Titan by merger for $20 per share for Titan common

28  stock, which represented a 30% premium to the closing price of Titan common stock on August 14,

1 | 2003. Lockheed's letter proposed paying the acquisition price 50% in cash and 50% in Lockheed
2 | common stock subject to further due diligence and Lockheed Board of Directors' approval.

3 |     225.   On August 20, 2003, the Titan Board met to consider Lockheed's proposal compared
4 | to the prospect of Titan continuing to operate on an independent basis or Titan pursuing alternative
5 | strategic transactions.  The Titan Board received presentations from Titan's management team,
6 | including Ray and Sopp, and Relational Advisors.  The Titan Board instructed Ray to reject
7 | Lockheed's $20 per share offer in favor of shopping the Company around for a better price.
8 | However, with one $20 per share offer in-hand, defendants determined not to shop the Company
9 | around publicly because that would likely expose them to further due diligence requests.  Instead,
10 | defendants decided to shop the Company to a select group of four defense firms with whom they
11 | determined they could actively limit the due diligence.

12 |     226.   At the August 20, 2003 meeting, the Titan Board approved retention, severance and
13 | other payments to certain Titan employees which would be triggered by the now imminent "change
14 | of control" of Titan.  These benefits included:

15 |     (a)   New "change in control" benefit provisions for Ray and Sopp entitling them
16 | to a lump sum payment amount equal to *three times the sum of their base salary and their "Highest*
17 | *Annual Bonus,"* upon their termination, even their voluntary resignation, following the Lockheed
18 | acquisition, plus outplacement services valued at up to $100,000.  Based on their then-current
19 | compensation levels, the total estimated cost of the severance payments and continued welfare
20 | benefits payable to Ray and Sopp were *approximately $5.6 million and $2 million*, respectively;

21 |     (b)   Immediate vesting upon consummation of the merger of all stock options that
22 | had been previously granted to the executives to acquire shares of Titan, which would remain
23 | exercisable in Lockheed's stock for the remainder of their original terms.  With the acceleration of
24 | their stock options, Titan's executive officers and directors would receive the following amounts:

| | |
|---|---|
| Gene W. Ray | $4,542,113 |
| Nicholas J. Costanza | 1,463,632 |
| Mark W. Sopp | 1,217,381 |
| Charles R. Saffell, Jr. | 349,424 |
| Paul W. Sullivan | 681,302 |
| Allen D. Branch | 512,887 |
| Thomas J. Brennan | 577,454 |
| Lawrence J. Delaney | 605,938 |
| A. Anton Frederickson | 529,925 |
| Ronald B. Gorda | 529,925 |
| Robert J. Osterloh | 632,719 |
| Earl A. Pontius | 613,867 |
| Leslie A. Rose | 733,699 |
| Robert J. Whalen | 605,938 |
| All directors and executive officers (32 persons) | $17,010,598 |

(c)     Retention bonuses valued at over $4.7 million;

(d)     Severance benefits valued at approximately $7.8 million;

(e)     Extra bonuses for two executives, including Sopp "in recognition of their performance relating to the proposal for a strategic transaction;" and

(f)     Full 2003 incentive bonus to all "headquarter employees" including Ray and Sopp, regardless of the Company's actual performance in 2003.

227.     Following the August 20, 2003 meeting, defendants contacted the four other defense companies identified as potential alternative purchasers. Two of the companies were not interested in pursuing discussions with Titan and two other companies executed confidentiality agreements with Titan.

228.     On August 29, 2003, Ray received a revised offer from Lockheed of $20 per share of Titan common stock in cash or $21.50 per share payable half in cash and half in Lockheed common stock. Thereafter, the two other defense firms that had previously expressed interest in acquiring Titan indicated they did not want to pursue an acquisition of Titan.

229.     On September 5, 2003, Titan received a revised offer from Lockheed of $22 per share of Titan common stock, payable half in cash and half in Lockheed common stock. The revised offer was conditioned upon additional due diligence. On that date, Lockheed rejected Ray's request that the offer be increased and instead provided Titan with a detailed list of due diligence items that it wanted to review.

230.    On September 9, 2003, representatives of Lockheed and Titan, including executive vice presidents from three of Lockheed's business segments and all but one of the eight business sector presidents of Titan, met to discuss reciprocal due diligence issues in McLean, Virginia. On the same day, a separate, inter-disciplinary subject-area due diligence team from Lockheed met with representatives of Titan in San Diego. Lockheed's and Titan's respective due diligence review continued through September 15, 2003. Throughout the due diligence processes, defendants continued to conceal the illegal payments to foreign consultants.

231.    Throughout the Class Period, defendants Ray and Sopp also filed false §302 certifications under the Sarbanes-Oxley Act. Section 302 of the Sarbanes-Oxley Act provides in relevant part:

> (1)    the signing officer has reviewed the report;
>
> (2)    based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;
>
> (3)    based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;
>
> (4)    the signing officers –
>
> > (A)    are responsible for establishing and maintaining internal controls;
> >
> > (B)    have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;
> >
> > (C)    have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and
> >
> > (D)    have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date . . . .

232.    By filing each of the following §302 certifications, defendants Ray and Sopp made false statements by not disclosing the bribes and internal control problems that were occurring at Titan. These statements were made on the following dates:

| Filing Date | Quarter or Fiscal Year Ending | Signatories |
|---|---|---|
| August 11, 2003 | June 30, 2003 | Ray and Sopp |
| November 10, 2003 | September 30, 2003 | Ray and Sopp |
| March 10, 2004 | December 31, 2003 | Ray and Sopp |
| April 29, 2004 | December 31, 2003 Amended Form 10-K | Ray and Sopp |
| May 10, 2004 | March 31, 2004 | Ray and Sopp |

233.    Signing these false Sarbanes-Oxley certifications was required to avoid disclosing the illegal activities described in this Complaint.  When such activities were eventually revealed, Titan's stock dropped precipitously.  In particular, from Titan's stock price of $22 per share, which prevailed throughout most of the Class Period, Titan's stock price plummeted to as low as $11.74 per share by July 2, 2004.

234.    A special telephonic meeting of the Titan Board was held on September 15, 2003 where the Titan Board unanimously approved the merger with Lockheed at $22 per share. Lockheed's Board of Directors also approved the acquisition.

235.    Also on September 15, 2003, the Titan Board increased Sopp's target bonus under the Titan Annual 2003 Incentive Plan by 15% of his annual base salary, a value of $48,750, simply for causing the merger to occur.  Despite the failure of the merger, payment has already been made to Sopp, as have been all 2003 incentive bonuses.

236.    The merger agreement with Lockheed contained the following representations and warranties made by Titan (defined as the "Company" in the agreement):

> **5.21 Relations with Governments.**  To the knowledge of Company, neither Company nor any of its Subsidiaries, nor any director, officer, agent or employee of Company or any of its Subsidiaries, has **(a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (b) made any unlawful payment or offered anything of value to foreign or domestic government officials or employees or to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns, (c) made any other unlawful payment,** or (d) violated any applicable export control, money laundering or anti-terrorism law or regulation, **nor have any of them otherwise taken any action which would cause Company or any of its Subsidiaries to be in violation of the Foreign Corrupt Practices Act of 1977, as amended,** or any applicable law of similar effect.

This document was filed with the SEC on September 17, 2003, and the merger announcement was made on September 15, 2003.

237.    The above FCPA statement was also demonstrably false and misleading when made. Titan has pled guilty to violations of 15 U.S.C. §78dd-1, and in particular, for making use of interstate and foreign instrumentalities corruptly in furtherance of unlawful payments to a foreign public official for the purpose of influencing his acts and decisions to assist Titan in obtaining and retaining business. DOJ Plea Agreement at 4-5. Titan has also admitted that part of these payments was for unlawful activity related to the Beninese presidential election. *Id.* at 9-13. As described in the DOJ Plea Agreement, these underlying facts all occurred before 2002. *Id.* at 6-13.

238.    Therefore, as a result of the admissions made in the DOJ Plea Agreement, Titan has admitted to knowingly having committed these unlawful payments well before September 17, 2003 when the merger agreement was filed with the SEC, making the above statements intentionally false and misleading when made.

239.    The SEC's March 1, 2005 Release No. 51283 noted that the above false FCPA statement was publicly disclosed and disseminated by Titan in two places:

> The proxy statement disclosed that "the merger agreement contains representations and warranties by Titan that expire upon completion of the merger as to, among other things ... Titan's compliance with the Foreign Corrupt Practices Act of 1977, as amended." In addition, the Merger Agreement containing the FCPA Representation was appended to Titan's proxy statement. The proxy statement was filed with the Commission and sent to Titan's shareholders. The Merger Agreement and the proxy statement were amended at various times after September 15, 2003, primarily due to SEC and Department of Justice investigations of potential Titan violations of the FCPA. Throughout this period, the FCPA Representation itself remained unchanged. In June 2004, Lockheed terminated the Merger Agreement.

240.    With regard to the above FCPA statement, the SEC found that a reasonable investor could conclude that these representations could be material:

> the inclusion of the FCPA Representation in a disclosure document filed with the Commission, whether by incorporation by reference or other inclusion, constitutes a disclosure to investors. Depending on the context in which the disclosure is made (including the significance of the representation or other contractual provision and the total mix of information available to the investor), a reasonable investor could conclude that the statements made in the representation describe the actual state of affairs and the information could be material. *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information"). In such a situation, where a document containing such a representation is disclosed, if additional material facts exist, such as those contradicting or qualifying the disclosure of the original representation (for example, knowledge by the senior officers of the company that the facts described in the representation are not true), omission of which makes that disclosure misleading, a company would also be required to disclose those facts.

This is particularly true when an issuer knows of new information before the original proxy statement, or amendments, are published. Where the failure to make such disclosure is negligent, an issuer would violate Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, and where the failure involved scienter, the issuer would also violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

241.   The SEC also noted that any general disclaimers would not constitute a sufficient disclosure where Titan had material information contradictory to the representations that it made:

> As is the case in other circumstances, where specific additional material facts exist that are known to an issuer, or an issuer was reckless in not knowing them, (in the case of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), or an issuer was negligent in not knowing them, (in the case of Section 14(a) of the Exchange Act or Rule 14a-9 thereunder) general disclaimers regarding the material accuracy and completeness of disclosure may not be sufficient disclosure, for example, in situations where an issuer has material information contradictory to representations it has made. *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."); *In re Initial Public Offering Sec. Litig.*, 2004 WL 2320364, at *15 (S.D.N.Y. October 15, 2004) (party may not rely on general disclosure if party is aware of "problem worthy of disclosure").

242.   Finally, the SEC noted in its Release that it only considers bringing these types of an enforcement action where the subject of the representation is "materially misleading":

> We highlight the important principle that disclosures regarding material contractual terms such as representations may be actionable by the Commission. We will consider bringing an enforcement action under Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 thereunder in the future if we determine that the subject matter of representations or other contractual provisions is materially misleading to shareholders because material facts necessary to make that disclosure not misleading are omitted.

243.   The purpose of this denial, and its effect, was to artificially increase the price of Titan's stock over and above what it would have been in the absence of this statement. In particular, after the merger was announced, the stock price rose from $16.96 to $21.29 per share. In the absence of the statement, and in particular, were Titan to have admitted the true facts, the Lockheed's merger proposal and the resulting rise in stock price would not have occurred. When the information began to emerge that Titan was in fact guilty of these violations and that the merger would not take place as a result, Titan's stock price declined to as low as $11.74 per share on July 2, 2004.

244.   In making that representation, defendants were fully aware that if they acted truthfully with Lockheed, the SEC, and the DOJ, Lockheed might have gone ahead with the merger albeit at a

1   lower price and that Titan would likely have been hit with only small SEC and DOJ fines. However,

2   defendants acted recklessly in deciding to intentionally conceal the FCPA violations because they

3   knew that if such intentional concealment of the FCPA violations were discovered, Titan would be

4   hit with large DOJ and SEC fines and, pursuant to the merger agreement, the merger would not go

5   through:

6           *any representations, warranties*, covenants or obligations contained in this
            Agreement, which breach would result in the failure to satisfy one or more of the

7           conditions set forth in Section 7.3(a), and in any such case such breach shall be
            incapable of being cured or, if capable of being cured, shall not have been cured

8           within 30 days after written notice thereof shall have been received by the party
            alleged to be in breach. . . .

9

10  The conditions of §7.3(a) that would result in a breach allowing Lockheed to terminate the merger

11  included:

12          (ii) the representations and warranties of Company contained in this Agreement,
            **without regard to any materiality or Material Adverse Effect** qualifier contained
            therein, shall be true and correct on and as of the date made and on and as of the

13          Closing Date as if made at and as of the Closing Date (except for any representations
            and warranties made as of a specified date, which shall be true and correct as of the

14          specified date), except where the failure of such representations and warranties to be
            true and correct would not reasonably be expected to have, individually or in the

15          aggregate, a **Material Adverse Effect** on Company and would not materially impair
            Company's ability to perform its obligations under this Agreement. . . .

16

17  Exhibit A to the merger agreement defines a Material Adverse Effect as follows:

18              **"Material Adverse Effect"** means, with respect to any entity, (a) any
            adverse change, circumstance, fact, event or effect that, individually or in the

19          aggregate with all other adverse changes, circumstances, facts, events and effects, *is*
            *or is reasonably likely to be materially adverse to the business, condition (financial*

20          *or otherwise), assets or results of operations of such entity* and its Subsidiaries
            taken as a whole . . . or (b) a material adverse effect on the ability of such entity to

21          perform its obligations under this Agreement.

22      **D.**      **Defendants Announce the Merger Agreement with Lockheed Without**
                    **Disclosing the FCPA and GAAP Violations**

23      245.    On September 15, 2003, Titan and Lockheed announced that Lockheed would acquire

24  the outstanding shares of Titan in exchange for consideration valued at $22 per share, comprised of a

25  mix of cash and Lockheed's stock. The offer was valued at $1.8 billion, plus the assumption of an

26  additional $600 million in Titan debt. The transaction was expected to close following the Titan

27  shareholder meeting scheduled in March 2004. Commenting on the merger, defendant Ray stated:

28

- 80 -         04-CV-0676-LAB(NLS)

"We are extremely proud of our track record of growth and dedicated service to our nation during our 22-year history." ... "Lockheed Martin is acquiring Titan to expand and grow the business. Together we will offer a broader spectrum of system and IT solutions to our customers. As such, I am confident that this match is a winner for our customers and employees."

246.    On the news of the merger, the Company's stock price again spiked 25%, or $4.33 from $16.96 to over $21.29 per share on extremely high trading volume.

**E.     Titan Continues to Issue False Financials and Omits Impact of Violations of the FCPA and GAAP**

247.    On October 23, 2003, the Company issued a press release entitled "Titan Reports Record Quarterly Revenues of $472 Million, Up 34%; GAAP EPS $0.18; Pro Forma EPS(1) $0.20," which stated that results reflected record organic growth in revenue, and improved operating margins and earnings per share and stated in relevant part that:

> Titan reported record quarterly revenues for the third quarter of 2003 of $472 million, an increase of 34% over $353 million in the third quarter of 2002. The organic growth for the quarter was 33% over the prior year, driven by growth in Titan's core National Security Solutions business.
>
> Net income for the third quarter of 2003 was $15.2 million, or $0.18 per share, compared with a net loss of $225 million or $2.89 per share for the third quarter of 2002.

248.    Commenting on these results, defendant Ray stated:

> "The record revenues and continued operating margin improvements this quarter demonstrate our ability to execute our strategy of generating new business, winning recompetes, and implementing operational efficiencies." ... "As planned, we have grown our business organically as a provider of choice for mission critical communications and intelligence solutions for the Department of Defense, Department of Homeland Security, and other federal agencies."

249.    Defendants also further increased guidance for FY03 and FY04:

> Citing continued gains in revenue, improvements in operating margin, and exceptionally strong cash flow generation, the Company is increasing guidance for the balance of the current year and for FY 2004. Revised FY 2003 revenue guidance is $1.775 billion to $1.8 billion; GAAP earnings per share are anticipated to be $0.54 to $0.56; and guidance for pro forma earnings per share has *increased to $0.72 to $0.74 per share*. Revised FY 2004 revenue guidance is $2.1 billion to $2.2 billion, and GAAP earnings per share are *anticipated to be $0.87 to $0.93*.

250.    Commenting on this increased guidance, defendant Ray stated:

> "The outlook for the remainder of 2003 and for 2004 is robust, reflecting our record backlog, our expertise at executing large program awards, our strong bid and proposal pipeline, and our proven ability to execute our business development initiatives. Titan is on track to achieve a 28% organic revenue growth rate for FY

2003." . . . "The most significant driver of that growth is the expanding need for more, and increasingly sophisticated, C4ISR [command, control, communications, computers, intelligence, surveillance and reconnaissance] systems, products and services, which is Titan's core competency."

251.    On February 23, 2004, the Company issued a press release entitled "Titan Reports Record Fourth Quarter and Full Year 2003 Results Quarterly Revenues $488 million, up 29%; 2003 Revenues $1.78 billion, up 28% over 2002." The press release stated in relevant part that:

> For full year 2003, Titan reported revenues of $1,775 million, an increase of 28% over $1,392 million for the full year 2002. The organic growth rate for 2003 was 26%. Results reflect record revenue growth for Titan driven by the Company's ability to bid, win, and execute on large procurements from the U.S. Department of Defense and other government agencies in areas such as defense secure communications and intelligence systems, government enterprise IT systems, transformational programs, and homeland security applications. Net income for the fourth quarter of 2003 was $4.1 million, or $0.05 per share, compared with a net loss of $0.8 million or $0.01 per share for the fourth quarter of 2002.

252.    Commenting on these results, defendant Ray stated:

> "The record revenues and continued operating margin improvements this quarter reflect our strong organic growth in providing National Security Solutions to the U.S. Department of Defense, Department of Homeland Security and other federal agencies – as well as our continued efforts to improve operational efficiencies."

253.    Defendants also provided the following additional details with regards to the FY03 results:

> For full year 2003, Titan reported revenues of $1,775 million, an increase of 28% over $1,392 million for the full year 2002. Net income was $32.1 million, or $0.38 per share, compared with a net loss of $271.5 million or $3.58 per share for the full year 2002.

### F.    Titan Reveals Investigations into Possible Violations of the FCPA, but Denies the Veracity of the Allegations

254.    On February 13, 2004, defendants issued a press release disclosing that the Company had disclosed activities to the SEC and DOJ that could constitute FCPA violations. However, defendants explicitly denied any wrongdoing. The press release, entitled "Titan Announces SEC Investigation," stated in relevant part:

> The Titan Corporation (NYSE: TTN) announced today that representatives of Lockheed Martin and Titan recently initiated meetings with the DOJ and the Securities and Exchange Commission to advise of an internal review relating to certain agreements between Titan and international consultants and related payments in foreign countries. Lockheed Martin and Titan have been informed that the Securities and Exchange Commission has commenced an investigation into whether payments were made in violation of applicable law. ***Titan is not aware of any***

*unlawful payments by Titan* and intends to cooperate fully with the government's investigation.

Lockheed Martin has requested that Titan afford it access to all relevant information related to its relationships with international consultants so that Lockheed Martin may review that information in advance of the stockholders' meeting scheduled for March 16, 2004. Titan intends to cooperate fully with Lockheed Martin in accordance with the terms of the parties' merger agreement.

255.    On February 13, 2004, defendants also discussed the matter with the public and press. In these conversations, Titan spokesman Wil Williams, speaking on behalf of the Company, stated that the investigation "would not delay the closing of its merger with Lockheed Martin," that "we don't believe this will be an issue," and that "we expect closing on March 16."

256.    As noted above, the market reacted to this disclosure of possible illegal payments in foreign countries. However, the decline was moderated considerably by Titan's false representation that "we don't believe this will be an issue." As a result, Titan's stock dropped only $1.30 per share from $21.80 per share on February 12, 2004, to $20.49 per share on February 13, 2004, trading over eight million shares compared to 235,000 shares the day before.

257.    Following the February 13, 2004 announcement, Titan spokesman Wil Williams made numerous false and misleading statements to the press, including, but not limited to:

"They asked for information, we gave them information, and we see no reason for concern for the company," Titan spokesman Wil Williams said at the time.

*The San Diego Union-Tribune*, May 16, 2003.

To date, "neither company has found any wrongdoing" and there is "no reason to believe" any problems will be found, Titan spokesman Wil Williams told Defense Daily. Titan still expects the deal to close on March 16, the date its shareholders vote on the acquisition, he said.

*Defense Daily*, February 17, 2004.

Titan spokesman Wil Williams told Reuters that the probe "focuses on a very small internal area that was dealing with our radio operation. I want to underscore that we are not aware of any problem." Added Williams, "we fully expect the merger to continue on schedule."

*CFO.com*, February 17, 2004.

"This is just part of a rigorous review that Lockheed Martin does to review all activities related to a merger," Titan spokesman Wil Williams told The DAILY. "Because these dealings are international, we informed the DOJ and SEC, but nothing has been found that is wrong. . . ."

*Aerospace Daily*, February 17, 2004.

   Titan spokesman Wil Williams said the company's leadership adheres to high ethical standards.

*San Diego Business Journal*, February 23, 2004.

258.   The above statements were false and misleading when made. Titan has pled guilty to violations of 15 U.S.C. §78dd-1. As part of the DOJ Plea Agreement, Titan admitted that Titan made payments in furtherance of unlawful acts under the FCPA and that the money was given to a foreign public official to influence acts or decisions of the foreign officials. DOJ Plea Agreement at 4-5. Titan has also admitted that these payments were for unlawful activity related to the Beninese presidential election. *Id.* at 9-13. As described in the DOJ Plea Agreement, these underlying facts all occurred before 2002. *Id.* at 6-13.

259.   Therefore, as a result of the admissions made in the DOJ Plea Agreement, Titan has admitted to knowingly having committed these unlawful payments well before the above statements in February 2004. *See id.* at 4-13. As such, the statements that Titan was "not aware of any problem" or that Titan did not know of unlawful payments were false and misleading when made. Titan's statement that Titan adhered to high ethical standards was false and misleading when made because Titan has admitted that it acted corruptly in bribing foreign officials and other crimes (*id.* at 4) and because Titan has admitted that it did not enforce its Code of Ethics policy (*id.* at 13), never conducted any FCPA compliance training (*id.* at 14), and never maintained any due diligence files on its foreign agents (*id.* at 14).

260.   The purpose of Titan's denials, and its effect, was to artificially increase the price of Titan's stock over and above what it would have been in the absence of these statements. In the absence of the statements, and in particular, were Titan to have admitted the true facts, the Lockheed's merger proposal and the resulting rise in stock price would not have occurred. Securities Class Members suffered damages as a result of this artificial inflation and as a result of Titan's deception. When the information emerged that Titan was in fact guilty of these violations and that the merger would not take place as a result, Titan's stock declined to as low as $11.74 per share on July 2, 2004. This decline represents the value of Titan's stock based upon the revelation of

1   the true information about Titan and based upon the revelation about Titan's attempts to cover up the

2   fraud.

3        261.    On March 5, 2004, Lockheed announced that the DOJ had opened a formal criminal

4   inquiry into whether Titan made illegal payments to foreign consultants in violation of the FCPA.

5   Lockheed and Titan issued separate press releases.  Lockheed, growing impatient with the scandal

6   and signaling that it was considering walking away, stated that "[c]losing of the Titan transaction is

7   subject to approval of Titan's stockholders, *the absence of any material adverse change in Titan*

8   and other conditions set forth in the merger agreement," while Titan's release only reflected that

9   "[c]losing of the proposed transaction is subject to approval of Titan's stockholders and other

10  conditions set forth in the merger agreement."  Lockheed also told *The Wall Street Journal* that if

11  allegations of improper payments proved true, the actions could be in violation of the FCPA, and

12  that it was also investigating whether the payments themselves were accurately reflected in Titan's

13  financial reports.

14      262.    Lockheed's Form 10-K filed on March 8, 2004 describes the seriousness of an FCPA

15  violation for Titan's business as it would affect the merger with Lockheed:

16      ***Our review, the SEC investigation and the Department of Justice inquiry of Titan***
      ***may not be completed, or may not be conclusive, by the scheduled Titan***
17      ***stockholders' meeting date or the closing date.***

18         In September 2003, we announced that we had entered into a merger
      agreement to acquire The Titan Corporation.  On February 13, 2004, Lockheed
19  Martin and Titan announced that representatives of both companies had initiated
      meetings with the Department of Justice and the SEC to advise of an internal review
20  relating to certain agreements between Titan and international consultants and related
      payments in foreign countries.  The SEC informed Lockheed Martin and Titan that it
21  has commenced an investigation into whether payments by Titan were made in
      violation of applicable law. Lockheed Martin is independently reviewing Titan's
22  payments to international consultants to assess whether all conditions to the closing
      of the proposed merger will be satisfied.  Lockheed Martin has requested that Titan
23  afford it access to all relevant information related to its relationships with
      international consultants so that the review may be completed in advance of the Titan
24  stockholders' meeting. Titan is cooperating with this request, as well as conducting
      its own review.

25

26         During the course of our review, we learned of allegations that improper
      payments were made, or items of value were provided, by consultants for Titan or its
27  subsidiaries directly or indirectly to foreign officials.  The alleged payments and
      provision of items of value, if true, raise questions concerning whether there has been
      a violation of the Foreign Corrupt Practices Act. We also are reviewing with Titan
28  whether payments made by Titan to consultants were accurately reflected on Titan's

books and records. Our review is ongoing.  Together with Titan, we disclosed the allegations in a meeting with the SEC and the Department of Justice.  During that meeting, Lockheed Martin and Titan were informed that the Department of Justice has initiated a criminal inquiry into this matter.

The Titan stockholders' meeting for consideration of the merger is currently scheduled for March 16, 2004.  It is possible that the results of the Titan and Lockheed Martin internal reviews may not be completed by that date or may not be conclusive. In that instance, Lockheed Martin would need to determine whether the conditions to the merger have been satisfied.  Moreover, even if the Titan and Lockheed Martin reviews have been concluded prior to the date of the Titan stockholders' meeting, the SEC and the Department of Justice may not have concluded their investigations.  *If the government subsequently concludes that unlawful payments were made by Titan, action could be taken against Titan or some of its employees.  These actions could include fines, penalties, criminal sanctions and limitations upon the ability of the affected Titan business or businesses to export products or enter into future U.S. Government contracts.*

Closing of the Titan transaction is subject to approval of Titan's stockholders, the absence of any material adverse change in Titan and other conditions set forth in the merger agreement. Either Lockheed Martin or Titan may terminate the merger agreement if the merger is not completed by March 31, 2004, provided that the party seeking to terminate the agreement is not then in material breach of its obligations under the merger agreement in a manner that has contributed to the failure to consummate the merger.

263.   The market reacted immediately to this news causing Titan's stock to drop from $20.83 per share on March 5, 2004, to close at $19.11 per share on March 8, 2004, on a trading volume of over six million shares compared to 849,000 shares the day before.

G.   **Titan's 2003 Form 10-K Contained Numerous False and Misleading Statements**

264.   On March 10, 2004, Titan filed its 2003 Form 10-K with the SEC.  In this filing, defendants reported $1.775 billion in revenues and *net income of $29 million*.  Defendants also reported net accounts receivables of $388 million.  Defendants also made the following false statements with regards to the particular accounts receivables associated with its Titan Wireless project in Benin as follows:

Revenues for Titan Wireless were $71.5 million and net income was $1.0 million for the year ended December 31, 2003. . . .  The net income was primarily a result of the gain of $12.2 million from the disposition of the GlobalNet business. . . .  The gain was offset by impairment charges of $10.8 million resulting from the terms of the settlement agreements with Titan's customers in Nigeria and Benin, and by approximately $5.0 million of charges accrued for the exit activities in Benin.

*       *       *

Related to Titan's contract with the OPT, [Benin] Titan has a $46.2 million gross receivable due from the OPT, which is reflected in Current Assets of Discontinued Operations as of December 31, 2003. Of this amount, approximately $32.3 million is recorded as a receivable on the project, reflecting the outstanding balance on the non-recourse loan, drawn to cover subcontract costs. The remaining $14 million net receivable represents amounts due from the OPT under the Titan settlement agreement entered into with the OPT. Titan entered into the settlement agreement with the OPT in October 2003 pursuant to which Titan was to be paid $29.5 million in full satisfaction of Titan's performance on the OPT contract, of which $14 million remains outstanding as of December 31, 2003.

265.    Titan's 2003 Form 10-K also contained the following misleading statement with regards to the methods which Titan used to value long-lived assets:

*Valuation of goodwill, intangible and other long-lived assets.* We use assumptions in establishing the carrying value, fair value and estimated lives of our long-lived assets and goodwill. . . . Factors that would influence the likelihood of a material change in our reported results include significant changes in the asset's ability to generate positive cash flow, loss of legal ownership or title to the asset, a significant decline in the economic and competitive environment on which the asset depends . . . .

Titan's 2003 Form 10-K at 33. Titan violated these principles by improperly maintaining the value of at least two Hewlett-Packard Superdome computers on Titan's books despite the fact that Titan had effectively transferred these computers to the Saudi Ministry of the Interior in 2002. Indeed, Titan eventually disclosed on the July 8, 2004 "Business Outlook" conference call that:

Item 4, a non-cash asset impairment charge of 20-25 million. . . . These impairments pertain to two large computer systems purchased in 2000 and 2002. With one system supporting a program for US civilian government agencies. And the other for our business activities in Saudi Arabia. . . .

On the other system in Saudi Arabia, given that we have decided to curtail our activities in a [sic] that marketplace, we expect to not be able to recover our investment in the computer systems.

266.    Titan's 2003 Form 10-K also contained the following misleading statement with regard to the SEC and DOJ investigation of Titan:

In relation to the current investigation by the SEC and Department of Justice into whether payments involving foreign consultants were made in violation of applicable law, we may be required to pay certain liabilities in the future related to this matter. The Company has recorded a $3 million provision as of December 31, 2003, representing our estimate of potential liabilities related to this matter. The ultimate resolution of this matter is dependent upon the final results of such inquiries and investigations and associated liabilities if any, could be different from the amount currently estimated.

The 2003 Form 10-K was signed by defendants Ray, Sopp, and Lund.

267.    Then, on March 22, 2004, *The Wall Street Journal* shocked the investment community by breaking a story disclosing that internally Titan officials were in possession of evidence that Titan made potentially illegal payments to foreign officials totaling millions of dollars while competing for contracts in *Africa*, the *Middle East* and *Asia*, citing a person familiar with the inquiry. *The Wall Street Journal* also revealed that the discovery had led to the suspension of a mid-level employee at one of Titan's units and that Titan had entered into negotiations for a possible plea agreement with the DOJ. Director Joseph Caligiuri told *Bloomberg* reporter, Edmond Lococo, that a special committee led by the Titan Board member Robert Hanisee, had been investigating the payments and completed most of the work last week, and that committee was discussing with the DOJ a *guilty plea* that consultants for Titan had made improper payments to foreign officials.

268.    A subsequent article run by *The Los Angeles Times* on March 23, 2004, entitled "Plea May Be Key to Buyout of Titan," explained that public disclosure of the payments and the illegality had spooked Lockheed and stated in relevant part:

> Lockheed, which agreed to buy Titan in September, is thought reluctant to complete the deal unless Titan can clear itself of potential criminal indictment stemming from the investigations, said sources who asked not to be identified.
>
> The companies also are approaching an April 20 deadline for completing the purchase.  Thus, Titan might accept a plea agreement to quickly settle the investigations and allow the deal to proceed, sources said.  Titan already has said it set aside $3 million to pay possible fines.
>
> The potential Titan violations of the U.S. Foreign Corrupt Practices Act were uncovered during internal reviews by both companies, which reported their findings to government officials.
>
> But a plea agreement still might not be enough to get the transaction completed, sources said.
>
> Even if a plea is entered, Lockheed Martin, the Bethesda, Md.-based defense giant, might then demand that the terms of its buyout offer be amended to reflect Titan's fines and any damage Titan suffers to its reputation and its ability to secure government contracts, sources said.  Depending on how much Lockheed alters those terms, Titan's management and stockholders might then have to reconsider approval of the merger. Lockheed also would have to quickly get the revised terms to Titan's stockholders before April 12, when they are scheduled to vote on the buyout.

269.    According to *The Los Angeles Times* article, on this news "Titan's stock fell 43 cents to $19.73 a share Monday, while Lockheed Martin rose 41 cents to $44.51."

1    270.    On March 31, 2004, Titan spokesperson, Wil Williams, told the press, as reported by

2    *The San Diego Union-Tribune* on April 1, 2004: "Titan does not believe, based on the facts that we

3    know today, that there has been any material adverse change" that would cause Lockheed to cancel

4    the deal.

5    271.    On April 7, 2004, Lockheed and Titan jointly issued a press release entitled

6    "Lockheed Martin and Titan Announce Amended Merger Agreement; Titan Anticipates June 7,

7    2004 Stockholder Meeting" announcing that Lockheed renegotiated its deal to buy Titan, lowering

8    its bid by $200 million and pushing back the merger's closing date as Titan dealt with federal

9    investigations into whether its consultants bribed foreign officials.  While Lockheed originally

10   agreed to pay $2.4 billion in cash, stock and assumption of debt for the San Diego-based Company,

11   the renegotiated price totaled $2.2 billion, or roughly $20 in cash for each Titan share, and would no

12   longer include an exchange of stock.  Also, while shareholders of Titan originally were scheduled to

13   vote on the deal on March 16, 2004, the date was pushed back once last month, and the acquisition

14   was now scheduled for a vote on or after June 7, 2004.  The closing date had been pushed back from

15   the original date of March 31 to June 25, 2004, but it might extend as late as September 24, 2004.

16   As a condition of closing the merger, Titan was now required to provide written confirmation either

17   that the DOJ allegations had been resolved and it did not intend to pursue any claims against Titan,

18   or that Titan had entered into a plea agreement and completed the sentencing process.  The press

19   release stated in relevant part:

20       Lockheed Martin Corporation (NYSE: LMT) and The Titan Corporation (NYSE:
         TTN) announced today that they have amended their merger agreement. Under the
21       terms of the amended agreement, Titan stockholders will receive $20 in cash in
         exchange for each Titan share owned.
22
             As previously announced, Lockheed Martin and Titan have been conducting
23       reviews of whether payments were made, or items of value were provided, by
         consultants for Titan or its subsidiaries to foreign officials. *These internal reviews*
24       *are substantially complete*. The Securities and Exchange Commission (SEC) also
         commenced an investigation into whether payments involving Titan's international
25       consultants were made in violation of applicable law. In addition, the DOJ initiated a
         criminal inquiry into this matter. As part of their reviews, Lockheed Martin, Titan,
26       the SEC and the DOJ have been evaluating Titan's internal controls relating to these
         matters.
27
             The merger agreement also has been amended to provide that, as a condition
28       to the closing of the transaction, *Titan must obtain written confirmation* that the

- 89 -                    04-CV-0676-LAB(NLS)

DOJ considers its investigation of *these allegations resolved* and does not intend to pursue any claims against Titan, *or Titan must have entered into a plea agreement* with the DOJ and *completed the sentencing process.* Upon satisfaction of this condition, Lockheed Martin has agreed that the facts surrounding these allegations and the related proceedings, costs and expenses will not constitute a material adverse effect on Titan.

In light of the amendments to the merger agreement, Titan will not consider the merger at the special meeting of its stockholders scheduled to be reconvened on April 12, 2004. Titan intends to establish a new record date for the determination of the Titan stockholders who are entitled to vote on the amended merger agreement and plans to prepare and distribute new proxy materials to these record holders as soon as they are available, in anticipation of a new special meeting to be held on or after June 7, 2004. The revised merger agreement provides that if the merger is not completed on or before June 25, 2004, either Lockheed Martin or Titan may terminate the merger agreement, provided that the party seeking to terminate the agreement is not then in material breach of its obligations under the merger agreement in a manner that has contributed to the failure to complete the merger by such date. Under certain limited circumstances, the date may be extended to a date as late as September 24, 2004.

Had Titan promptly disclosed the violations of the FCPA to Lockheed, the SEC and the DOJ earlier, it is possible that the merger could have been carried out.

**H.    Titan Issues Further False or Misleading Financials for 1Q04 and Omits Impact of Violations of the FCPA and GAAP**

272.    On May 3, 2004, Titan reported financial results for 1Q04. In the press release, defendants reported revenues of $459 million for the 1Q04, a 21% increase over revenues of $378 million for the same period a year ago. The year-over-year growth rate in the first quarter was also 21%. Net income for 1Q04 was $3.1 million, or $0.03 per diluted share, compared with net income of $7.0 million, or $0.09 per diluted share, for 1Q03. The release also stated that:

Receivables growth during the quarter was largely the result of longer payment cycles on certain contracts and a customer-mandated temporary change from electronic billing to manual billing for Titan's largest contract. As a result, Days Sales Outstanding (DSO) grew to 84 days at March 31, 2004, from 72 days at December 31, 2003. Titan believes this DSO growth is temporary, and that more normalized payment cycles will be restored in the second and third quarters of 2004, thereby resulting in reductions of both DSO and outstanding bank debt.

273.    Commenting on the results, defendant Ray stated:

"This quarter marks the fourth quarter in a row where Titan's organic revenue growth has exceeded 20% over the comparable prior year period." . . . "Our employees remained focused on providing and expanding the vital services we deliver to key national security customers. Compared with the first quarter of last year, we increased revenues and continued to build backlog, laying the foundation for strong future business growth."

274. On May 10, 2004, Titan filed its Report on Form 10-Q for 1Q04. The report was signed by defendants Ray and Sopp and reaffirmed the Company's previously issued financial results. The defendants also represented the following:

> The accompanying financial information includes substantially all subsidiaries on a consolidated basis and all normal recurring adjustments which are considered necessary by the Company's management for a fair presentation of the financial position, results of operations and cash flows for the periods presented.
>
> *     *     *
>
> In the three months ended March 31, 2004, Titan incurred approximately $17.6 million in legal, investment banking, accounting, printing and other professional fees and costs related to the planned merger, which are reflected as merger-related costs in the accompanying consolidated income statements. Approximately *$11.9 million of these costs were associated with the comprehensive internal review being conducted by Titan to evaluate whether payments involving international consultants for Titan or its subsidiaries were made in violation of applicable law.* The legal, accounting and other professional fees incurred also supported the related inquiry by the DOJ and the investigation by the Securities and Exchange Commission (*see* Note 7).

**I.     The Merger Crumbles as Titan Fails to Resolve the Investigations**

275. On June 4, 2004, Titan announced it had received a "Wells Notice" from the staff of the SEC in connection with the previously announced SEC investigation regarding certain payments to foreign countries. The "Wells Notice" notified Titan that the SEC staff intends to recommend that the SEC bring a civil action against Titan for alleged violations of U.S. securities laws.

276. On June 7, 2004, Titan announced that a majority of its stockholders adopted the merger agreement and approved the proposed merger with Lockheed.

277. On June 23, 2004, Wachovia Securities ("Wachovia") announced that they were lowering their investment rating from "Market Perform" to "Underperform" as they had become less comfortable with the fact that Titan would reach a plea agreement with the DOJ regarding the FCPA inquiry before Lockheed's Friday, June 25 drop-dead date. Wachovia reported that the announcement of an agreement was necessary, or Lockheed indicated it would walk away from its $20 per share cash offer and pay the $60 million break-up fee. Wachovia also stated that "[i]f [Titan] remains independent, they will need to rebuild some management capability," citing the loss of several senior managers.

278.    On June 24, 2004, a few minutes before the market closed, trading in shares of Titan and Lockheed was halted on the NYSE pending an announcement. Thereafter, Titan announced that Lockheed was not willing to give Titan more time to settle the FCPA violations with the government:

> San Diego, CA -- June 24, 2004 -- The Titan Corporation (NYSE: TTN) announced today that it has been informed by Lockheed Martin Corporation (NYSE: LMT) that it is **unwilling to extend the June 25, 2004 date** by which Titan must secure a definitive plea agreement relating to alleged violations of the Foreign Corrupt Practices Act. Reaching a definitive plea agreement by June 25, 2004 is required in order to avoid triggering termination rights under the merger agreement. Titan also announced that, **based on information received from the government** by both Titan and Lockheed Martin, **it does not expect that a definitive plea agreement** can be finalized and signed by that date. Accordingly, Titan does not believe that a definitive plea agreement or a further amendment to the merger agreement will be delivered on or before June 25, 2004, and that therefore either party will have the right to terminate the merger agreement after June 25, 2004, provided that the party electing to terminate has not breached in any material respect its obligations under the merger agreement in any manner that has contributed to the failure to consummate the merger on or before June 25, 2004.

> Titan has not received any indication from Lockheed Martin concerning whether or not it will terminate the merger agreement after June 25, 2004 if a definitive plea agreement has not been secured on or before that date.

279.    Three and a half hours later, *Bloomberg* reporter Edmond Lococo issued an article entitled "Titan Shares May Drop 40% With Collapse of Sale to Lockheed." Lococo also stated:

> Lingering Questions.

> The breakdown of the transaction leaves Titan investors with lingering questions, starting with **how the Justice Department probe will ultimately be resolved, Jordan said.**

> In March, Titan said it established a $3 million reserve to cover potential fines from the bribery probe. Yesterday's statement made no mention of whether that reserve would still be adequate.

280.    Titan's shares lost 20% of their value the next day, Friday, June 25, 2004, as investors feared Lockheed would call off the deal and *The Wall Street Journal* reported:

> Lockheed-Titan Deal Appears To Collapse as Deadline Looms

> *        *        *

> After a tortuous path, Lockheed Martin Corp.'s $1.66 billion acquisition of **Titan Corp.** appeared to collapse when Titan announced that it doesn't expect to reach a plea agreement by today's deadline to resolve a Justice Department investigation into alleged overseas bribery.

1
           \*     \*     \*

2       The development *surprised investors*, who for weeks had received signals

3 from both companies that a settlement was forthcoming. In a statement, however, Titan said that "it does not expect that a definitive plea agreement can be finalized

4 and signed" by the June 25 deadline.

           \*     \*     \*

5
      It was unclear what triggered the breakdown of a plea agreement with the

6 government. Under a proposed settlement, *the Justice Department was demanding* that Titan or some of its subsidiaries *plead guilty to multiple felony counts* and pay

7 fines and penalties that are substantially higher than the $3 million the company has set aside, according to people familiar with the situation.

8
281.   On June 26, 2004, Lockheed terminated the merger and stated in a press release:

9
Lockheed Martin Corporation (NYSE: LMT) announced that it has terminated the

10 merger agreement with The Titan Corporation because Titan did not satisfy all the closing conditions on or before June 25, 2004. Under the terms of the amended

11 merger agreement, either party could terminate the merger agreement if Titan either (i) had not obtained written confirmation from the Department of Justice that the

12 investigation of alleged Foreign Corrupt Practices Act (FCPA) violations was resolved as to Titan and the Department did not intend to pursue any claims against

13 Titan; or (ii) Titan had not entered into a plea agreement on or prior to June 25, 2004, provided that the terminating party had not contributed to the failure to consummate

14 the merger through a breach of its obligations in any material respect. Titan did not satisfy either requirement.

15
      The merger agreement was entered into on September 15, 2003, and was

16 amended twice to provide additional time for Titan to resolve FCPA concerns with the U.S. Government. The corporation declined Titan's request for a further

17 extension.

18 282.   On June 27, 2004, *Bloomberg* reported that *The Wall Street Journal* wrote:

19       After years of transactions, Titan was set early this year to make its climactic deal, the sale of itself to Lockheed Martin Corp. But the $1.6 billion sale imploded

20 bitterly over the weekend because of an unresolved bribery investigation involving operations that Titan recently took on in its push to expand.

21
           \*     \*     \*

22
      After being investigated for months over possible bribery by consultants

23 Titan employed abroad, the company failed to reach a plea deal with the Justice Department by a Friday deadline that Titan and Lockheed Martin had set. Lockheed,

24 having postponed the closing twice, refused a further extension, and on Saturday it formally terminated the merger plan.

25
      *A proposed Titan settlement in the range of $30 million -- one of the biggest*

26 *Foreign Corrupt Practices Act penalties ever -- was in advanced stages*, people familiar with the Justice Department talks say. . . .

27

28

        04-CV-0676-LAB(NLS)

283.    The impact of Titan's illegal conduct and its failure to reach a settlement was well known to the investment community as well as Titan.  In Titan's June 30, 2004 Form 10-Q filed on August 9, 2004, Titan stated:

> Both prior to and since the termination of the merger agreement with Lockheed Martin, Titan has had settlement discussions with the SEC and the DOJ.  If settlement discussions fail, and the government determines that unlawful payments were made, the government could take action against Titan and/or some of its employees.  These actions could include criminal and *civil fines, penalties, criminal sanctions and limitations on Titan's ability to export products or enter into future U.S. government contracts*.

284.    On June 30, 2004, Edmond Lococo of *Bloomberg* also commented on Titan's risk of not receiving future government contracts after Lockheed had backed out of the merger:

> Titan still has an incentive to settle the case to avoid a trial and the risk of being barred from future government contracts, one penalty allowed under the Foreign Corrupt Practices Act, said Gourley, who handles cases involving the act but isn't involved with Titan.

285.    Indeed, an FCPA violation for Titan came at the worst possible time just when the Pentagon was spending massive amounts of money on the war on terrorism.  *The New York Post* reported on May 12, 2004 that private contractors, like Titan, "are getting at least 30 cents out of every dollar spent on the war against terror."  Moreover, Deborah Avant, a professor at George Washington University and specialist in Pentagon contracting, says the figure may actually be a conservative estimate.

286.    On June 28, 2004, *Standard & Poor's Ratings Services* (the "S&P") issued a press release stating it revised its CreditWatch listing on Titan from developing to negative, following Lockheed's decision to terminate its $2.2 billion deal to acquire Titan.  The S&P press release stated:

> Standard & Poor's will continue to monitor the ongoing Justice Department probe, in addition to a civil case that the SEC has notified Titan it will likely bring against the company, and will re-evaluate its ratings and determine the impact, if any, the probe could have on Titan's business practices and financial profile.

287.    On July 1, 2004, *Moody's* placed Titan on review for possible downgrade and issued the following press release stating:

> Moody's has placed The Titan Corporation ("Titan") on review for possible downgrade to reflect concerns about its reputation and cash flow *from the impact of the company's alleged violation of provisions set forth in the Foreign Practices Corrupt Act*.  Increases in *accounts receivable* since December 31, 2003 along with other business issues will also be explored during the review.  The decision to place

- 94 -                              04-CV-0676-LAB(NLS)

the company on review for possible downgrade considers the announcement by Lockheed Martin to terminate its merger with Titan.

\*     \*     \*

In its review for possible downgrade, Moody's will focus on the liquidity and cash flow effects of the alleged violation by Titan of provisions in the Foreign Practices Corrupt Act. Moody's will also consider the likely potential outcomes and attempt to quantify their effects on the company's reputation, business renewal rates, contract win rate, possible contract losses, and related working capital changes.

According to some press reports, the company was discussing a settlement with the Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) in the area of $30 million subject to approval by Lockheed Martin. Expenses related to the termination of acquisition plans by Lockheed Martin have not been determined, but may also have an impact on the company's debt levels and working capital needs. Changes in the company's product offerings may include a reduced emphasis on international contracts and will need to be reviewed in order to understand their impact on revenue growth and on the company's overall competitiveness for certain contracts. In the first quarter of 2004, Titan reported that its accounts receivable had increased to $427.5 million from $388 million at the end of 2003.

288.   Titan's stock plummeted on the news of Titan's inability to settle the FCPA investigation and complete the merger with Lockheed, projecting that the violations had credibility and were worse than let on by Titan. The shares fell from a 12-month high of $21.99 per share and failed to regain ground, closing Wednesday, August 28, 2004, at $12.98 per share. According to a *San Diego Union-Tribune* report, financial analysts indicated concern about Titan's financial prospects. "Analyst Adam Weiner of Credit Suisse First Boston took a similar view," the *Union-Tribune* said, "writing that 'lingering uncertainty' surrounding the federal inquiry and Titan's 'management distractions' raised questions about the company's performance. But Weiner saw room for optimism if Titan can settle the federal investigations and show that its operations are indeed stabilized. 'There remains the possibility that another suitor for Titan emerges at some point, particularly if pending federal investigations are resolved and a credible earnings outlook restored,' Weiner wrote."

**J.     Post-Securities Class Period Revelations About Titan**

289.   On July 1, 2004, defendants tried to prevent further hemorrhaging in the Company's stock by announcing a July 8, 2004 conference call to discuss Titan's 2004 business outlook. Titan's press release stated:

The Titan Corporation (NYSE: TTN) announced today that Gene W. Ray, chairman, president and chief executive officer, and Mark W. Sopp, senior vice president and chief financial officer, will host a conference call and Q&A session with the investment community on Thursday, July 8, 2004 at approximately 4:45 p.m. EDT to discuss preliminary financial and operating results for the second quarter ended June 30, 2004.

Titan management will also address the following areas:

- strategic direction following the termination of its merger agreement with Lockheed Martin Corp. (NYSE: LMT) on June 26, 2004;

- the benefits of Titan's increasing focus on providing national security solutions;

- the high retention rate of its senior operating officers and other key employees during the pending merger and after its termination;

- business growth prospects in the company's core operations;

- the ongoing Foreign Corrupt Practices Act (FCPA) government investigations; and

- strategic decisions for Titan's non-core operations and related financial charges in Q2'04.

"Titan's business has shown excellent growth during the last several months, notwithstanding the significant diversion of management's attention to the proposed merger and government investigations," said Ray.

290.    On July 8, 2004, defendants issued a press release reporting the financial results for 2Q04 and revealed, for the first time, write-offs and losses associated with the divisions and companies embroiled in the illegal and improper practices being investigated:

The Titan Corporation (NYSE: TTN) today announced preliminary financial results for the second quarter ended June 30, 2004 . . . .

*        *        *

Projections for the company's net loss for the quarter and net loss per share include certain expected charges that have not yet been finally determined. The estimated range of the *net loss is expected to be $62-$78 million*, or $0.74-$0.93 per share, comprised of the following anticipated results and charges:

- Net loss from continuing operations of $27-$38 million, which includes:

  - Operating profit of $33-$35 million, before merger-related costs, government investigation costs and reserves, asset impairments, and interest expense;

  - Merger-related and government investigation costs incurred of approximately $8-$9 million;

- 96 -                    04-CV-0676-LAB(NLS)

- • Accruals of reserves relating to the estimated additional costs to reach resolution with the government on the Foreign Corrupt Practices Act (FCPA) investigations of $26-$32 million, which are not expected to be tax deductible; and

- • Asset impairment charges within continuing operations of $20-$25 million;

- • Interest expense of approximately $9 million;

- • An estimated tax provision on the operating profit above at an effective rate of 40%; and an estimated tax benefit on the merger-related and government investigation costs, asset impairment charges, and interest expense items above at an effective 40% tax rate.

- • Loss on Discontinued Operations (net of tax) of approximately $35-$40 million.

\*    \*    \*

As previously disclosed, Titan had reserved $3 million as of December 31, 2003 for resolution of the government FCPA investigations. *Titan now estimates the incremental cost to resolve this matter with the government will be $26-$32 million.* The company is continuing to cooperate fully with the government to resolve the investigations. The actual provision to be recorded in the second quarter will be determined at the time final earnings are released in early August.

The operating loss for the second quarter of 2004 is also expected to reflect *approximately $20-$25 million in asset impairment charges. Approximately half of these charges pertain to impairment of fixed assets directly related to the termination of a program by a civilian government agency in the second quarter, and a reduction in scope of planned business activities in Saudi Arabia.*

\*    \*    \*

Titan also announced today that it has put up for *sale its non-core Datron* World Communications business and its Titan Scan Technologies service business. Titan expects to record *after-tax charges in discontinued operations of approximately $24-$28 million* in the second quarter of 2004 related to the disposal of these two businesses. The charges are comprised of approximately *$18 million of non-deductible impaired intangible assets, mostly goodwill, and fixed asset values not expected to be recovered in the disposal of these businesses.*

Titan also expects to record a *charge of approximately $11 million, after-tax, pertaining to our discontinued Titan Wireless activities in Benin, Africa.* This charge, principally the result of the Benin customer's cash flow deficiencies and inability to obtain adequate financing, *represents a full allowance for the remaining amount of the past-due $14.5 million receivable on the underlying Benin contract, plus an additional $4 million accrual related to a contingent liability associated with a subcontractor on this project.*

291.    On August 4, 2004, Titan issued its earnings release for the second quarter confirming these write-downs and losses related to the divisions and entities involved in the investigations and improper or illegal practices. The release stated:

> The company reported a *net loss of $66.6 million*, or $(0.79) per share, for the second quarter of 2004 compared with net income of $5.9 million, or $0.07 per diluted share, for the second quarter of 2003. Included in the net income for the second quarter of 2003 was *a charge of $12.4 million for debt extinguishment costs and a loss from discontinued operations of $0.8 million*. Titan's net loss for the second quarter of 2004, which was within the range projected in the company's preliminary second quarter 2004 results announced on July 8, 2004, was comprised of the following:

|  | ($thousands) |
|---|---|
| Operating profit, before merger-related costs, government investigation and settlement costs, and asset impairments | $33,920 |
| Merger, investigation & settlement costs | $34,332 |
| Impairment of assets | $22,695 |
| GAAP operating loss | $(23,107) |
| Interest expense, net | $8,918 |
| Net loss from continuing operations (pre-tax) | $(32,025) |
| Income tax benefit | $2,596 |
| Net loss from continuing operations | $(29,429) |
| Net loss from discontinued operations (after tax) | $(37,123) |
| Net loss available to common shareholders | $(66,552) |

\*       \*       \*

> Operating profit for the second quarter of 2004 was adversely affected by approximately $5 million in losses resulting from Titan's National ID Card system contract in Saudi Arabia. Selling, general and administrative expenses were 7.4% of revenues in the second quarter of 2004 compared with 8.8% of revenues in the comparable prior-year period. . . .

\*       \*       \*

> As previously disclosed, Titan had reserved $3 million as of December 31, 2003 for resolution of the government Foreign Corrupt Practices Act (FCPA) investigations. Titan recorded an additional provision in the second quarter of 2004 of *$25.5 million for anticipated settlement costs*, and $8.8 million in merger and government investigation-related expenses, mostly legal costs, incurred during the quarter. The company did not accrue for future legal costs expected to be incurred to reach resolution of the FCPA matter; those costs will be expensed as incurred in future periods. Titan is continuing to cooperate fully with the government to resolve the investigations.

> The operating loss for the second quarter of 2004 also included $22.7 million in asset impairment charges. Approximately half of these charges pertain to impairment of fixed assets directly related to the termination of a program by a civilian government agency in the second quarter, and impairment of assets

- 98 -

04-CV-0676-LAB(NLS)

associated with a reduction in scope of planned business activities in Saudi Arabia. . . .

\*     \*     \*

As previously announced on July 8, 2004, Titan has offered for sale its non-core Datron World *Communications* business and its Titan Scan Technologies service business. The company recorded an aggregate *after-tax loss in discontinued operations of $24.6 million* in the second quarter of 2004 related to these two businesses. The loss is primarily comprised of the impairment of intangible assets, mostly goodwill, and fixed asset values not expected to be recovered in the disposal of these businesses.

Titan also recorded an aggregate *after-tax loss of $11.9 million* pertaining to its discontinued Titan Wireless activities in Benin, Africa. This loss includes a full allowance for the remaining amount of the past-due *$14.4 million receivable* on the underlying Benin contract, a *$2.3 million after-tax provision related to a contingent liability associated with a subcontractor on this project, and administrative and legal costs related to this operation*.

292.   These write-downs and losses related to the entities involved in the corrupt and improper practices which allowed Titan to inflate its revenues and earnings prior to and during the Class Period, and prior to negotiations with Lockheed for a merger, which, in part, allowed Titan to show an earnings profit of over $6 million for the quarter ending June 30, 2004 and over $15 million for the six months ending June 30, 2004, were confirmed in Titan's quarterly Report on Form 10-Q filed with the SEC on August 9, 2004.

**K.     Basis that Statements Were False or Contained Material Omissions**

293.   Defendants' misconduct throughout the Class Period was designed to perpetuate the perception of Titan as a company that was poised for continued growth and whose stock would soon be acquired by Lockheed at a substantial premium to its pre-merger announcement trading price. The statements made by defendants during the Class Period were each false and misleading when made. The true facts, known only to defendants, were that by means of defendants' undisclosed, improper and illicit practices set forth in §IV.D., Titan and defendants:

(a)     Inappropriately inflated revenue and accounts receivables, and failed to timely write off assets, in violation of GAAP (see §V.L.);

(b)     Violated the FCPA, in violation of 15 U.S.C. §78dd-1, and Titan's own publicly stated Code of Ethics ostensibly designed to assure the investment community that Titan would not violate these laws;

- 99 -                              04-CV-0676-LAB(NLS)

1      (c)    Made Titan's financial results look better than they actually were prior to and

2  during the Class Period;

3      (d)    Exposed Titan to huge civil and criminal penalties for its unlawful conduct,

4  the potential liability of which was not adequately reserved for or disclosed in the Company's

5  audited financial statements;

6      (e)    Successfully negotiated a merger with Lockheed on favorable terms and kept

7  Lockheed bound to the merger contract through the end of the Class Period; and

8      (f)    Falsely denied any illegal or wrongful conduct.

9  Defendants subsequently admitted to the falsity of their statements by entering into a Plea

10  Agreement with the DOJ.

11      **L.     Defendants' Conduct Violated GAAP and SEC Rules and Regulations**

12          **1.     Inadequate Disclosure in Titan's SEC Filings**

13      294.    Titan improperly failed to disclose that it was able to obtain certain revenue only as a

14  result of engaging in bribery. When revenue is derived from an illegal act that is considered material

15  in relation to the financial statements, this information should be disclosed. *See* Kieso &

16  Weygandt's *Intermediate Accounting*. Further, Generally Accepted Auditing Standards ("GAAS")

17  alert auditors and accountants to illegal acts and the need for disclosure. *See* Statement on Auditing

18  Standards ("SAS") No. 54, *Illegal Acts by Clients*. Illegal acts encompass such items as illegal

19  political contributions, bribes, kickbacks and other violations of laws and regulations. *Id.*

20          **a.     Inadequate Disclosure in Titan's Management's**
                  **Discussion and Analysis Section of the Form 10-K**

21

22      295.    Specifically, Titan failed to disclose that it was able to obtain certain revenue only as

23  a result of engaging in bribery. The overall objective in the Management's Discussion and Analysis

24  of Financial Condition and Results of Operations ("MD&A") section of the SEC filing is to provide

25  investors with the information needed to assess the financial condition and results of operations of

26  the registrant. Further, the disclosures are designed, without limitation, to allow investors to view

27  the business through the eyes of management. *See* SEC Release 33-6834, SEC Interpretation:

28  Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain

- 100 -                04-CV-0676-LAB(NLS)

1   Investment Company Disclosures, of May 18, 1989. Item 303 of Regulation S-K requires specific

2   disclosures including any known trends or uncertainties that are reasonably likely to impact the

3   company's liquidity, and any unusual or infrequent events or transactions or any significant

4   economic changes that materially affected the amount of reported income from continuing

5   operations and in each case, indicate the extent to which income was so affected. Therefore, the

6   MD&A sections of Titan's SEC filings should have discussed the illegal bribes used to induce

7   foreign governments to sign contracts with Titan.

8   **b.   Inadequate Footnote Disclosure**

9       296.    Additionally, Titan failed to disclose its bribes in the financial footnotes of its SEC

10   filings. AICPA Statement of Position ("SOP") 94-6, *Disclosure of Certain Significant Risks and*

11   *Uncertainties*, requires disclosure of a wide variety of information in the footnotes to the financial

12   statements, but it primarily focuses on the "risks and uncertainties that could significantly affect the

13   amounts reported in the financial statements in the near term or the near-term functioning of the

14   reporting entity." *See* SOP 94-6, ¶2. Specifically, SOP 94-6 was issued in December 1994 and

15   concluded that:

16       [R]eporting entities should make disclosures in their financial statements beyond
         those now required or generally made in financial statements about the risks and
17       uncertainties existing as of the date of those financial statements in the following
         areas:
18
         a.   Nature of operation
19
         b.   Use of estimates in the preparation of financial statements
20
         c.   Certain significant estimates
21
         d.   Current vulnerability due to certain concentrations
22
     *See* SOP 94-6, ¶8. Therefore, Titan's footnote disclosure should have discussed the illegal bribes
23
     used to induce foreign governments to sign contracts with Titan.
24
     **2.   Titan's Bribes and Resulting Revenue Were Material**
25
         297.    The bribes and the resulting revenue Titan recognized were material. GAAP affirms,
26
     "[t]he omission or misstatement of an item in a financial report is material if, in the light of
27
     surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of
28

a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." *See* Statement of Financial Accounting Concepts ("FASCON") No. 2, *Qualitative Characteristics of Accounting Information*, ¶132 and SAB No. 99, *Materiality*.

298.    SAB No. 99 goes on further to specifically state that one consideration that may well render material a quantitatively small misstatement (or omission) of a financial statement item is "whether the misstatement involves concealment of an unlawful transaction."

299.    Similarly, FASCON No. 2, ¶128d states, "[a]mounts too small to warrant disclosure or correction in normal circumstances may be considered material if they arise from ***abnormal or unusual*** transactions or events." Illegal bribes certainly fall under the category of "abnormal or unusual" and, thus, are material and require disclosure.

300.    The materiality of these bribes and Titan's illegal conduct is further evidenced by the impact that these revelations had upon the stock price of Titan (declining from nearly $22 per share in early February, 2004, to as low as $11.80 per share in July 2004 in reaction to the revelations), the reactions of Lockheed in withdrawing from the merger, and the risk that these violations could bar Titan from conducting business with the U.S. government with whom it does most of its business. The materiality of these bribes is also evidenced by the actual punishments inflicted upon Titan which included a $30 million fine, three-year organizational probation, an admission of criminal behavior, re-filing of tax returns to eliminate illegal deductions, and a special assessment.

### 3.    Titan Inappropriately Inflated Revenue and Accounts Receivables

301.    As described in ¶¶139-154, 179-193, 197-200, and 297-307, Titan improperly recognized revenue when it knew that collectibility of the receivable was not "reasonably assured." For example, in Benin, Titan had by late 2002 allegedly given up on recovering over $25 million of the debt, had received little or no payments and had no basis for expending any additional payments except by the provision of additional bribes. ¶¶301-307.

302.    GAAP, as described by FASCON No. 5, provides the basic requirements for revenue to be recognized: (a) revenue must have been earned; and (b) ***revenue must be realizable (collectible)***. *See* FASCON No. 5.

303.   Additionally, the SEC has issued SAB No. 101,[1] which summarizes the SEC's views in applying GAAP, including FASCON No. 5, to revenue recognition in financial statements. SAB No. 101 states that revenue is generally realized or realizable and earned when *all* of the following criteria are met:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred or services have been rendered;

- The seller's price to the buyer is fixed or determinable; and

- ***Collectibility is reasonably assured.***

*See* SAB No. 101.

304.   Further, notwithstanding the fact that uncollectible revenue should not have been recognized in the first place, Titan failed to subsequently establish sufficient receivable reserves.

305.   Titan was required by GAAP to record reserves for the receivables that were probably uncollectible.

An estimated loss from a loss contingency [*e.g.*, collectibility of receivables] . . .shall be accrued by a charge to income if both of the following conditions are met:

a.   Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. . . .

b.   The amount of loss can be reasonably estimated."

*See* FASCON No. 5.

306.   Ultimately, during 2Q04 Titan recorded a $14.351 million reserve on its accounts receivables associated with the Benin contract.

307.   Titan was required to account for its illegal bribes as a reduction to revenue. "[C]ash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services and, therefore, should be

---

[1]   On May 9, 2003, the SEC issued SAB No. 103 which codified SAB No. 101. On December 17, 2003, the SEC issued SAB No. 104 which revises and rescinds portions of Topic 13, *Revenue Recognition*, of SAB No. 103 (*i.e.*, SAB No. 101). However, the SEC's view, noted above, on when revenue is generally realizable and earned did not change.

characterized as a reduction of revenue when recognized in the vendor's income statement." *See* Emerging Issues Task Force ("EITF") Issue No. 01-9, Accounting for Consideration Given by a Vendor to a Customer, ¶9. As described above, Titan has admitted that these payments were illegal bribes. Titan actively credited phony invoices of non-performed work so as to recognize revenue on the bribes made to Karicom. As such, Titan's SEC reported revenues were false and misleading when initially made, and continued to be false throughout the Class Period.

### 4. Defendants Failed to Write off Impaired Assets

308. Titan failed to write off its impaired fixed assets in a timely manner in accordance with Statement of Financial Accounting Standards ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. SFAS No. 144 requires companies to recognize an impairment loss in the period in which an asset becomes impaired. *See* SFAS No. 144. Ultimately in 2Q04, Titan wrote off $22.7 million of impaired assets.

309. Additionally, Titan also failed to write off its impaired goodwill in a timely manner in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. According to Titan's SEC filings, Titan adopted the provisions of SFAS No. 142 effective January 1, 2002. This standard requires companies to cease amortizing goodwill and instead review goodwill and other tangible assets for impairment upon adoption of SFAS No. 142 and at least once annually thereafter. Titan's annual testing is performed in the first quarter of each year. Goodwill must also be tested between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value on the books. SFAS No. 142.

310. Ultimately, Titan recorded an aggregate after-tax loss in discontinued operations of $24.6 million in 2Q04, primarily related to impaired goodwill. This should have been written off at least one quarter sooner during Titan's annual review of goodwill in light of the fact that Titan knew the customs problems and the risk of not getting paid.

### 5. False Tax Return

311. Titan has admitted that it aided or assisted in the filing of a false return in violation of 26 U.S.C. §7206(2) and all of its legal elements which include: 1) that the defendant willfully aided, assisted, procured or advised in the preparation of an income tax return that was false; and 2) that the

return was materially false.  DOJ Plea Agreement at 5.  Titan has also admitted to the facts underpinning this charge, including:

> The United States Internal Revenue Code ("the Code") typically allows taxpayers to deduct from income all ordinary and necessary expenses incurred in the operation of any trade or business.  However, the Code specifically prohibits taxpayers from deducting any direct or indirect payment made to an official or employee of any government, or of any agency or instrumentality of any government, if the payment constitutes an illegal bribe or kickback or is unlawful under the FCPA.  26 U.S.C. §162(c).

> As described more fully above, TITAN recorded on its books and records approximately $2.1 million in improper payments made to the Benin Agent, and falsely characterized these payments as customs exonerations and other apparently legitimate business expenses.  Because of this improper characterization, the $2.1 million in "social payments" were recorded on the books and records of Titan Wireless as an account receivable entitled "Reimbursable Operating Expenses."  In or about July 2002, the amount of the total accounts receivable related to the BCT Contract stood at approximately $50 million, a portion of which was the remaining balance of the "Reimbursable Operating Expenses."

> In or about July 2002, in conjunction with TITAN CORPORATION's decision to exit all of its worldwide telecommunications business, TITAN CORPORATION agreed to settle its outstanding accounts receivable with the OPT of Benin for approximately $30 million.  Also during 2002, TITAN CORPORATION wrote-off the remaining accounts receivable related to the BCT Contract valued at approximately $20 million, a portion of which contained the remaining balance of the "Reimbursable Operating Expenses."  This bad debt expense write-off included some portion of the Benin payments made by TITAN CORPORATION in violation of the FCPA.  TITAN CORPORATION deducted on the company's tax returns the entire $20 million write-off of accounts receivable related to the BCT Contract, including the remaining balance of the "Reimbursable Operating Expenses."

> In or about September 2003, TITAN CORPORATION willfully caused to be filed with the U.S. Internal Revenue Service a consolidated Form 1120, U.S. Corporate Income Tax Return, for tax year 2002, that included on Line 15, Bad Debts, the amount of $76,214,512.00, knowing that it included a portion of the improper Benin payments which could not be claimed as a deduction on TITAN CORPORATION's income tax return.

*Id.* at 15-17.  As such, Titan's SEC-reported tax obligations and Titan's reported earnings net of taxes were false and misleading when initially made, and continued to be false throughout the Class Period.

1    **VI.   SCIENTER**

2        **A.    Titan Has Admitted that It Had Actual Knowledge of the Falsity of Its**
         **Statements to the Public**

3
         312.    In the DOJ Plea Agreement, Titan has admitted its actual knowledge of criminal

4    bribery violations (15 U.S.C. §78dd-1), criminal falsification of its books and records (15 U.S.C.

5    §§78m(b)(2)(A) and 78m(b)(5)), and criminally aiding and assisting in the preparation or

6    presentation of false or fraudulent tax returns (26 U.S.C. §7206(2)).  Titan has also admitted to

7    underlying elements of the offense, for example, that Titan acted "corruptly" and that the bribes were

8    made "knowing" that payments would be made to Beninese officials with the purpose of "inducing"

9    that official so as to influence the act or decision of the Beninese government.  DOJ Plea Agreement

10   at 4-6.  Titan has admitted to all of the underlying facts in the DOJ case, revolving around Titan's

11   actual knowledge of the bribes, false books, and false tax returns.  For example:

12
                 Between January 2001 and May 2001, TITAN made seven payments to the
13               Benin Agent totaling approximately $2.1 million, during which period TITAN knew
                 that the "social payments" in fact would be used to support the Benin President's re-
14               election effort.

15   *Id.* at 10.  These include admissions that between 1999 and 2001, Titan knowingly bribed foreign

16   officials in violation of criminal FCPA provisions of the federal securities laws and that Titan

17   falsified the books and records of Titan in violation of the criminal provisions of the federal

18   securities laws.  *Id.* at 2.  In each instance, Titan has admitted that in violating these laws, they acted

19   knowingly, corruptly, and willfully.  *Id.* at 4-5.  As such, Titan has admitted that it had actual

20   knowledge of all of the FCPA violations at issue in this Complaint.

21       313.    In addition to defendants' direct knowledge of the improper, illegal or corrupt

22   practices set forth above, facts strongly infer Titan and the Individual Securities Defendants had

23   motive to commit the fraud or to continue to hide the material facts and their knowledge of these

24   practices.

25       **B.    Motive Caused by the Need for Cash if Titan Were to Continue to**
         **Grow by Acquisition**

26
         314.    In the spring of 2003, when Titan began to seriously consider selling itself to a

27   potential suitor, the Company's business plan was to continue to grow by acquisition.  But with

28

                                          - 106 -                    04-CV-0676-LAB(NLS)

Titan's financial position, and its meager profits, it was unlikely that Titan could continue this course without an infusion of cash.  Titan stated in its December 31, 2002 Form 10-K:

> ***Our strategic goals include the continued funding of acquisitions and capital expenditures***. We plan to finance these requirements from a combination of sources, which include cash generation from our core businesses, our credit facility and potential cash generated from the disposal of discontinued businesses. Management believes that the combination of our existing cash, amounts available under our credit facility and cash flow expected to be generated from our operations will be sufficient to fund planned investments and working capital requirements for at least the next twelve months. ***However, we could elect, or we could be required, to raise additional funds during that period and we may need to raise additional capital in the future. Additional capital may not be available at all, or may not be available on terms favorable to us. Any additional issuance of equity or equity-linked securities may result in substantial dilution to our stockholders. Management is continually monitoring and reevaluating its level of investment in all of its operations and the financing sources available to achieve our goals.***

315.    Titan reiterated this risk as it was actively negotiating with Lockheed and others to be purchased. Titan stated in its June 30, 2003 Form 10-Q:

> Management believes that the combination of our existing cash, amounts available under our credit facility and cash flow expected to be generated from our operations will be sufficient to fund planned investments and working capital requirements for at least the next twelve months. ***However, we could elect, or we could be required, to raise additional funds during that period and we may need to raise additional capital in the future. Additional capital may not be available at all, or may not be available on terms favorable to us. Any additional issuance of equity or equity-linked securities may result in substantial dilution to our stockholders. Management is continually monitoring and reevaluating its level of investment in all of its operations and the financing sources available to achieve our goals.***

316.    After Titan and Lockheed reached an agreement, Titan continued to warn of this risk if the deal did not go through. Titan stated in its September 30, 2003 Form 10-Q:

> Management believes that the combination of our existing cash, amounts available under our credit facility and cash flow expected to be generated from our operations will be sufficient to fund planned investments, the planned redemption of the preferred stock and working capital requirements for at least the next twelve months if the pending merger with Lockheed Martin is not consummated. Under the merger agreement, we are prohibited from raising additional capital. ***Should the merger be delayed or terminated, we could elect, or we could be required, to raise additional funds during that period and we may need to raise additional capital in the future. Additional capital may not be available at all, or may not be available on terms favorable to us. Any additional issuance of equity or equity-linked securities may result in substantial dilution to our stockholders. Management is continually monitoring and reevaluating its level of investment in all of its operations and the financing sources available to achieve our goals.***

317.    Again, this risk was repeated in Titan's 2003 Form 10-K filed on March 10, 2004:

We plan to finance our operations and working capital from a combination of sources, which include cash generation from our core businesses, our credit facility and potential cash generated from the disposal of discontinued businesses. Management believes that the combination of our existing cash, amounts available under our credit facility and cash flow expected to be generated from our operations will be sufficient *to fund planned investments, the planned redemption of the* preferred stock, the payment of additional consideration on acquisitions, potential liabilities related to the current government investigation and working capital requirements for at least the next twelve months if the proposed merger with Lockheed Martin is not consummated. Under the merger agreement, we are prohibited from raising additional capital. ***Should the merger be delayed or terminated, we could elect, or we could be required, to raise additional funds during that period and we may need to raise additional capital in the future. Additional capital may not be available at all, or may not be available on terms favorable to us. Any additional issuance of equity or equity-linked securities may result in substantial dilution to our stockholders. Management is continually monitoring and reevaluating its level of investment in all of its operations and the financing sources available to achieve our goals.***

**C.    Facts Regarding Each of the Individual Securities Defendants Support a Strong Inference of Scienter**

**1.    Gene W. Ray**

318.    Defendant Ray is the Chairman of the Titan Board and CEO of Titan. Ray also served as President of Titan until May 2002 and was re-elected as President on February 2003, replacing defendant DeMarco. Ray's primary motivation in the fraud was to ensure that the Lockheed merger was carried out on favorable terms so as to obtain the huge financial benefits contained in his golden parachute executive agreement and to convert his considerable Titan holdings into Lockheed securities on extremely favorable terms.

319.    Titan amended Ray's executive agreement in the summer of 2003, so as to provide special merger benefits for Ray at the direct expense of stockholders. Pursuant to the agreement, Ray would be entitled to a lump sum payment in an amount equal to three times the sum of his base salary. This was a considerable amount as Ray's base salary in 2003 was $807,501. Titan's Form DEF 14A, filed on July 26, 2004, at 21. The agreement also provided Ray with three times his highest annual bonus, plus a prorated bonus for the year of the merger. Lockheed's Form S-4, filed on October 15, 2003, at 50-52. To ensure that the bonus provision would be particularly enriching, on September 15, 2003, the Titan Board increased the target bonuses for Ray by an additional $120,000. *Id.* at 53. With this increase, Ray's 2003 bonus was $760,000. Titan's Form DEF 14A, filed on July 26, 2004, at 21.

320. Ray's executive agreement also ensured that he would maintain his family's prescription, dental, disability, employee life, group life, accidental death and travel accident insurance plans and programs benefits for three years after the end of his continuation coverage period (typically 18 months) under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Lockheed's Form S-4, filed on October 15, 2003, at 50. With regard to medical, the agreement specifically ensured that Ray and his wife would receive medical benefits for life – a benefit worth more than a quarter million dollars. *Id.* Ray also received outplacement services worth as much as $100,000, and was deemed to be "vested" for all purposes under Titan's supplemental retirement plan and Titan's 401-k plan. *Id.* Ray was also provided with an office and secretary for a period of five years after his employment terminated – a benefit estimated to be worth $800,000. *Id.* Finally, under the terms of the executive agreement, Ray's executive stock options became immediately vested and exercisable at the time of the merger. As if these benefits were not enough, Titan guaranteed a tax "gross up payment" so as to ensure that Ray would retain an amount equal to the excise tax imposed upon the executive. *Id.* Lockheed estimated that these benefits were worth $5,466,000 for Ray not including the required tax gross up payment. Ray's executive agreement also included an unusual additional provision authorizing Ray to award a total of $1,500,000 in severance payments to employees of Titan at Ray's discretion.

321. Ray was also motivated to carry out the fraud due to the huge benefit he would obtain by converting his stock holdings into Lockheed securities (or cash) at a massive premium. As of July 18, 2004, Ray owned or could acquire, within 60 days through option exercise, 1,219,446 shares of Titan's stock. On July 23, 2003, the day before the Class Period started, Titan closed at $11.26 per share. As a result, if Ray had succeeded in carrying out the merger at $22 per share, he would have stood to gain $10.74 per share or a total of $13,096,850 in stock appreciation as a result of the fraud. This provided significant motive for Ray to commit the fraud.

322. Defendant Ray has effectively admitted that he had actual knowledge of the improper transactions and accounting in question in this case. From the August 12, 2002 Form 10-Q going forward, Ray signed a certification of Titan's financial disclosures, stating that the financial

- 109 -

04-CV-0676-LAB(NLS)

1  statements fairly represented the financial condition and results of operations for Titan and that Ray

2  had:

3      [d]esigned such disclosure controls and procedures, or caused such disclosure
       controls and procedures to be designed under our supervision, to ensure that material

4      information relating to the registrant, including its consolidated subsidiaries, is made
       known to us by others within those entities, particularly during the period in which

5      this report is being prepared [and]

6      [e]valuated the effectiveness of the disclosure controls and procedures and presented
       in this report our conclusions about the effectiveness of the disclosure controls and

7      procedures, as of the end of the period covered by this report based on such
       evaluation. . . .

8

9      323.    Had Ray carried out the tasks that he claimed to, he would have "ensured" that

10  "material information" such as the bribery and uncollectible receivables would have been known to

11  Ray. As such, either Ray's certification is false, or Ray's statement constitutes an admission as to

12  knowledge of the bribery and uncollectible receivables alleged herein.

13     324.    Further, as noted by numerous articles, Ray was intimately involved with the

    transactions at issue in this Complaint. For example, a February 17, 1999 Titan press release stated

14  that:

15      The Titan Corporation (NYSE:TTN) announced today that President and Chief

16      Executive Officer, *Gene Ray, accompanied by a delegation of five people, met
        recently with the Head of State of Benin*, Mathieu Kerekou, regarding the

17      installation and integration of a state of the art communications system in Benin,
        Africa and the in-country production of personal computers, work stations, and

18      laptops for distribution throughout Africa.

19                          *       *       *

20      The President and Chief Executive Officer of The Titan Corporation, Dr.
        Gene Ray said, "It was an honor to meet with His Excellency, Mathieu Kerekou, the

21      Head of State of Benin, where we both reaffirmed our personal commitment to this
        project. At the meeting with the Head of State, *I informed His Excellency that the*

22      *hub site has been completed in Benin, and that the initial satellite equipment is
        now arriving in his country*."

23     325.    Ray's actual knowledge of the fraud can be derived from the DOJ Plea Agreement

24  and from internal Titan documents obtained by counsel during their investigation of this case. The

25  DOJ Plea Agreement with Titan contains the following facts which Titan has admitted as a condition

26  of its plea that a Titan officer went to Benin in November 1998, was introduced to a Beninese

27  national (the "Benin Agent") and told that he had access to the President of Benin. DOJ Plea

28

                              - 110 -              04-CV-0676-LAB(NLS)

1  Agreement at 7. As described above at ¶100, the Benin Agent was Karim Amadou and the Titan

2  officer was Ray.

3        326.   Ray's involvement in this transaction and in the illegal bribes for exoneration, is

4  made obvious by a letter composed on October 11, 2000 by defendant Ray to President Kerekou

5  (¶95), and by Ray's October 16, 2000 letter to Minister Zossou (¶96), which threatened to stop the

6  BCT project because Titan was not receiving exoneration from customs duties.

7        327.   The DOJ Plea Agreement with Titan contains the following facts pertaining to the

8  December 2000 BCT meeting attended by Ray:

9            Afronetwork's 1996 agreement to build a telecommunications network in
             Benin obligated Afronetwork (and TITAN upon assignment of the contract) to pay
10           "part of its profits as subsidies for development" of certain "sectors" in Benin, such
             as health, education, and agriculture. TITAN was to determine the practical methods
11           of carrying out these subsidies in consultation with the Benin cabinet departments
             responsible for those sectors. A then-officer of TITAN CORPORATION and certain
12           TITAN employees were aware that these subsidies, which they referred to as "social
             payments," were required under the agreement assigned to TITAN.
13
             On or around December 19-20, 2000, at a BCT Steering Committee meeting
14           in Paris, France, the Benin Agent and the Director General of the OPT demanded that
             TITAN accelerate the "social payments" and insisted that they be paid before the
15           next election in March 2001. Under the terms of the 1996 agreement, the social
             payments were not yet due, nor had there been any coordination or consultation with
16           Benin cabinet departments, as required under the 1996 agreement.

17  DOJ Plea Agreement at 9-10.

18        328.   Internal minutes of this meeting obtained by counsel demonstrate that the December

19  2000 BCT Steering Committee meeting was attended by Ray. At this meeting, Titan admits that

20  Titan executives:

21           agreed to pay to the Benin Agent [Karim Amadou] some $2 million in expedited
             "social payments." This payment was to be made in exchange for, and contingent
22           upon, the agreement of the OPT that TITAN's management fee under the BCT
             Contract be increased from 5% to 20% of the value of the equipment that TITAN
23           provided under the contract.

24  *Id.* at 10. As part of the DOJ Plea Agreement, Titan has admitted that these payments constituted

25  knowing illegal bribes under the FCPA. *Id.* at 2, 4, 10.

26        329.   Karim Amadou's illegal efforts are described in a 2002 letter from Karim Amadou to

27  Ray, which states:

28

- 111 -                          04-CV-0676-LAB(NLS)

1    You probably know the major part that I played in the establishment of Titan
2    Africa in Benin . . . .

                            *       *       *

3
4    I had, at the time, to use my personal audience to get from the Minister of Finance
     the urgent application of measures of exemption from customs duties on the imports
5    of the company.

     (Translated from French.)
6
7    330.    Ray also received the following email from DeMarco, which described Titan's effort
     to recover the "social payment" bribes from the OPT:
8
9    TTN [Titan] has funded certain "social program" expenses ahead of the
     required payment of such expenses, as outlined in the BCT agreement.  This is
10   approximately $1,500,000. We need to have the OPT recognize this obligation to
     TTN [Titan] in the form of a Note Payable that will stand up in a Benin court, and
11   that we can gain insurance on. We need to ultimately get the OPT to pay TTN [Titan]
     back for these "Advanced" amounts.

12   The quotation marks around "social program" and the word "Advanced" appear in the original and

13   demonstrate that Ray and DeMarco knew that these payments were not legitimate.

14   331.    Ray was directly involved in other bribes.  For example, on July 8, 1999, Ray wrote

15   Minister Severin Adjovi, Minister of Telecommunications, congratulating him on his new ministerial

16   position, and acknowledged knowing that his daughter was working for Titan at Afronetwork.  In the

17   letter, defendant Ray stated:

18   It was a pleasure to see your daughter, Chantal, again when she attended the
     VSAT training course held at Vallejo and San Diego in February and March. I know
19   she worked very hard. I also read the superb graduation speech that she prepared and
     presented at the end of the Vallejo classes. *We are fortunate to have Chantal as an*
20   *employee of AFRONET Benin.*

21   As described in detail at ¶¶124, 132-134, over the next two years, Titan would make numerous

22   payments to Severin Adjovi's daughter totaling nearly $200,000.

23   332.    Prior to the February 2000 BCT Steering Committee meeting, Ray also received an

24   agenda which noted that Edmund Adjovi, Severin Adjovi's brother, was being paid for "managing

25   the political scene in Cotonou."  At the subsequent BCT meeting attended by Ray, Edmund Adjovi's

26   generous salary and extensive support staff and perks were discussed and approved.  *See* above at

27   ¶¶126-127.

28

                                    - 112 -                    04-CV-0676-LAB(NLS)

333.     Similarly, a May 3, 2000 Titan press release, entitled "Titan Launches GSM Mobile Network in Benin," states that:

President Matthew Kerekou, the Head of State, placed the first official phone call over the Libercom network. Ambassador Robert Felder, the U.S. Ambassador to Benin, Mr. Barthelemy Agnan, Director General of the OPT, and numerous other dignitaries, *joined Titan Chairman, President and CEO Gene Ray* and Titan Wireless President and CEO Herb Bradley *for the launch ceremony* in Cotonou which was broadcast on television and covered by the national media.

334.     Likewise, a May 4, 2000 *San Diego Metropolitan* article included the following passage purporting to quote Ray:

"The launching of GSM service in Benin was an important milestone for Titan," says Ray. "First, it demonstrates our ability to integrate large, complex networks. Second, through our Benin project . . . *we have gained valuable experience* as a telecommunications service provider. We look forward to expanding our service businesses to neighboring countries as we continue to build our presence on the African continent."

335.     As such, it is clear that Ray was intimately involved in the negotiations and contract fulfillment for the Beninese project such that he would have been intimately involved with any bribery and collectibility issues involved with this work.

336.     As noted above, Titan/Titan Wireless received a "partial exoneration" of customs duties from the Beninese as a result of Karicom's efforts.   All the members of the Titan Wireless/Titan Africa Board, including Ray, were completely aware of the "status of exoneration," or lack thereof, on the Beninese project and were completely aware of the role that Karicom fulfilled in Benin for Titan/Titan Wireless.  As a member of the Titan Africa Board, Ray received accurate information regarding Benin from his subordinates.

337.     Ray was not only directly informed, but was also informed about these issues through his close relationship with DeMarco. Ray was immensely impressed with DeMarco going back to when DeMarco had been an auditor of Titan with Arthur Andersen. Ray once introduced DeMarco expressing admiration regarding DeMarco's knowledge regarding business, accounting and finance matters. Ray greatly appreciated DeMarco's role as the architect for taking Titan from being an approximately $140 million-a-year company to a $1+ billion-a-year company. On a number of occasions over the years, Ray and DeMarco would go over papers together for the duration of the

- 113 -                          04-CV-0676-LAB(NLS)

1  airplane flights they were on. Indeed, DeMarco represented to Head that DeMarco would tell Ray of

2  DeMarco's plans to have Karicom bill Titan for phony services.

3      **2.    Mark W. Sopp**

4      338.    Defendant Sopp has been Titan's Senior Vice President, CFO and Treasurer since

5  April 2001. Sopp's primary motivation in the fraud was to carry out the Lockheed merger on

6  favorable terms so as to obtain the huge financial benefits contained in his golden parachute

7  executive agreement and to convert his considerable Titan holdings into Lockheed securities on

8  extremely favorable terms.

9      339.    During September 2003, Sopp made sure that his interests were placed above

10  stockholders by negotiating an executive agreement so as to provide him with special benefits in the

11  merger. Pursuant to the agreement, Sopp would be entitled to obtain a lump sum payment in an

12  amount equal to three times the sum of his base salary. This was a considerable amount as Sopp's

13  salary for 2003 was $324,508. Titan's Form DEF 14A, filed on July 26, 2004 at 21. The agreement

14  also provided Sopp with three times his highest annual bonus plus a prorated bonus for the year of

15  the merger. To ensure that the bonus provision would be particularly enriching, on September 15,

16  2003, the Titan Board increased the target bonuses for Sopp by an additional $48,750, raising Sopp's

17  2003 bonus to $293,000. Lockheed's Form S-4, filed on October 15, 2003, at 53. The executive

18  agreement ensured that Sopp would maintain his family's medical, prescription, dental, disability,

19  employee life, group life, accidental death and travel accident insurance plans and programs benefits

20  for three years after the end of COBRA coverage (typically 18 months) and provided Sopp with

21  outplacement services worth as much as $100,000. Sopp's agreement also provided that he would

22  be deemed to have vested for all purposes under Titan's supplemental retirement plan and Titan's

23  401-k plan. Finally, under the terms of the executive agreement, Sopp's executive stock options

24  would immediately be vested and become exercisable. All of these benefits to Sopp were effectively

25  tax-free as Titan guaranteed a tax "gross up payment" so as to ensure that Sopp would retain an

26  amount equal to the excise tax imposed upon Sopp. Lockheed estimated that these benefits were

27  worth $1,989,000 for Sopp and noted that this estimate did "not include any tax gross up payment."

28  Lockheed's Form S-4, filed on October 15, 2003, at 50.

340.   Sopp was also motivated to carry out the fraud due to the huge benefit he would obtain by converting his stock holdings into Lockheed securities at a massive premium. As of July 18, 2004, Sopp owned, or could acquire, within 60 days through option exercise, 192,731 shares of Titan's stock. On July 23, 2003, the day before the start of the Class Period, Titan closed at $11.26 per share. If Sopp had succeeded in carrying out the merger at $22 per share ($10.74 higher than the July 23, 2003 close), Sopp would have gained $2,069,930 in stock appreciation by the fraud. This provided a significant motive for Sopp to commit the fraud.

341.   Defendant Sopp has effectively admitted that he had actual knowledge of the improper transactions and accounting in question in this case. From the August 12, 2002 Form 10-Q going forward, Sopp signed a certification of Titan's financial disclosures, stating that the financial statements fairly represented the financial condition and results of operations for Titan and that Sopp had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; [and]

> Evaluated the effectiveness of the disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . . .

342.   As described above, Sopp was aware of the illegal "social payment" bribes as he was a recipient of DeMarco's September 17, 2001 email, which stated:

> TTN [Titan] has funded certain "social program" expenses ahead of the required payment of such expenses, as outlined in the BCT agreement. This is approximately $1,500,000. We need to have the OPT recognize this obligation to TTN [Titan] in the form of a Note Payable that will stand up in a Benin court, and that we can gain insurance on. We need to ultimately get the OPT to pay TTN [Titan] back for these "Advanced" amounts.

343.   Later, on December 10, 2001, defendant DeMarco sent an email to Sopp, stating, "[a]s we know, we have heard some things from certain people indicating that there may be some "funny business" going on in Benin. In a subsequent email to Sopp, on December 11, 2001, CFO Caulson stated:

- 115 -                    04-CV-0676-LAB(NLS)

> We had a[n] audit performed by Arthur Andersen.  They certainly did not uncover the "funny business" that is occurring, but it was performed and things were identified. . . .

> As far as other assessments and control reviews, Vincent Charles, my accountant out of France, is down there at this moment cleaning things up.

> We will follow this up with a full time employee.

344.   On December 11, 2001, at 2:36 p.m., defendant DeMarco sent an email to Sopp, requesting that Caulson "[i]nstruct new management to do its own study and investigation for any funny stuff." Later that night, on December 11, 2001, at 7:35 p.m., defendant DeMarco replied to the same email to Sopp and Lechien, stating that he "want[s] a written report [from Charles] by January 15, 2002 documenting exactly what he did and what are his findings."

345.   As described above at ¶¶165-170, the Charles' draft report recounted numerous accounting deficiencies, pointed to many of the Beninese payments, which Titan has admitted were knowing illegal bribes under the FCPA, and demonstrated that Titan had no effective accounting controls in place in Benin.  DOJ Plea Agreement at 2, 4, 10-13.  Sopp and Titan hid the Charles' report and its conclusions from the public while repeatedly asserting that there were no FCPA or ethical violations and certifying as to the correctness of Titan's financial results.

346.   As such, Sopp had actual knowledge of the illegal payments in question.

### 3.   Deanna Hom Lund (Petersen)

347.   Defendant Lund worked at Arthur Andersen's San Diego office before joining Titan in 1993 as corporate manager of operational analysis.  Lund and DeMarco had a long history together.  Defendant DeMarco worked as a senior audit manager for Arthur Andersen, serving the Titan account out of Arthur Andersen's San Diego office from approximately 1987 until January 15, 1997.  Similarly, Lund worked at Arthur Andersen's San Diego office before joining Titan in 1993 as corporate manager of operational analysis.  When DeMarco was appointed as CFO, Titan also announced in the same press release that it had promoted Lund to the position of Corporate Controller.  DeMarco had personally hired her as Controller, and while there, Lund was "in on a lot of things." Indeed, when DeMarco was terminated by Titan in February 2003, Lund soon followed DeMarco to his new place of employment at Wireless Facilities.  As such, it is clear that Lund and

1   DeMarco worked closely together for many years and Lund would have been privy to DeMarco's

2   information about the financial transactions at issue in this Complaint.

3         348.    Lund's primary motivation in the fraud was to carry out the Lockheed merger on

4   favorable terms so as to obtain the financial benefits contained in her golden parachute executive

5   agreement.  To protect their personal interests in the merger, Lund and other corporate executives

6   obtained an agreement granting them substantial retention, severance, and/or other payments in the

7   merger.  Lockheed's Form S-4, filed on October 15, 2003, at 52.  The total estimated cost of the

8   payments payable to these nine Board-elected corporate vice presidents, including Lund, was

9   $1,716,000.  Under the golden parachute provisions, Lund and other top executives would also have

10  been provided with financial counseling and tax preparation services valued at $624,000.  Further,

11  on August 20, 2003, the Titan Board adopted a resolution that, like the agreements with Ray and

12  Sopp, contained a provision that would accelerate and fully vest Lund's stock options upon the

13  merger.  The impact of this maneuver was substantial and Lockheed admitted that options to

14  purchase in the aggregate 1,867,629 shares of Titan common stock held by the executive officers and

15  directors of Titan would be accelerated and become fully vested and exercisable upon completion of

16  the merger.  This provided significant motive for Lund to commit the fraud.  Notably, despite her

17  access to insider information regarding Titan, Lund also sold 26,006 shares of stock on July 31, 2003

18  – during the Class Period – obtaining proceeds of $398,932.

19        **4.    Eric M. DeMarco**

20        349.    The DOJ Plea Agreement with Titan contains the following facts pertaining to the

21  December 2000 BCT meeting, which was attended by defendant DeMarco:

22        Afronetwork's 1996 agreement to build a telecommunications network in
    Benin obligated Afronetwork (and TITAN upon assignment of the contract) to pay

23  "part of its profits as subsidies for development" of certain "sectors" in Benin, such
    as health, education, and agriculture.  TITAN was to determine the practical methods

24  of carrying out these subsidies in consultation with the Benin cabinet departments
    responsible for those sectors.  A then-officer of TITAN CORPORATION and certain

25  TITAN employees were aware that these subsidies, which they referred to as "social
    payments," were required under the agreement assigned to TITAN.

26

27        On or around December 19-20, 2000, at a BCT Steering Committee meeting
    in Paris, France, the Benin Agent and the Director General of the OPT demanded that

28  TITAN accelerate the "social payments" and insisted that they be paid before the
    next election in March 2001.  Under the terms of the 1996 agreement, the social

payments were not yet due, nor had there been any coordination or consultation with Benin cabinet departments, as required under the 1996 agreement.

DOJ Plea Agreement at 9-10.

350.    Internal minutes of this meeting demonstrate that the December 2000 BCT Steering Committee meeting was attended by DeMarco. At this meeting, Titan admits that Titan executives:

agreed to pay to the Benin Agent [Karim Amadou] some $2 million in expedited "social payments." This payment was to be made in exchange for, and contingent upon, the agreement of the OPT that TITAN's management fee under the BCT Contract be increased from 5% to 20% of the value of the equipment that TITAN provided under the contract.

*Id.* at 10. As part of the DOJ Plea Agreement, Titan has admitted that these payments constituted knowing illegal bribes under the FCPA. *Id.* at 2, 4, 10.

351.    DeMarco also wrote the following email to Ray, which described Titan's effort to recover the "social payment" bribes from the OPT:

TTN [Titan] has funded certain "social program" expenses ahead of the required payment of such expenses, as outlined in the BCT agreement. This is approximately $1,500,000. We need to have the OPT recognize this obligation to TTN [Titan] in the form of a Note Payable that will stand up in a Benin court, and that we can gain insurance on. We need to ultimately get the OPT to pay TTN [Titan] back for these "Advanced" amounts.

The quotation marks around "social program" and the word "Advanced" appear in the original and demonstrate that Ray and DeMarco knew that these payments were not legitimate.

352.    Later on December 10, 2001, defendant DeMarco sent an email to several Titan executives, stating, "[a]s we know, we have heard some things from certain people indicating that there may be some "funny business" going on in Benin. In a subsequent email sent to DeMarco on December 11, 2001, CFO Caulson stated:

We had a[n] audit performed by Arthur Andersen. They certainly did not uncover the "funny business" that is occurring, but it was performed and things were identified. . . .

As far as other assessments and control reviews, Vincent Charles, my accountant out of France, is down there at this moment cleaning things up.

We will follow this up with a full time employee.

353.    On December 11, 2001, at 2:36 p.m., defendant DeMarco sent an email to several executives, requesting that Caulson "[i]nstruct new management to do its own study and

investigation for any funny stuff." Later that night on December 11, 2001, at 7:35 p.m., DeMarco received an email sent to Sopp and Lechien, stating that DeMarco "want[s] a written report [from Charles] by January 15, 2002 documenting exactly what he did and what are his findings."

354.    As described above at ¶¶165-170, the Charles' draft report recounted numerous accounting deficiencies, pointed to many of the Beninese payments, which Titan has admitted were knowing illegal bribes under the FCPA, and demonstrated that Titan had no effective accounting controls in place in Benin. DOJ Plea Agreement at 2, 4, 10-13. DeMarco and Titan hid the Charles' report and its conclusions from the public while repeatedly asserting that there were no FCPA or ethical violations and certifying as to the correctness of Titan's financial results.

355.    Defendant DeMarco is a former Titan President and COO. On February 12, 2003, Ray (on behalf of Titan) and DeMarco signed a "mutual termination of employment" agreement in which DeMarco would obtain benefits of $1.515 million in cash and other benefits and Ray would take over as President of Titan. DeMarco now works for Wireless Facilities.

356.    As noted above, Titan/Titan Wireless received a "partial exoneration" of customs duties from the Beninese as a result of Karicom's effort.   All the members of the Titan Wireless/Titan Africa Board – which included DeMarco – were aware of the "status of exoneration," or lack thereof, on the Beninese project and were aware of the role that Karicom fulfilled in Benin for Titan/Titan Wireless. In particular, DeMarco received PowerPoint presentations that detailed the monthly performance of operations in Benin for a given quarter, including actual revenues compared to projected revenues for the period, in addition to revenues projected for future periods. DeMarco also received accurate data as a Titan Africa Board member where this financial data was presented at quarterly meetings. In addition, Comptroller of Titan, Lechien, who reported to DeMarco, also received this data. DeMarco and Lechien had both traveled to Paris frequently to help set up the Titan Secure venture in Saudi Arabia.

357.    That DeMarco had actual knowledge of the fraud is also demonstrated by a number of confidential witnesses. DeMarco would have had to have been aware of the problematic activities going on in Benin because of DeMarco's need to routinely transfer funds to pay for the $7.5-$8 million in unaccountable Benin expenditures. Head kept writing checks to Amadou and DeMarco

1   kept wiring more and more money. Indeed, DeMarco structured all of Titan's business ventures,

2   received the Benin P&L, traveled to Africa frequently, and was the source of the percentage of

3   completion accounting techniques learned from "the Andersen school of accounting" that allowed

4   Titan to either overstate or prematurely state revenues at the Company.

5       358.    Prior to defendant Sopp taking over as CFO (an appointment which was made in

6   April 2001), DeMarco reviewed all the performance data for the Beninese venture that Head

7   submitted, and DeMarco then made the decisions as to what would be reported by Titan regarding

8   the Beninese venture.

9       359.    DeMarco knew that the Titan Wireless division was not successfully earning revenues

10  as he was briefed regarding Titan Wireless' performance by Titan Wireless CEO O'Rourke. This

11  information was communicated to DeMarco via PowerPoint presentations composed by Abba, a

12  former Program Manager, which clearly showed that the Titan Wireless projects, including the

13  Benin project, were not performing up to forecasted goals. DeMarco knew about these large

14  shortfalls in the revenues that had been projected for Titan Wireless and what was actually earned

15  because Titan Wireless was reliant on Titan to receive injections of funding to sustain its operations

16  because it was not organically generating sufficient revenues on its own.

17      360.    DeMarco knew of the Benin deals and made false statements regarding the

18  collectibility of Benin receivables going all the way back to 2002. For example, in a July 11, 2002

19  conference call with analysts, DeMarco stated in reaction to a question about the viability of the $50

20  million receivable for the Benin project, "the expectation from a cash standpoint is that contract is

21  with the government entity . . . we are being paid and we expect to go after and collect that . . . ."

22  Before the summer of 2002, the Beninese owed Titan approximately $50 million but had not paid

23  anything. By summertime 2002, it was "known for sure" that Titan was not going to get the full $50

24  million. As a result, there were negotiations to reduce the amount owed by half to only $25 million.

25      361.    The facts above provide a strong inference that DeMarco knew, or was deliberately

26  reckless in not knowing, about the bribery and uncollectible receivables associated with the Benin

27  transactions. Indeed, any doubt is eliminated by DeMarco's attempt to cover up the bribes when

28  they were made. In particular, in carrying out the payments to Karicom, DeMarco told Head to

                                    - 120 -                      04-CV-0676-LAB(NLS)

1   direct Karicom to send invoices to Titan Africa for work-related activity that Karicom did not

2   actually perform (such as for "site surveying" and other "technical work"). Under DeMarco's plan,

3   Titan would receive invoices for the fictitious work and would pay Karicom based on these fictitious

4   bills. By directing Karicom to bill Titan for work that was not actually performed, it created a

5   problem for Titan because the disbursements were "auditable" but the work could not be verified.

6   These fraudulent efforts demonstrate DeMarco's knowledge that these bribes were improper.

7           362.    DeMarco also attempted to cover up his misdeeds after the fact. As noted above,

8   Head was interviewed by Lockheed's lawyers, and later the SEC and the Assistant Attorney General.

9   An hour before Head was scheduled to have a conference call with Lockheed's attorneys, DeMarco

10  called Head and told him to tell the lawyers "as little as possible." DeMarco told Head that if Head

11  answered all the questions from the lawyers, "they'll go down a path we don't want to go." Head

12  told DeMarco that he would answer whatever questions the lawyers asked him.

13          **D.      Admission of Scienter by Titan Director**

14          363.    During 2002, Titan appointed Peter Cohen to the Titan Board. Mr. Cohen was

15  interviewed by *The San Diego Union-Tribune* for an article that appeared on July 18, 2004. This

16  article provided significant insights into the Company's knowledge of the problems in 2002 that

17  Titan had been experiencing since 2002 and Titan's current crisis. In particular, the story stated:

18              Even Cohen acknowledged that Titan has a credibility issue.

19              But what investors and analysts need to understand, Cohen said, is that *"the*
20              *reality of this company is much better today than it was two years ago, when people*
                *thought everything was fine."*

21              At the time, Cohen saw a fundamental problem in Titan's efforts to develop a
                commercial wireless business in developing countries, which was part of the
22              company's broader strategy to enter commercial markets as Pentagon spending
                declined in the 1990s.
23
                *Cohen said that when he agreed to join Titan's board in early 2002, he*
24              *made it clear that he viewed Titan's foreign wireless business as "nothing other*
                *than a write-off waiting to come."*
25
                While Titan wrote off most of that business in late 2002 for almost $225
26              million, Cohen said it was an uphill battle because some board members still viewed
                wireless service in developing nations as a good business.
27

28

"Very subsequent to that," Cohen added, "a senior officer of the company left, and he left in part because some of us said he's never going to succeed Gene Ray as chief executive."

Cohen declined to be more specific. But Eric DeMarco's resignation as Titan's chief operating officer in early 2003 surprised Wall Street and triggered a sharp sell-off in Titan shares.

Events this year have proved to be a dash of cold water for many, added Cohen, who doesn't fault Ray for the trouble.

But closer financial oversight was clearly warranted, and Cohen said he intends to fill that role, along with fellow directors Robert Hanisee and Joseph R. Wright Jr.

"Gene is a Ph.D. scientist, but he's not a doctor of finance," Cohen said.

Such statements demonstrate that Titan knew about the collectibility problems in Benin back in 2002 but refused to properly write down these receivables at the time. These statements also demonstrate that "closer financial oversight was clearly warranted" for transactions that were occurring at this time.

## VII.   CLASS ACTION ALLEGATIONS

364.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of (a) all persons who purchased Titan common stock on the open market during the Class Period (the "Securities Class"); and (b) all persons who held the common stock of Titan at any time from August 3, 1999 through and including July 23, 2003, and who continued to hold that stock on June 26, 2004 (the "Holder Class"). Excluded from the Classes are defendants. Plaintiff Shurkin represents the Securities Class and plaintiff Berger represents the Holder Class.

365.   The members of the Classes are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Titan had more than 81.5 million shares of stock outstanding, owned by hundreds, if not thousands, of persons.

366.   There is a well-defined community of interest in the questions of law and fact involved in this case for both Classes. The questions of law and fact common to the members of the

Securities Class which predominate over any questions which may affect individual Class members include:

        (a)     Whether the 1934 Act was violated by defendants; and

        (b)     Whether the price of Titan's stock was artificially inflated.

The questions of law and fact common to the members of the Holder Class which predominate over any questions which, if they exist, may affect individual Class members include:

        (a)     Whether defendants breached their fiduciary duties to the Holder Class; and

        (b)     The amount of damage caused to the Holder Class by defendants' breaches of fiduciary duty.

The questions of law and fact common to the members of ***both*** Classes include:

        (a)     Whether defendants omitted and/or misrepresented material facts;

        (b)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        (c)     Whether defendants knew or recklessly disregarded that their statements were false and misleading; and

        (d)     The extent of damage sustained by Class members and the appropriate measure of damages.

    367.    Plaintiffs' claims are typical of those of the two Classes because plaintiffs and the Classes sustained damages from defendants' wrongful conduct.

    368.    Plaintiffs will adequately protect the interests of the Classes and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Classes. The class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of Section 10(b) of the 1934 Act
and Rule 10b–5 Against Titan and Individual Securities Defendants**

    369.    Plaintiff Shurkin incorporates ¶¶1-368 by reference.

370.     Titan and the Individual Securities Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   The statements made prior to the Class Period, including Titan's representations regarding its compliance with the law and revenues at the Benin project, as well as Titan's omissions of liabilities pertaining to the Benin project, were alive during the Class Period and artificially inflated the price of Titan's securities during the Class Period by making investors believe that Titan's revenues in Benin were legitimate and collectible, that Titan had lower liabilities associated with the Benin project than was actually the case, and that Titan had not violated various laws which could incur criminal and civil liabilities, and which could prevent the ability for Titan to be acquired.

371.     Titan and the Individual Securities Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff Shurkin and others similarly situated in connection with their purchases of Titan common stock during the Securities Class Period.

372.     Plaintiff Shurkin and the Securities Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Titan's stock.  As a result of the Securities Class Period and pre-Class Period scheme, statements and omissions, set forth above, Titan's stock traded at artificially inflated prices when purchased by plaintiff Shurkin and the Securities Class members.  When Titan's stock price declined and/or failed to appreciate, upon the partial revelation of the scheme, fraud and/or omissions, as set forth above, plaintiff Shurkin and the Securities Class members suffered a loss and were damaged thereby.

373.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff Shurkin and the other members of the Securities Class suffered damages in connection with their purchases of Titan's stock during the Securities Class Period.

### COUNT II

**For Violation of Section 20(a) of the 1934 Act**
**Against All Defendants**

374.    Plaintiff Shurkin incorporates ¶¶1-373 by reference.

375.    The Individual Defendants acted as controlling persons of Titan within the meaning of §20(a) of the 1934 Act.  By reason of their positions with Titan and ownership of Titan's stock, the Individual Defendants had the power and authority to cause Titan to engage in the wrongful conduct complained of herein.  Titan controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Titan are liable pursuant to §20(a) of the 1934 Act.

### COUNT III

**For Breaches of Fiduciary Duty Against the Individual Defendants**

376.    Plaintiff Berger incorporates ¶¶1-368 by reference.

377.    Plaintiff Berger asserts this claim on behalf of himself and the Holder Class to seek damages suffered individually by Titan shareholders, and does not seek any recovery for Titan, derivatively or otherwise.  The damages suffered by Titan shareholders do not derive from, nor match the damages suffered by Titan itself, if any, as a result of the wrongdoing alleged herein.  Specifically, the Individual Defendants knowingly and/or recklessly made materially false and misleading statements and omitted material facts in connection with the Lockheed merger.

378.    The Individual Defendants owed the highest fiduciary duties to Titan shareholders.  These duties prohibit them from acquiescing in or condoning illicit activities or failing to discover document and disclose such activities to governmental officials.

379.    The Individual Defendants have engaged in breaches of their fiduciary duties by making materially false and misleading statements or omitting material facts in connection with the

1 Lockheed merger and causing the Company to disseminate false and misleading financial

2 statements.

3    380.   As a result of the conduct detailed above, the Individual Defendants did acquiesce in

4 or condone illicit activity, failed to establish adequate procedures to prevent it, and failed to

5 voluntarily report it in the hope that it would not be uncovered.  Such misconduct was, however,

6 readily uncovered by Lockheed, to the personal detriment of Titan shareholders.

7    381.   By reason of the foregoing, Titan shareholders have sustained serious damage and

8 injury, including the diminution in the value of their shares based on Titan's failure to consummate

9 the Lockheed merger, for which relief is sought herein.

10    382.   In light of the above, the Individual Defendants engaged in breaches of fiduciary

11 duty, and are liable to plaintiff Berger and all Holder Class Members for all resultant damages.

12 **VIII.  PRAYER FOR RELIEF**

13    WHEREFORE, plaintiffs, on behalf of themselves and the Classes, pray for judgment as

14 follows:

15    A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of

16 the Federal Rules of Civil Procedure;

17    B.    Awarding plaintiffs and other members of the Holder and Securities Classes damages

18 together with interest thereon;

19    C.    Awarding plaintiffs and other members of the Holder and Securities Classes costs and

20 expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees

21 and other costs and disbursements;

22    D.    Awarding plaintiffs and other members of the Holder and Securities Classes such

23 other and further relief as may be just and proper under the circumstances;

24    E.    Declaring that Individual Defendants have breached their fiduciary duties to plaintiff

25 Berger and the Holder Class and aided and abetted such breaches;

26    F.    Awarding interest and attorneys' fees as permitted under law; and

27    G.    Granting such other relief as the Court may find just and proper.

28

1    IX.    **JURY DEMAND**

2          Plaintiffs demand a trial by jury.

3    DATED: July ____, 2005              LERACH COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
4                                        REED R. KATHREIN
                                         JAMES W. OLIVER
5
                                         *Reed R. Kathrein*
6                                        with permission by

7                                        _____
                                                  REED R. KATHREIN

8                                        100 Pine Street, Suite 2600
                                         San Francisco, CA  94111
9                                        Telephone:  415/288-4545
                                         415/288-4534 (fax)
10
                                         LERACH COUGHLIN STOIA GELLER
11                                         RUDMAN & ROBBINS LLP
                                         BRIAN O. O'MARA
12                                       401 B Street, Suite 1600
                                         San Diego, CA  92101
13                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)
14
                                         ROBBINS UMEDA & FINK, LLP
15                                       BRIAN J. ROBBINS
                                         JEFFREY P. FINK
16                                       CAROLINE A. SCHNURER
                                         STEVEN R. WEDEKING
17                                       610 West Ash Street, Suite 1800
                                         San Diego, CA  92101
18                                       Telephone:  619/525-3990
                                         619/525-3991 (fax)
19
                                         Co-Lead Counsel for the Securities Class
20
     DATED: July ____, 2005              GOODKIND LABATON RUDOFF
21                                         & SUCHAROW, LLP
                                         LAWRENCE A. SUCHAROW
22                                       IRA A. SCHOCHET

23

24                                       _____
                                                   IRA A. SCHOCHET
25
                                         100 Park Avenue, 12th Floor
26                                       New York, NY  10017-5563
                                         Telephone:  212/907-0700
27                                       212/818-0477 (fax)

28                                       Co-Counsel for the Holder Class

                                  - 127 -                   04-CV-0676-LAB(NLS)

IX.     JURY DEMAND

        Plaintiffs demand a trial by jury.

DATED: July ____, 2005

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
REED R. KATHREIN
JAMES W. OLIVER


_____
                REED R. KATHREIN

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
BRIAN O. O'MARA
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
CAROLINE A. SCHNURER
STEVEN R. WEDEKING
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

Co-Lead Counsel for the Securities Class

DATED: July 15, 2005

GOODKIND LABATON RUDOFF
   & SUCHAROW, LLP
LAWRENCE A. SUCHAROW
IRA A. SCHOCHET


_____
                IRA A. SCHOCHET

100 Park Avenue, 12th Floor
New York, NY 10017-5563
Telephone: 212/907-0700
212/818-0477 (fax)

Co-Counsel for the Holder Class

- 127 -

04-CV-0676-LAB(NLS)

1

2    DATED: July 18, 2005                    PASKOWITZ & ASSOCIATES
                                             LAURENCE D. PASKOWITZ
3

4

5                                            LAURENCE D. PASKOWITZ

6                                            60 East 42nd Street, 46th Floor
                                             New York, NY  10165
7                                            Telephone: 212/685-0969
                                             212/685-2306 (fax)
8
                                             Co-Counsel for the Holder Class
9

10   T:\CasesSF\Titan Corp Sec\CPT00021156.Amd2.doc

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



CONFIDENTIAL

---

# TITAN AFRICA S.A

---

### INTERNAL AUDIT REPORT

Distribution Titan :     Eugene O'Rourke              Prepared by Vincent Charles
                         Chris Caulson
                         Sam Talbot
                         Jean Louis Albert            Draft Report : December 18,2001

1

# EXHIBIT A

## EXECUTIVE SUMMARY

The Internal audit of Titan Africa S.A (The company) was carried out to review the organization, the operational processes and controls of the accounting department. A specific focus was requested to detect eventual suspicious transaction. This audit doesn't include a review of the GSM network, cooperated with the OPT (Libercom). GSM operation review was performed by Andersen (in July 2000).

The following is a summary of significant observations made in course of the audit:

Titan Africa S.A. has significant weaknesses in the accounting system:

- Absence of archiving policy for invoices and legal documents
- No real accounting, only listing of expenses
- No reconciliation performed (petty cash – bank – Interco)
- Accounting performed for only one bank account whereas several owned by the companies

Titan Africa S.A. has weak procedures & internal controls that could allow fraud and loss of revenue:

- Non-segregation of duties between the petty cash function and the accounting.
- Weak senior management control on the purchase procedure
- No reconciliation on the pledge bank account where the Libercom revenues are collected before being shared between Titan & Libercom.

Existence of bank account not followed in the accounting transaction with bank secrecy countries and other signs of potential fraud.

## CURRENT ORGANIZATION OF THE ACCOUNTING DEPARTMENT

The accounting is handled on Excel spreadsheet, one file being created each month. It appears that several versions of the report exist for a specific month, the most recent one not being clearly identifiable. Entries are classified between:

- Checks (normally T&A to the bank statement Ecobank OPEX)
- Big expenses over 150 EUR (Including the check payments)
- Small expenses

The accounting is done on a cash basis, which doesn't permit to retrace Titan Africa S.A. commitments nor to trace them to the underlying supporting document. The chart of account is not existent and doesn't permit the follow up of the main budget line.

Spreadsheets are not exhaustive as:

- They capture only transactions on the Ecobank operating accounts, whereas Titan Africa S.A. owns several accounts (see following captions).
- Some trades are intentionally never inputted. For example, wages are paid in cash and are not booked for "confidentiality purposes".
- According to the accountant (Annette HOUINSOU), transactions occurring after sending the monthly report to TW San Diego were booked neither on the current nor on the following period, following the senior management requirement (S HEAD).

2/2

2

There is no archiving policy. Invoices since Titan Africa S.A. inception are "archived" in cartons. We found cartons with original invoices stored in 2 locations: In the accounting department, and in the CEO (S.HEAD) office/bedroom. Part of this was stored in a non-safe physical location (balcony). On a sample basis, a significant part of the invoices was missing.

As per subsequent review with Sam T , Foiling of historical invoices is almost complete as of mid January. The new accountant, Epiphane, is implementing the necessary systems.

The following consequences arise from this situation.

- The reconciliation of the Petty Cash is not possible and is then not performed. This fact raises a risk of fraud, increased by the non segregation of duties between the accounting and cashier function (See hereunder)
- The absence of a real accounting department is not compliant with the local GAAP (SYSCOA.)
- No filing of VAT and tax returns are possible. Non-filing of VAT returns is costly for Titan Africa S.A. thus unable to required VAT refund.

_Recommendation:_

_Titan Africa S.A. purchased an accounting system (Azur SYSCOA) that permits all accounting transactions (Assets Table, lettering, etc) and excel Export. Many African companies use this system and we estimate this as being sufficient for Titan Africa S.A. needs._

_We hired a new chief accountant with a ten years experience in Univeler Cotonou that will begin by January 15, 2002. We provide him with a detailed action plan of which will depend its remuneration. The success clause is the clean audited report 2001._

---

## TRANSACTION WITH NO LEGAL SUPPORT FOUND & NO OBVIOUS ECONOMIC SUBSTANCE

---

Facts listed here maybe justified. I never had the opportunity to discuss with the former management about some clarifications.

### 1. Libercom marketing expenses

Without being sure of the exhaustiveness of this amount, Titan Africa paid at least 1,5 mio EUR on behalf of LIBERCOM, mainly related to marketing expenses for launching the GSM network and for the rent of the office building. We don't find any contract related to the obligation of Titan for this payment, nor for the reimbursement clauses. It seems that this payment is done following verbal agreement between Titan Africa CEO and Libercom CEO. Moreover, the economic substance on Titan behalf for these payments is hardly understandable.

### 2. Afronetwork

Without finding any underlying contract, it seems that Titan Africa purchased the goodwill to Afronetwork. We don't find any economical substance to this transaction, as TTN A has for the moment no other activity than Cooperating for the exploitation of the Libercom Network. We could however note that TTN San Diego agreed this funding as wiring cash to that aim.

We found trace of payments to Afronetwork for 60 K EUR, but due to the trouble organization of the accounting department, this amount could be significantly higher.

Payments were done based on 'decharge ' but with no formal accounting document. (Décharge = handwritten where the person certifies having received cash). It seems that these payments stand for Afronetwork's rents and wages, even if some payment were done for "unexpected coming expenses". ( ex feb 13, 2001).

On 18 payments booked in the spreadsheets, we found 6 decharges. We also found one decharge not booked.

---

## LACKS OF PROCEDURE

### 1. ABSENCE OF PURCHASE PROCEDURE

We do not identify any formal purchase procedure. It seems that each purchases were done in petty cash, following verbal approbation of the general manager ( Macaire ZINSOU).
A significant part of transaction was justified by decharge.
For example, a former Titan engineer (Frank FAIR) withdrew 87 K eur for mission expenses and only justified 17% with receipt. This could however be justified.

*Recommendations*
*Titan Africa S.A. should set up a formal purchase procedure with purchase request signed by the general manager and archive together the purchase order with the invoice and the delivery bill.*

### 2. ABSENCE OF RECONCILIATION & SIGNIFICANT PETTY CASH TRANSACTION

Titan Africa S.A. used significant petty cash transaction. As there is

- ❑  No segregation of duties between the cashier function and the accounting,
- ❑  No reconciliation possible
- ❑  Huge petty cash balance.

Without being sure of the exhaustiveness of these figures:

- ❑  During 2001, we account for 27 petty cash supplying totalizing 420,000 Euro. The average supplying amounts to 15,000 Euro, with a peak of 45,000 Euro as of 09/01/01.
- ❑  In 2000, we account for a minimum of 6 supplying, including a 161,000 Euro as of 08/25/2001.

We found petty cash in the cartons where the invoice were archived for an amount of 20 Euro in several bills.

*Recommendations*
*We recommend to have at least 2 signatories for the wire and check payment above a certain amount ( Eg 500 000 CFA).*
*The input of all company's transactions since Titan Africa S.A. inception will evidence the unreconciled share of petty cash.*
*The petty cash should no more exceed a certain milestone (Ex: 1000 EUR). African companies control petty cash by exiging the payment to the cashier of the unreconciled balance.*

---

## PARTICULAR TRANSACTIONS

In Benin, invoices have to comprise the following legal mentions:

- •  The Number INSAE (Benin trade ID)
- •   Should be number sequentially
- •  VAT, even if the rate is nil
- •  Address of the company., Phone, etc…

An invoice without those mentions is suspicious.

4/4

1.   SLEEPING TITAN BANK ACCOUNT

In theory, Titan Africa S.A. owns only 2 bank accounts:
-Bank Of Africa Pledge account for the BOT
-Ecobank          Operating expenses account

Related to the Ecobank statement, we note the following facts:
*   All statements were not stored in the same physical location and were then only partially classified in chronological order
*   Trades performed on the bank are mainly petty cash withdrawals and check payments. Since January 2001, the bank never indicates the beneficiary of these withdrawals. Before that date, these were rarely indicated.

As per bank statement, we have identified the following persons having performed withdraw cash:

*Titan Employees*
| | |
|---|---|
| Maurice Guezo | Customs relation |
| C Adjovi | VSAT ingegneer |
| Florent Thomede | Purchase manager |
| Annette Houessou | cashier |

*Suppliers*                                    *Cy*
| | |
|---|---|
| J Houessou | Afrique Conseil |
| Herve GBO | IB |
| B Johnson | Multimedia |

* Not defined
| | |
|---|---|
| Ghislain Thomede | Related to Florent? |
| Celestin ZINSOU | Related to Macaire? |
| E Deguenon | |
| H Guedou | |
| S Fkaram | |
| A Saturnin | |
| Viviane Ghomez | |
| A Barthelemy | |

We don't know how was organized the withdraw authorization cycle. Both the quantity and the nature of persons entitle to withdraw directly the cash is curious and require further investigations.

We found that Titan Africa S.A. owned 2 accounts at Continental bank Benin & 3 other accounts at Ecobank for which no statements are available as considered as sleeping account (see full references of the accounts in the appendix). We obtain bank statements for the Ecobank accounts, and its appears that they were usually used for one single transaction.
As of today, these additional sleeping accounts are now closed and the (small) balances transferred to the Ecobank Account.

A.  Ecobank Accounts

*Joined account Titan- general d'Afrique*

General d' Afrique is a Titan supplier that provides big work for building the Libercom network. The utility of a joined account Titan -General d'Afrique is not obvious.

This account was used for one single transaction:

5/5

As of 21 February 2001, with value date February 20, 2001, an amount as of 1,7 bio CFA (2,5 mio EUR) was wired crediting the ECOBANK OPEX account. As of February 26, 2001, but with value date retroactively as of February 20, 2001, the following amount was wire into the bank account Titan General d'Afrique. This was credited 1,7 bio CFA as of 26-02-01, and debited the same day for 1,65 billion CFA, with no explicit statement wording ("entry following mail transfer"). As of 06/08/2001, the balance (0,05 bio CFA) was wired. (more details filed in Appendix). As per Sam Talbot subsequent review, the cash finally ended in the BOA BCT pledged account.

We do not find any rational for any of this movement, but we could mention that if the cash was not coming from a Libercom master distributors, Titan may have lose the 50% Libercom share with the pledge split.

Even if no more No more transaction occurred anymore on this accounts, the balance being of 4,000 EUR as of today.

*Joined account Afripa-Libercom*

During April & May 2000, several payments totalizing 388,995,000 CFA (593,000 EUR) credited this account.

As of 31/05/00 an amount of 100,000,000 CFA (152 450 EUR) was paid by check (more detail in appendix). We don't find the final beneficiary of this transaction (not booked in the "accounting"). The origin of the cash inflows is not identified. Even if the Libercom network became really operational in June 2000, some revenues may have been collected before (handsets sales).

Prior the May 31 check, as of April 8,2000, an order was prepared by the former CEO (Steve HEAD) for wiring 100,000,000 CFA from the Ecobank - Opex to this joined account. The transaction never occurred

The balance of 288 mio CFA was afterward wired to the pledge account BOA for the BCT exploitation.

*Account Titan – Projet GSM*

The sole transaction performed on this account is a wire crediting the account as of 11/20/01 by 31,5 Mio CFA (48,000 EUR) , and debiting this as of 23/11/01, and crediting the Ecobank OPEX Account. We do not reconciled the cash inflow with the Titan Funding

## B. Continental Bank Accounts

Titan Africa S.A owned at least 2 sleeping accounts at Continental bank Benin ( list in appendix). No statement was found. . As per project manager S Talbot, there was a negative balance in one account and 26 million CFA in the other. Sa Talbot has asked the TW CFO (Chris Caulson) to get Steve Head to write to close the accounts and transfer the monies.

We found checkbooks of these accounts with check done but nothing written on the stub. Statements copies are required to the bank but nothing is obtained yet.

## C. Other transaction- OPEX Ecobank account

A similar material transaction was performed. As of 22/03/00, the account was credited by 2.209.306 EUR and debited of this amount as of 27/03/00. The statement mentions "loan". We don't find the origin of the flows, but the mention in the margin "(R)" could evidence more a bank mistake.



### D. Unreconciled inflows – Pledged bank account

A consultant for Sofrecom (Jean Marie VERRON) is currently reconciling the BOA bank account, which is the pledged account where the revenue should flows before being spitted between Titan & Libercom, following the BCT agreement.

His work is currently related to the master distributors sales, during the last quarter. Without any estimates of the final amount, thousands of Euros could be potentially missing this quarter as some cash inflow collected and declared by the master distributors are not put into the BOA account.

We do not found links between some eventual missing payments on the BOA bank statement with some cash crediting some 'sleeping' account.

To obtain a kind of insurance of the completeness of the Titan Africa bank account obtained, we list in appendix all the transfer between Titan Africa S.A.'s accounts as per Ecobank Opex account.

*Recommendation*
*Reconcile entirely the BOA statement. As per Andersen report, no reconciliation has been performed since beginning of the year.*

#### 2. TRANSACTION WITH BANK SECRECY HAVEN COUNTRIES

ENITEL is one of the Master distributor of LIBERCOM. This company ordered to one of its Luxembourg's subsidiary ENITO S.A. (having hood office in British Virgin Island) cell phones for an amount of 840,000 EUR.

Titan Africa (as per letter of the CEO S HEAD) paid the tax duties on its behalf, before asking for the reimbursement (56 K EUR) in a letter to the ENITO SA CEO (G Tossou). We do not understand why Titan Africa was implicated in such a transaction.

We identify this purchase as a suspicious transaction for the following reasons:
- We have no evidence of the reality of this transaction (no delivery bill, no transitaire bill). This document should however exist as handwritten mention of the existence.
- We don't see the economic benefit for Titan Africa to pay the customs fees
- ENITO SA doesn't exist (not listed in database of the Lux Co and in the directory, false phone number on the invoice)
- We do not clearly identify the financial flows. It may be possible that we do not collect from Enitel all payment required.   Final conclusion will however be given in the SOFRACOM consultant report.
- The letter & invoices were archived in a carton inside the former CEO bedroom/office (S Head), instead of being in the accounting department.
- The mention of the certificate of incorporation is compulsory in Luxembourg. Luxembourg is a French speaking country, and there is no rational for having a 'certificate of incorporation' written in English in the legal stamp duty of the company.

We could however mention that Titan Wireless San Diego is aware of similar deals with Enitel concerning the purchase of Scratch card.

#### 3. CAR PURCHASES

Titan Africa S.A. purchased 11 cars:
- 3 cars were purchased with no invoice (only decharge) for a total amount of 58 K EUR
- 2 cars were purchased (ISUZU & Green Honda CIVIC) and we don't find any invoice nor retrace the purchase to the "accounting". (Research also made by the accountant Annette H)

An engineer (C Adjovi) is currently stopped as being pregnant. She was not required to give back the car. Until the arrival of S Talbot. The car is now back in the office.

### 4.   UNUSUAL WITHDRAW IN A PARIS BANK ACCOUNT.

We found in a carton stored on S. Head balcony bank slips. The administrative manager of Titan Africa S.A. (Macaire Zinsou) performed 2 withdraws at the Société Générale of Paris Victor HUGO.(account 30 003-3420-50995296-49).
- 12/09/2000 - 27.000 FRF (withdraw num 851 21 24)
- 14/09/2000 - 5.000 FRF (withdraw numb 851 22 41)

At the back of the withdraw slip is handwritten « *Aller Boulevard Haussman devant le magasin Printemps-Retour 95 rue Nollet 17eme arrondissement 01-42-28-10-56 Fulconi Voucher* » (Aller =Go – Retour= trip back)

As per the directory, Mrs Monique FULCONI lives at this address & has the phone number indicated above.
We don't find any reason for these unusual cash movements nor of the storage on Steve Head balcony. We found in the same carton pictures of M Zinsou in front of a limousine car in the USA without understanding the storage in such a place.

### 5.   RELATED PARTY TRANSACTIONS

As per bylaws of Titan Africa S.A. dated August 26,1999, the management of Titan Africa S.A. is composed of:
- ✓  Steve HEAD: C.E.O (P.D.G)
- ✓  Karim AMADOU: General Manager (D.G)

Titan Africa S.A. made significant transaction with Mr Amadou:
As of 01/27/00, as per "accounting", Titan Africa S.A. reimbursed to K Amadou 180 K EUR. The reason for this reimbursement is not mentioned.
In 2000, K Amadou acts as intermediary for the transit and customs fees – (negotiation with Transit Benin). It's a known fact that the transaction negotiated with Transit Benin was very unbalanced for Titan.
K Amadou acts currently as a master distributor for the sale of Libercom products and then the relation with Titan Africa S.A (his payment collected on the pledge account)
As per subsequent review, we learnt that the new general manager in Benin, Luc Tanoh, is looking to correct the company registration documents.

### 6.   IMPORTANT PURCHASE OF IMMATERIAL SERVICES

In the frame of the launch of Libercom, many purchases were done on the behalf of Titan Africa S.A. (see point here above on the transaction with no legal frame)

#### A.   Afrique Conseil

We outsourced to Afrique Conseil most of the campaign for the launch of the brand Libercom, We paid to them a minimum of 1,5 mio EUR, for 3 kinds of services:

❑ Intermediary for the advertising campaigns: TV & radio announcement, add in Newspapers, etc...on a random basis, they send to Titan Africa some support (underlying invoices from the TV channel LC2, newspaper copy, etc...)

❑ Consultant for the brand launch. Titan paid at least a market study of 72 K eur for the launch of the brand.( January 2000)

❑ We outsourced to Afrique Conseil the payment of sellers for the launch of Libercom

8/8

Between April & July 2001, we paid on behalf of Afrique Conseil on a quasi-continuous basis:
- ✓ 1 Expert                6.860 Eur/Month
- ✓ 1 partner               4.575 Eur/Month
- ✓ 1 junior                3.050 Eur/Month
- ✓ 5 supervisor salesmen   1.143 Eur/month
- ✓ 86 to 101 salesmen      458 Eur/Month

We do not find all invoices related to these services, I estimate roughly payments to 200 k EUR.
To assess the reasonableness of the 'consultant' number, we found the attendance/ pay sheet for August 8 & 9th, 2000. We count:
- ▪ 8 distributors of small poster and newspapers, paid a maximum of 7 Eur days (140 Eur months)
- ▪ Travel costs paid to 16 persons.

Without being sure of the exhaustiveness of this listing, and even if we don't find the AC invoice for August, both the quantity of salesmen and the price invoiced seem quite suspicious.
The company is a SARL (Limited Liability Cy) with a share capital of 1.000.000 CFA- (1 525 Eur). Share capital has no proportion with the turnover of the company (at least 1,5 mio Eur from Titan)
No invoice from Afrique Conseil mentions VAT.
To finish, employee tips mentions friendship relationship between the AC treasurer J Houessou and the Libercom management. We could also mention a decharge signed by J HOESSOU to Eliane ( Titan Africa) mentioning the withdraw from our petty cash of 4,5 K Eur for 'current expense to Justify'

### B. Multi Media

We paid to Multimedia a minimum of 320 K EUR for purchase of Libercom T Shirt, Titan Polo and poster Campaign. Prices invoiced make sense, but we were unable to check the quantity (no delivery bill nor inventory follow up).
Invoices comprise the numerical sequentiality, the INSAE number but not the VAT. However, this could be a common practice in Benin.

We found suspicious that the CEO of MM (Boris JOHNSON), withdrew directly 3.5 K eur on Titan Ecobank account (07 Apr 00). We don't identify the link mr Sylvestre JOHNSON, that withdrew cash as of 08 & 09 November 00 of 5 793 Eur and 9 146 Eur. Direct withdraws may however be a common payment practice in Benin.

### C. Plastic bag purchase

We purchase plastic bag for a price of 1200 CFA (1,8 Eur) to many companies

- ❑ During April 2000, Titan purchased 6 667 bag (8 000 eur) to 2m design - Eliane GOUMEY - Interior decorator. Without finding any invoice, we also purchase bag for 3000 eur in June 2000.
There is no obvious link between the Interior decorator and the plastic bag manufacturing. We found other invoices from 2M related to curtains purchase (immaterial).
None of the invoice mention VAT.
- ❑ As of June 15, 2000, the company Afrique Finance International (CEO Lucien KIKI), provide us with 50 000 bags, with no mention of the underlying price. The company is presented as being a service provider in financial engineering & management consulting. The Titan purchase manager (F. Tomese) sign the contract

### D. Other consultant project

- We paid to Genie d'Afrique Consultant 7 625 K eur as a project study for the BCT, paid in cash to Mrs Anita AGUENOUKOUN. The invoices as none of the legal mention ( VAT, address, Insae number, etc…).
- As of May 22, 2000 We paid to Finance Consultant Associés ( Hyppolyte WOLOU) 7 110 Eur. We have no mention on the invoice of the service rendered. We could however mention that the phone number given on the page header is different from the legal company stamp.

### E. Other suppliers: Atelier d'Impression IB

Titan Africa paid at least 40 K eur to Atelier d'Impression IB for miscellaneous stickers, polo, etc…. .

We do not have the delivery bill nor the INSAE number. Moreover, We note that:

- The phone number is different from one invoice to another
- We paid cash Mr Herve GBO for the service. Mr GBO made a withdrawal for 500 K CFA as of 09/22/00 on the Ecobank OPEX account. We didn't know to what extend this withdraw could be a normal payment.

### F. Commissions in Petty Cash

Even if known by Titan management, we could note that an amount of 780 mio CFA (1,2 Mio Eur), was paid in Petty cash in 4 payments between January & march 2001. The beneficiary is not specified.

---

### NEW OFFICE

---

Titan Africa S.A. plans to move the office space from Villa Fadoul to an office space located in downtown Cotonou (Adjibi building). We visit the proposed premise that presents the following advantages:

- Cheaper place for nearly the same surface.( 600.000 CFA/Month instead of 1.200.000 CFA)
- Possibility to install the mirror billing in the premise, as close to the Libercom building.
- More professional place. (Open spaces)
- BOA agency at the ground flour, that could facilitate the follow up of the pledge account.
- More visibility of the company as located close to Libercom & Telecel building, in one of the most recent building of the town.
- New location permits to have easily a link with the Afripa WLL. (Afripa Antenna is at less that 500 Meters with no obstacle)

The drawback is a less pleasant location (polluted avenue)

We estimate that moving the Titan Africa's office is reasonable, following criteria listed here above. We learnt by subsequent review that the new office is not yet chosen, and that the new project manager (Luc TANO) envisions several new locations.

10/10

---

**APPENDIX**

---

**BANK STATEMENTS INFORMATION**

The sleeping accounts have the following references:

| | |
|---|---|
| Continental Bank | 10-021265-8004- 000 |
| Continental Bank | 10-021351-8041- 000 |

| | |
|---|---|
| Ecobank Titan  General d'Afrique BCT | 1.179110.003507 |
| Titan Africa Libercom | 1.179110.002503 |
| Titan – Projet GSM | 1.017919.001502 |

The "official" is the Ecobank OPEX 10179110001507

**Transaction Générale d'Afrique**

On the OPEX account 10179110001507
Transfer de fond incoming cash   1,702,807,952 CFA, transact° FT015200020 value date 20/02/01
Transfer de fond outgoing cash   1,702,807,952 CFA, transact° FT015200174 value date 20/02/01

On the Ecobank Titan  General d'Afrique BCT   10179110003507
Transfer de fond incoming cash   1,702,807,952 CFA, transact° FT01500053 value date 26/02/01
Transfer de fond outgoing cash   1,702,807,952 CFA, transact°  FT01500178 value date 20/02/01

**Transaction Titan Projet GSM**

On the Ecobank Titan – Projet GSM      1.017919.001502
Transfer de fond incoming cash   31,576,000 CFA, transact° Bd  628096 value date 20/11/00
Transfer de fond outgoing cash   31,576,000 CFA, transact°  FT003280016 value date 23/11/00
The cash finally arrived on the Titan – Ecobank account

**Transaction on the account Afripa Libercom**

In April & May 2000, payment arrives on this bank account for an amount of 388,995,000 CFA (593 K EUR). As of 31/05/00 an amount of 100,000,000 CFA (152 450 EUR) was paid with the check number 0868101 (transaction 110009004). We don't find the final destination of this payment that was not booked in the Excel spreadsheet "Accounting".

*To ensure the exhaustiveness of the bank statement collected, the following wires are mentioned as being transfer between accounts of the Company on the Ecobank operating account with the other account collected:*

| Date | CFA | EUR | Destination account | Support |
|------|-----|-----|--------------------|---------|
| | | | | Mention of a loan in the |
| 03/22/2000 | (1 449 210 000) | (2 209 306) | | Libellé |
| 06/30/2000 | (100 000 000) | (152 449) | | |
| 07/12/2000 | (2 000 000) | (3 049) | | |
| 11/23/2000 | 31 576 000 | 48 137 | | |
| 02/16/2001 | (3 617 817) | (5 515) | | |
| | | | Account Titan | |
| 03/08/2001 | (1 702 807 952) | (2 595 914) | Générale d'Afrique | |
| | | | | Letter from Steve HEAD, |
| 02/26/2001 | (100 000 000) | (152 449) | | request of transfer |

## DETAIL OF THE TRANSACTION WITH BANK SECRECY HEAVEN (Luxembourg/ British Virgin Island)

As per invoice drafted in Paris as of April 28, 2000, purchase of 5 000 phones siemens c25 for a purchase price of 1.094 FRF per unit, arrived by the flight SN 625.

Seller : ENITO SA
10 Avenue de la Faïencerie
L 1510 Luxembourg
Hood office
Omar Hodge Building
Wickam's Cay
Tortola
British Virgin Island

CEO: G TOSSOU

As per letter from Steve Head dated May 11, 2000, Titan advance the customs duties for an amount of 367 172, 61 FF

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2.     That on July 18, 2005, declarant served the FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTY by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of July, 2005, at San Diego, California.

_Vicki J. Rogers_
_____
VICKI J. ROGERS

TITAN CORP. SEC (LEAD)
Service List -  7/18/2005 (04-0176)
Page 1 of 2

**Counsel For Defendant(s)**

* William E. Grauer
Koji F. Fukumura
Cooley Godward LLP
4401 Eastgate Mall
San Diego, CA  92121
  858/550-6000
  858/550-6420 (Fax)

* Robert W. Brownlie
Mark H. Hamer
Noah A. Katsell
DLA Piper Rudnick Gray Cary US LLP
4365 Executive Drive, Suite 1100
San Diego, CA  92121-2133
  858/677-1400
  858/677-1401 (Fax)

**Counsel For Plaintiff(s)**

Stan S. Mallison
Law Offices of Stan S. Mallison
1042 Brown Avenue, Suite A
Lafayette, CA  94549
  925/283-3842
  925/283-3826 (Fax)

Brian O. O'Mara
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
401 B Street, Suite 1600
San Diego, CA  92101-4297
  619/231-1058
  619/231-7423 (Fax)

Reed R. Kathrein
James W. Oliver
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111-5238
  415/288-4545
  415/288-4534 (Fax)

Brian P. Murray
Eric J. Belfi
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY  10016
  212/682-1818
  212/682-1892 (Fax)

*Indicates service by overnight mail.

TITAN CORP. SEC (LEAD)
Service List -  7/18/2005  (04-0176)
Page 2 of  2

Brian J. Robbins
Jeffrey P. Fink
Caroline A. Schnurer
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA  92101
   619/525-3990
   619/525-3991 (Fax)

Lawrence A. Sucharow
Ira A. Schochet
Goodkind Labaton Rudoff &
Sucharow, LLP
100 Park Avenue, 12th Floor
New York, NY  10017-5563
   212/907-0700
   212/818-0477 (Fax)

Laurence D. Paskowitz
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, NY  10165
   212/685-0969
   212/685-2306 (Fax)